**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

CAYUGA NATION, by and through its lawful governing
body, the CAYUGA NATION COUNCIL,

                              Plaintiff,                          5:22-cv-00128 (BKS/ATB)

v.

DUSTIN PARKER, NORA WEBER, JOSE VERDUGO,
JR., ANDREW HERNANDEZ, PAUL MEYER,
IROQUOIS ENERGY GROUP, INC., JUSTICE FOR
NATIVE FIRST PEOPLE, LLC, C.B. BROOKS LLC, and
JOHN DOES 1–10,

                              Defendants.

---

**Appearances:**

*For Plaintiff:*
David G. Burch, Jr.
Michael E. Nicholson
Gabriel M. Nugent
Barclay Damon LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, New York 13202

*For Defendants Dustin Parker, Nora Weber, and Andrew Hernandez:*
Daniel Hurteau
Nixon Peabody LLP
677 Broadway, 10th Floor
Albany, New York 12207

*For Defendants Paul Meter, Justice for Native First People, LLC, and C.B. Brooks LLC:*
David H. Tennant
Law Office of David Tennant PLLC
3349 Monroe Avenue, Suite 345
Rochester, New York 14618

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiff Cayuga Nation, through its governing body, the Cayuga Nation Council, brings this action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. (Dkt. No. 1). The Cayuga Nation generally alleges that Defendants Dustin Parker, Nora Weber, Jose Verdugo, Jr., Andrew Hernandez, Paul Meyer, Iroquois Energy Group, Inc., Justice for Native First People, LLC, C.B. Brooks LLC, and John Does 1–10, are engaged in an unlawful scheme to co-opt the Nation's sovereign rights, erode its business and customer base, and steal its revenues "through the illegal sale of untaxed and unstamped cigarettes and marijuana, and various other merchandise" on the reservation. (*Id.* ¶ 2). Defendants are alleged to have committed a pattern of racketeering activities under § 1961(1), including trafficking in contraband cigarettes (18 U.S.C. §§ 2341–2346), money laundering (18 U.S.C. § 1956), engaging in monetary transactions in property derived from specified unlawful activity (18 U.S.C. § 1957), and distributing or possessing a controlled substance (21 U.S.C. § 841). Presently before the Court is the Cayuga Nation's motion for a preliminary injunction under Federal Rule of Civil Procedure 65 enjoining Defendants from opening or operating any business from the property located at 7153 State Route 90N in Montezuma, New York, (Dkt. No. 2), and Defendants'[1] motions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6). (Dkt. Nos. 34, 35). The motions are fully briefed. (Dkt. Nos. 30, 31, 37, 40, 44, 45). The Court heard oral argument on May 4, 2022. For the

---

[1] The motions to dismiss were filed on behalf of Defendants Dustin Parker, Nora Weber, Andrew Hernandez ("the Parker Defendants"), (Dkt. No. 34), and Defendants Paul Meyer, Justice For Native First People, LLC and C.B. Brooks LLC ("the Meyer Defendants"), (Dkt. No. 35); the Court's references to "Defendants" in this decision refers to all of these Defendants.

reasons that follow, Defendants' motions to dismiss under Rule 12(b)(1) are denied, and this action is stayed pending the parties' notification of the exhaustion of proceedings in Cayuga Nation Civil Court.

## II.     FACTS[2]

### A.     The Cayuga Nation Reservation – Cigarette Manufacturing and Sales

The Cayuga Nation is a federally recognized sovereign Indian Nation governed by the Cayuga Nation Council. (Dkt. No. 1, ¶ 11). In the Treaty of Canandaigua of 1794, 7 Stat. 44, "the United States recognized a federal reservation for the Cayuga Nation comprising 64,015 acres—located within what today are Seneca and Cayuga Counties in upstate central New York." (*Id.* ¶ 25). As a sovereign Indian nation, the Cayuga Nation is entitled to conduct "certain economic activity on its own reservation free from state tax and regulatory laws, even in transactions with non-Indians." (*Id.* ¶ 35). The Cayuga Nation's activities include, as relevant here, manufacturing Cayuga brand cigarettes, sale of cigarettes "wholesale" from a warehouse in Seneca Falls "to retail stores and various businesses located within the Cayuga Nation's border," and operation of "convenience stores on tribal land," (Dkt. No. 30-1, ¶ 9; Dkt. No. 30-2, ¶¶ 2–3), where the Cayuga Nation sells Cayuga and other "native-brand cigarettes," as well as premium-brand cigarettes, (Dkt. No. 30-2, ¶¶ 4–6), to "enrolled Cayuga members and to non-Indians," (Dkt. No. 37-1, ¶ 8). The Cayuga Nation maintains that to the extent it sells the Cayuga and other "native-brand cigarettes" "unstamped or untaxed," "it does so in compliance with the law and under the unique privilege afforded to it as an Indian nation." (Dkt. No. 37, at 7 n.2). It is undisputed, however, that while premium brand cigarettes sold to members of an Indian Nation

---

[2] The facts set forth herein are drawn from the Complaint and the exhibits attached thereto, as well as the exhibits submitted by the parties in connection with Plaintiff's motion for a preliminary injunction. (Dkt. Nos. 1, 2, 7, 30, 31, 37, 47).

for their own personal use are tax-exempt, New York's excise tax scheme requires that all premium brand cigarettes, even those sold on the Cayuga Nation reservation, have tax stamps.[3]

Regarding the sale of unstamped and untaxed Cayuga brand and other Native brand cigarettes, counsel for the Cayuga Nation explained at oral argument that because the Cayuga Nation is a sovereign Nation, only the Nation can sell Cayuga brand or other Native brand cigarettes. Counsel further explained that there are nations in New York that license individual members to sell Native brand cigarettes on reservation land, but that Defendant Dustin Parker has received no license from Cayuga Nation.

### B.      The Cayuga Nation Ordinance

The license to which counsel for the Cayuga Nation referred, is provided for in the Cayuga Nation's Amended and Restated Business License and Regulation Ordinance (the "Ordinance"). The Ordinance prohibits the operation of "any type of business on Nation land without a business license issued by the Nation pursuant to this Ordinance." (Dkt. No. 47-1, at 12). As relevant here, the Ordinance further provides that "[n]o license shall issue to, or be held by, any person who . . . is engaging, or seeks to engage, in any business that, directly or indirectly, competes in whole or in part with any business conducted by the Nation or an entity or enterprise owned or controlled by the Nation." (*Id.* at 13).

B.J. Radford, the Chief Financial Officer ("CFO") of the Cayuga Nation, states that "because of the sovereign rights the Nation properly may exercise on its own reservation, which

---

[3] Tax stamps evidence prepayment of New York cigarette excise taxes and are affixed to cigarettes, or cigarette packaging, by licensed tax-stamping agents, often wholesale dealers, after paying the excise taxes. *New York v. Grand River Enters. Six Nations, Ltd.*, No. 14-cv-910, 2020 WL 12969527, at *3, 2020 U.S. Dist. LEXIS 236928, at *7 (W.D.N.Y. Dec. 15, 2020) (citing N.Y. Tax L. ("NYTL") § 471). *See New York v. Mountain Tobacco Co.*, 942 F.3d 536, 540 (2d Cir. 2019). "All cigarettes sold by agents and wholesalers to Indian nations or tribes or reservation cigarette sellers located on an Indian reservation must bear a tax stamp." NYTL § 471(2).

is recognized under both federal and state law," the Nation generates "significant revenues from cigarette sales." (Dkt. No. 37-1, ¶ 15). CFO Radford further states that:

> The Nation uses the proceeds from these cigarette sales to raise critical revenues for essential Cayuga governmental programs for its citizens and the public, to make quarterly distributions to its citizens, and to help the Nation reacquire lands on its reservation.
>
> The governmental programs funded by the Nations' cigarette sales include payments for health care services for Cayuga members, educational scholarships for Cayuga children, and housing assistance for Cayuga citizens. The Nation makes meat and vegetable distributions to more than 100 Cayuga households.

(*Id.* ¶¶ 1, 11–12). CFO Radford states that "cigarette sales help fund the Cayuga Nation's police department—which protects Nation members, Nation properties, and non-Indian customers who come to the reservation for gaming, purchases of cigarettes and other goods, and other activities—and the Nation's tribal court, as well as other essential governmental programs." (*Id.* ¶ 13). Even though the Cayuga Nation is not required to pay property taxes, it supports local communities through donations. (*Id.* ¶ 14). For example, "on September 17, 2020, the Nation made a $200,000 donation to the Union Springs Fire Department to support the purchase of 28 state-of-the art, self-contained breathing apparatuses to be used by firefighters." (*Id.*).

### C.    Opening of Pipekeepers Smoke Shop on the Cayuga Nation Reservation

#### 1.    Seneca Falls Pipekeepers

In May 2021, Defendant Paul Meyer,[4] the sole member of Justice for Native First People, LLC, signed a four-year commercial lease agreement on behalf of the LLC for a commercial property, owned by the Seneca-Cayuga Nation of Oklahoma but within the boundaries of the

---

[4] Meyer is not Native American. (Dkt. No. 30-3, ¶ 7).

Cayuga Nation reservation, located at 126 E. Bayard Street in Seneca Falls, New York.[5] (Dkt. No. 30-3, ¶¶ 2–3; Dkt. No. 1, ¶ 37). Meyer states that "[i]n anticipation of subletting the property," which had previously been used as a convenience store and gasoline station, he "invested $80,000 to recommission the gas pumps" and updated the property. (Dkt. No. 30-3, ¶ 4). In June 2021, Defendant Dustin Parker, "an enrolled member of the Cayuga Nation," approached Meyer and "expressed interest in subletting the space . . . to operate a smoke shop and gas station." (Dkt. No. 31-1, ¶ 5; Dkt. No. 30-3, ¶ 6). In August 2021, Meyer and Parker agreed to a "four-year sublease . . . to run concurrently with" the underlying lease. (Dkt. No. 30-3, ¶ 8; Dkt. No. 30-1, ¶ 12).[6] In September 2021, Parker registered "Pipekeepers" as a business with Seneca County, "filed for a business license with the Town of Seneca," and obtained an inspection of the "business and property" by the Town of Seneca Enforcement Officer. (Dkt. No. 30-1, ¶ 13–15). However, Parker did not obtain a business license as required by the Cayuga Nation Ordinance. (Dkt. No. 47-1, at 28).

"On September 4, 2021, Pipekeepers began operations as a small retail convenience store." (Dkt. No. 30-1, ¶ 16). Parker "noted on [Pipekeepers] signage that the store owner . . . was a member of the Cayuga Nation," (*id.* ¶¶ 17–18), and photographs in the record show a large sign outside the store that says: "Cayuga Nation Bayard Street Store," (Dkt. No. 1-1, at 5). Parker managed and operated the business and his wife, Nora Weber, assisted "with the day-to-day operations and maintain[ed] the stores [sic] financial books." (Dkt. No. 30-1, ¶ 20). Parker purchased his "inventory from other neighboring Nations." (*Id.* ¶ 32).

---

[5] According to the Complaint, the lease between Justice for Native First People, LLC and the Seneca-Cayuga Nation was "upon information and belief" for the "below market rate of $1,000 per month." (Dkt. No. 1, ¶ 39).

[6] According to the Complaint, "Justice for Native First People permitted Defendant Parker to operate the Pipekeepers business from the Property for a substantial payment each month, essentially profiting from the Pipekeepers' illicit cigarette business." (*Id.* ¶ 40).

David Miller, a private investigator retained by the Cayuga Nation Police Department, visited the Seneca Falls Pipekeepers store in November 2021, and provided a declaration summarizing the visit as follows. (Dkt. No. 1-1, at 1–3). Miller observed Defendant Parker working behind the counter inside the store and wearing "a badge that stated 'Indian Police.'" (*Id.* at 2, 7). The store had "displays of numerous brands of Native American manufactured cigarettes." (*Id.* at 2, 7, 9–12). Miller asked Defendant Parker for, and purchased, a "bag of loose cigarettes" or "rollies," a "pack of Seneca cigarettes, which are a Native brand of cigarettes," and a pack of "Newport Menthol cigarettes, which are a national premium brand." (*Id.* at 2, 14, 16, 18). "None of the packages [Miller] received had any tax stamps affixed" and the receipt for the cigarettes did "not indicate any sales taxes were collected." (*Id.* at 2–3, 20).[7] Sergeant Kenneth Smith, a member of the Cayuga Nation Police Department states that Parker was also "illegally selling marijuana" at the Seneca Falls Pipekeepers. (Dkt. No. 2-2, ¶ 5).

According to Parker, in December 2021, Clint Halftown and Sharon Leroy, Cayuga Nation representatives, visited Pipekeepers and Halftown demanded that Parker "stop Pipekeepers [sic] business operations."[8] (Dkt. No. 30-1, ¶¶ 6–7, 25). Parker "rejected Halftown's demand" and Halftown "threatened to levy fines against Pipekeepers for failure to comply." (*Id.* ¶¶ 27–28).

---

[7] At oral argument, the parties agreed that neither the Cayuga Nation nor a member of the Cayuga Nation can legally sell "rollie" cigarettes or unstamped premium brand cigarettes like Newports.

According to Meyer, on or about November 21, 2021, the Seneca-Cayuga Nation informed him that the Cayuga Nation "was objecting to the smoke shop operated by my subtenant, apparently because it was cutting into their profits" and claiming that the smoke shop was illegal. (Dkt. No. 30-3, ¶ 10). In response, Meyer obtained a legal opinion from Attorney Michael Rhodes-Devey concerning the operation of a smoke shop by an enrolled Cayuga Nation member, which he provided to the Seneca-Cayuga Nation. (*Id.* ¶¶ 11–12; Dkt. No. 30-4, at 2–4 (legal opinion)).

[8] Parker states that as "representatives in the Cayuga Nation, Halftown and Leroy have a great deal of power on [sic] the Nation's decision-making" and refers to them as the "Halftown faction." (Dkt. No. 30-1, ¶¶ 8–9).

On or about December 22, 2021, the Cayuga Nation purchased the 126 E. Bayard Street property from the Seneca-Cayuga Nation. (Dkt. No. 1, ¶ 4; Dkt. No. 47-1, at 25–26).[9] On January 1, 2022, the Cayuga Nation assumed possession of the property. (Dkt. No. 1, ¶ 49). According to the Complaint, the Cayuga Nation "found cigarettes totaling over 10,000,000" at the Seneca Falls Pipekeepers. (*Id.* ¶ 53). The Complaint alleges that Defendants "shipped, transported, received, possessed, sold, distributed, or purchased contraband cigarettes or contraband smokeless tobacco in violation of the Contraband Cigarette Trafficking Act, 18 U.S.C. §§ 2341–46." (*Id.*).

According to Parker, in January 2022, "Halftown" opened a convenience store and smoke shop, renamed Lakeside Trading, at the 126 E. Bayard Street location. (Dkt. No. 30-1, ¶ 46). Parker states that when the Cayuga Nation took over the 126 E. Bayard Street property, it confiscated "approximately $200,000 in inventory" and gas "with a retail value of approximately $400,000," and "[b]ased on the brands . . . being sold," he "believe[s] Lakeside is selling [his] inventory." (*Id.* ¶¶ 42, 47).

### 2.    Montezuma Pipekeepers

On January 12, 2022, Meyer's other LLC, Defendant C.B. Brooks LLC, sold 7153 State Route 90 in the Town of Montezuma, a residential home, to Parker for $180,000. (Dkt. No. 2-2, ¶ 6; Dkt. No. 7-1, at 4; Dkt. No. 31-1, ¶¶ 19, 22).[10] Parker purchased this property "with the intention[] of opening up a new Pipekeepers store" ("Montezuma Pipekeepers"). (Dkt. No. 30-1,

---

[9] Parker avers that "Halftown, and the Halftown Faction, purchased 126 E. Bayard Street, Seneca, New York." (Dkt. No. 30-1, ¶ 33). There does not, however, appear to be any dispute that the property was purchased by the Cayuga Nation.

[10] C.B. Brooks LLC "purchased the property on July 8, 2021, for $30,000." (Dkt. No. 31-1, ¶ 19). Meyer described the property as "a vacant four bedroom single family dwelling in dilapidated shape and an overgrown 1.5 acre lot filled with junk." (*Id.*). Meyer avers that he "undertook extensive work to clear the lot and repair the interior and exterior to maximize the property's value for commercial use" and paid for "professional tree removal, track earth moving equipment," and junk removal. (*Id.* ¶ 21).

¶ 48). Parker states that the "property is zoned commercial and the business has obtained all necessary permits." (*Id.* ¶ 49).[11] According to Parker, the "new Pipekeepers has no affiliation to or materials that would demonstrate an affiliation with Halftown's faction." (*Id.* ¶ 50). The Cayuga Nation submitted pictures of the Montezuma property, which show a blue house with a wood fence. (Dkt. No. 7-2, at 1–3). The pictures do not show any signs. (*Id.*).

Sergeant Smith stated in a declaration dated February 9, 2022, that he "received information from an anonymous source that someone who has been 'selling weed' was possibly moving his sales operation to a new location . . . more specifically, to a blue house right behind a Circle K convenience store in the Town of Montezuma" and that "it was supposed to be a 'drive-through' style operation." (Dkt. No. 2-2, ¶¶ 3–4). Parker confirms in an affidavit dated March 15, 2022, that "[i]n February 2022, the [Montezuma] property was retrofitted to accommodate drive through services." (Dkt. No. 30-1, ¶ 51). Parker states that he also installed surveillance cameras and fencing, to ensure the safety of [his] staff and property." (*Id.* ¶ 52). "The new Pipekeepers store was opened on February 12, 2022." (*Id.* ¶ 53). There is no evidence presently before the Court showing what is being sold by the Montezuma Pipekeepers.

## III.    MOTIONS TO DISMISS – Fed. R. Civ. P. 12(b)(1)

### A.    Standard of Review

"Dismissal for lack of subject matter jurisdiction is proper 'when the district court lacks the statutory or constitutional power to adjudicate' a case." *Sokolowski v. Metro. Transp. Auth.*,

---

[11] The zoning of the Montezuma property is disputed. Sergeant Smith states that he was "informed by Nation Counsel Lee Alcott that this house is located in an agricultural/residential zoning district which would not permit the use of the property as a retail business." (Dkt. No. 2-2, ¶ 4). The "Tax Map ID/Property Data" regarding the Montezuma property states "In Ag. District." (Dkt. No. 1-2, at 1). Meyer states that "[a]t the time of purchase, not-up-to-date property tax records indicated the property was residential, but the zoning map designated it for commercial use." (Dkt. No. 31-1, ¶ 20). Any dispute relative to the zoning of the Montezuma property is immaterial to the resolution of the present motion.

723 F.3d 187, 190 (2d Cir. 2013) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). The Court will "take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). In resolving a motion to dismiss for lack of subject-matter jurisdiction, the Court may consider competent evidence outside the pleadings, such as affidavits and exhibits. *Makarova*, 201 F.3d at 113. "Where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings." *Tandon*, 752 F.3d at 243 (quoting *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003)). A plaintiff asserting subject-matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists. *Id.*

    **B.    Discussion**

    Defendants argue that this Court lacks subject matter jurisdiction over this case because it "lacks jurisdiction over" disputes of tribal law.[12] (Dkt. No. 34-1, at 8). The Cayuga Nation responds that there is no dispute concerning tribal law in this case and that "this Court clearly has subject matter jurisdiction over this case" because the Complaint alleges "a plainly-labeled civil RICO action under 18 U.S.C. § 1964(c)." (Dkt. No. 40, at 6). The Court finds it has the authority to determine this case.

    It "is 'a bedrock principle of federal Indian law that every tribe is capable of managing its own affairs and governing itself.'" *Tanner*, 824 F.3d at 327 (quoting *Cal. Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1263 (D.C. Cir. 2008)). Thus, "federal courts lack authority to

---

[12] In their papers, Defendants refer to this as a doctrine depriving the Court of jurisdiction when there is an "intra-tribal dispute," i.e., a dispute between a tribe and its members. (Dkt. No. 34-1, at 8). The doctrine on which Defendants rely, however, concerns a court's authority to "resolve internal *disputes about tribal law*." *Cayuga Nation v. Tanner*, 824 F.3d 321, 327 (2d Cir. 2016) (emphasis added). Assuming subject matter jurisdiction is otherwise present, and, as discussed *supra* Section IV., the tribal exhaustion rule is not implicated, the Court would not necessarily be prevented from deciding a case involving an intra-tribal dispute.

resolve internal disputes about tribal law." *Id.* (citing *Shenandoah v. U.S. Dep't of Interior*, 159 F.3d 708, 712 (2d Cir. 1998)); *see also id.* at 328 (explaining that "federal courts are forbidden" "to answer disputed questions of tribal law"). If, however, the Court "does not need to address the question [of tribal law] in order to establish jurisdiction," the case may proceed. *Id.*; *see also Miccosukee Tribe of Indians of Fla. v. Cypress*, 814 F.3d 1202, 1208–09 (11th Cir. 2015) ("[C]ertain issues are, by their very nature, inherently reserved for resolution through purely tribal mechanisms due to the privilege and responsibility of sovereigns to regulate their own, purely internal affairs (and due to the concomitant impropriety of the federal courts dictating answers to such questions). Examples of such issues include membership determinations, inheritance rules, domestic relations, and the resolution of competing claims to tribal leadership." (citing *Montana v. United States*, 450 U.S. 544, 564 (1981)).

In *Tanner*, the Cayuga Nation sued the Village of Union Springs regarding the opening of "a Nation-owned gaming facility" and whether a local anti-gambling ordinance was preempted by the federal Indian Gaming Regulatory Act. 824 F.3d at 324. The parties disputed whether the individual bringing the action, Clint Halftown,[13] was "authorized by tribal law to initiate the lawsuit on behalf of the Nation." *Id.* at 327. Guided by the principle that "federal courts lack authority to resolve internal disputes about tribal law," the Second Circuit concluded that "it lack[ed] jurisdiction to resolve the question of whether this lawsuit was properly authorized" by Halftown on behalf of the Cayuga Nation "as a matter of *tribal law*." *Id.* at 328. The Circuit ultimately found, however, that it could determine the action without resolving an issue of tribal law because the Bureau of Indian Affairs, which was part of the Executive Branch, and to which

---

[13] This appears to be the same Halftown referenced in the submissions in this case. While Defendants' reference to the "Halftown faction" suggests that Halftown's status as federal representative continues to be contentious, there is no argument that this lawsuit was not properly authorized.

the court was entitled to defer, had recognized Halftown as "authorized to act on behalf of the Nation." *Id.* at 330.

Here, Defendants argue that the application of the Ordinance "lies at the heart" of the present suit and therefore that the Court lacks jurisdiction to resolve the question of whether Pipekeepers' sale of untaxed, unstamped premium and Native-brand cigarettes, rollies, and marijuana was legal. (Dkt. No. 34-1, at 9). The Court disagrees. The Ordinance concerns only the licensing of businesses on the Cayuga Nation reservation and neither party has questioned the meaning or application of the Ordinance. Further, it appears that any determination regarding Defendants' conduct depends on an analysis of state law, which governs taxes on cigarettes sold in New York, *see* NYTL §§ 471, 471-e, and federal law, which continues to list marijuana as a Schedule I controlled substance, *see United States v. Blanding*, No. 21-cr-00156, 2022 WL 92593, at *2, 2022 U.S. Dist. LEXIS 4379, at *5 (D. Conn. Jan. 6, 2022) (explaining that "[t]he Controlled Substances Act classifies marijuana . . . as a Schedule I controlled substance" and possessing it "is illegal under federal law" (citing 21 U.S.C. §§ 812, 844)).

The Court notes, however, that there is some dispute between the parties concerning the legality of the Cayuga Nation's own activities. While the Cayuga Nation appears to acknowledge that it would violate federal or state law by selling unstamped premium brand cigarettes or rollies, it contends that it is its sovereign right to sell, on its reservation, untaxed and unstamped Native brand cigarettes, untaxed (but stamped) premium brand cigarettes, and marijuana but that Defendants violate the CCTA and federal drug laws by engaging in the same conduct because they are not operating under the cloak of tribal sovereignty.[14] Questions of whether a party is "an

---

[14] Notably, it is well-settled that the doctrine of sovereign immunity, which would immunize the Cayuga Nation from suit, "does not immunize individual members of the Tribe." *Puyallup Tribe, Inc. v. Dep't of Game of State of Wash.*, 433 U.S. 165, 171–72 (1977); *see Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59 (1978) (noting that individual tribal member was "not protected by the tribe's immunity from suit").

arm of a tribe" and protected by tribal sovereign immunity, which "applies to both the commercial and governmental activities of an Indian tribe, whether they take place on or off a reservation," *City of New York v. Golden Feather Smoke Shop*, No. 08-cv-3966, 2009 WL 705815, at *5, 2009 U.S. Dist. LEXIS 20953, at *14 (E.D.N.Y. Mar. 16, 2009) (citing *Kiowa Tribe v. Mfg. Techs.*, 523 U.S. 751, 760 (1998)), have been determined by federal courts, *see, e.g.*, *id.* 2009 WL 705815, at *5–6, 2009 U.S. Dist. LEXIS 20953, at *16–17 (discussing factors "courts have used to determine whether an organization is an arm of tribal government" and explaining that "[t]he question is . . . whether the entity acts as an arm of the tribe so that its activities are properly deemed to be those of the tribe" (quoting *Allen v. Gold Country Casino*, 464 F.3d 1044, 1046 (9th Cir. 2006)). Accordingly, as neither party has identified a dispute of tribal law, the Court concludes it has jurisdiction to decide the present RICO action and turns to the issue of tribal exhaustion. *See Miccosukee Tribe*, 814 F.3d at 1210 (finding that "jurisdiction over an otherwise justiciable RICO claim does not fail merely due to the suggestion that an issue of tribal law may arise").[15]

---

[15] Defendants rely on *Rabang v. Kelly*, where the plaintiffs, "'disenrolled' members of the Nooksack Indian Tribe," brought a RICO action against tribal council and tribal government members alleging that the defendants "abused their positions within the tribal government to carry out a scheme to defraud them of money, property, and benefits 'by depriving [them] of their tribal membership.'" 328 F. Supp. 3d 1164, 1166 (W.D. Wash. 2018), *aff'd*, 846 F. App'x 594 (9th Cir. 2021). The court noted that, "[i]n general, Indian tribes possess inherent and exclusive power over matters of internal tribal governance," and "[t]he determination of tribal membership has long been recognized as a matter of internal tribal governance to be determined by tribal authorities." *Id.* at 1167–68 (citing *Santa Clara Pueblo*, 436 U.S. at 72 n.32 (holding that tribes are immune from federal court jurisdiction in disputes regarding challenges to tribal membership)). Therefore, while noting that "federal courts have jurisdiction over RICO claims," because "the heart of Plaintiffs' RICO claims is a dispute about their membership in the Nooksack Indian Tribe," namely, "whether Defendants' actions were taken in accordance with Tribal law and the Nooksack Constitution," and, "resolution of their claims . . . would ultimately require the Court to render a decision about Plaintiffs' enrollment status," the plaintiffs "could not eliminate this inherent issue just by bringing their challenge as a RICO action." *Id.* at 1168. Here, unlike *Rabang*, which involved an issue inherently reserved to tribes, the only Tribal law the parties cite as impacting Defendants' operation of Pipekeepers is the Ordinance. Further, as there is no contention that the Court would be required to render a decision making any determination regarding the Ordinance to resolve this case, Defendants' reliance on *Rabang* is unavailing.

## IV.    TRIBAL EXHAUSTION[16]

The Parker Defendants raised the issue of "tribal exhaustion" in their reply memorandum of law, arguing that they had "[j]ust last week . . . learned that Plaintiff filed suit against them in Cayuga Nation Tribal Court."[17] (Dkt. No. 45, at 10, 12–13). Defendants submitted a copy of a March 11, 2022 order by a Cayuga Nation Civil Court Judge permanently enjoining Parker and Parker d/b/a Pipekeepers from "the operation of" the Montezuma Pipekeepers and assessing a fine of $1,000 per day for their violation of the Ordinance. (Dkt. No. 45-2, at 2–3). While the Cayuga Nation stated in the Complaint that "the Nation sought relief against Defendant Parker in the Cayuga Nation Civil Court," (Dkt. No. 1, ¶ 44), the Cayuga Nation otherwise provided no information about tribal proceedings. Accordingly, the Court issued a Text Order directing further briefing addressing "what impact, if any, the Cayuga Nation Civil Court's permanent injunction has on Plaintiff's application for a preliminary injunction," and what impact, if any, the Nation Court proceeding has on the tribal exhaustion rule. (Dkt. No. 46). The Cayuga Nation and the Parker Defendants filed supplemental briefing on these issues. (Dkt. Nos. 47, 48).

### A.    Cayuga Nation Civil Court Action

The documents submitted by the parties in response to the Court's text order reflect the following. On December 2, 2021, the Cayuga Nation obtained an order from the Cayuga Nation Civil Court ("Nation Court") enjoining Parker and Parker d/b/a Pipekeepers from the continued operation of Pipekeepers, and assessing a civil fine of $1,000 per day for their violation of the Ordinance. (Dkt. No. 47-1, at 20–21).

---

[16]"The exhaustion requirement is a 'prudential rule' based on principles of comity; it is not a jurisdictional prerequisite." *Bowen v. Doyle*, 230 F.3d 525, 530 (2d Cir. 2000) (quoting *Strate v. A–1 Contractors*, 520 U.S. 438, 453 (1997)).

[17] Although the Parker Defendants raised this argument in their reply, the Court invited further briefing from all parties on this issue, and thus it is properly before the Court. (Dkt. Nos. 46 to 48).

On February 10, 2022, the same day the Cayuga Nation filed the complaint and motion for preliminary injunction in this action, its counsel signed an amended Nation Court complaint against Parker and Parker d/b/a Pipekeepers. (*Id.* at 3–10). In its amended Nation Court complaint, the Cayuga Nation alleged that despite the permanent injunction issued on December 2, 2021, "Parker has simply relocated his Pipekeepers retail operation to a residential property in the Town of Montezuma," "within the Nation's federally-recognized reservation." (*Id.* at 4–5). The Cayuga Nation alleged that Parker and Pipekeepers continued to violate the Ordinance, (1) by operating a business on Nation land without a business license issued by the Nation pursuant to this Ordinance, and (2) by engaging in a "business that competes with any business conducted by the Nation or which constitutes a threat to the effective regulation of commerce on Nation land or to the health, safety, welfare, morals, or well-being of the Nation, its members, residents or neighbors." (*Id.* at 5). Based on these allegations, the Cayuga Nation sought a declaratory judgment declaring that Parker and Parker d/b/a Pipekeepers "are in violation of the Ordinance by their ownership and/or operation of Pipekeepers." (*Id.* at 9). The Cayuga Nation also sought a civil fine of $1,000 per day, an order directing the temporary closure of Pipekeepers for violation of the Ordinance, "removal of all persons engaged in the business of Pipekeepers," and an injunction enjoining Parker and Parker d/b/a Pipekeepers "from their continued operation of Pipekeepers." (*Id.* at 10).

On February 11, 2022, Cayuga Nation Civil Court Judge Joseph E. Fahey issued an Order temporarily enjoining and restraining Parker and Parker d/b/a Pipekeepers "from the continued operation of Pipekeepers," and directed that any opposition be filed by February 25, 2022. (*Id.* at 2). On March 11, 2022, Judge Fahey, noting that the Defendants had not "submitted any opposition," issued an order permanently enjoining Parker and Parker d/b/a Pipekeepers

"from the operation of Pipekeepers," and assessing a civil fine of $1,000 per day for "their violation of the Ordinance beginning February 17, 2022, the date service of the 'Notice of Violations' was made on Defendants, and continuing until such time as Pipekeepers ceases operations." (Dkt. No. 45-2, at 2–3). On March 21, 2022, the Clerk of the Cayuga Nation Civil Court, noting that the Nation Court had issued a default judgment against Parker and Pipekeepers, issued a judgment against Parker in the amount of $39,050.00. (*Id.* at 4–5).[18]

### B.   Impact of the Nation Court Injunction

The Cayuga Nation argues that the Nation Court injunction has no impact on its pending motion for a preliminary injunction because the "Nation Court Order relates only to the Ordinance, and applies only to Defendant Parker," and thus enjoins "none of the other Defendants . . . operating" the Montezuma Pipekeepers. (Dkt. No. 47, at 2). Defendants respond that the injunctive relief the Cayuga Nation is seeking from this Court—to enjoin the Montezuma Pipekeepers from operating—is essentially the same relief provided for in the injunction already issued by the Cayuga Nation Civil Court. (Dkt. No. 48, at 1). Defendants therefore argue that any injunction this Court issued would be "redundant" and threaten "to provide two opposing outcomes that makes enforcement of the injunction all the more complicated." (*Id.* at 1–2).

In the Second Circuit, courts have dismissed requests for injunctive relief as moot where an injunction issued by another court granting the same relief had already been issued. *See People v. Seneci*, 817 F.2d 1015, 1017 (2d Cir. 1987) (affirming dismissal of request for

---

[18] According to the parties, in addition to this proceeding and the Nation Court proceeding, the Cayuga Nation has also filed proceedings against Defendant Parker and/or Pipekeepers and other individuals in the Western District of New York, *Cayuga Nation v. Diebold, et al.*, No. 21-cv-00128, and the Supreme Court, County of Cayuga in March 2022, *Cayuga Nation v. Dustin Parker et al.* (Dkt. No. 48, at 1 n.1). In their supplemental brief, the Parker Defendants assert that the Cayuga Nation "is actively seeking to" enforce the Cayuga Nation Civil Court's injunction "in New York . . . Court." (*Id.* at 1–2). This is incorrect. As counsel for the Cayuga Nation represented at oral argument, the domestication proceeding is only about the money judgment aspect; the Cayuga Nation was not seeking in state court to convert the Nation Court injunction to a state court injunction. *See* Petition, *Cayuga Nation v. Parker*, Index No. E2022-0209 (N.Y. Sup. Ct. Mar. 22, 2022), ECF No. 1.

injunction where a state court had already granted plaintiffs "all of the injunctive relief requested in the present case"); *Marshel v. AFW Fabric Corp.*, 552 F.2d 471, 472 (2d Cir. 1977) ("[A]ny application for injunctive relief is now moot, in view of [a related state-court injunction]."); *Does 1-2 v. Hochul*, No. 21-cv-5067, 2021 WL 4172915, at *1, 2021 U.S. Dist. LEXIS 174822, at *3 (E.D.N.Y. Sept. 14, 2021) (denying motion for a temporary restraining order as moot where another federal district court had already "granted a TRO awarding the same relief that Plaintiffs seek here—namely, a TRO enjoining the State of New York from enforcing" vaccine regulation).[19]

It would appear that in view of the Nation Court's order permanently enjoining Parker and Parker d/b/a Pipekeepers "from the operation of Pipekeepers," the Cayuga Nation has already obtained all the preliminary injunctive relief sought in this case, and that its motion for a preliminary injunction is therefore moot. (*Compare* Dkt. No. 45-2, at 2 (Tribal Court order permanently enjoining Parker and Parker d/b/a Pipekeepers "from the operation of Pipekeepers"), *and* Dkt. No. 47-1, at 4 (Nation Court Amended Complaint identifying Pipekeepers' new location as 7153 State Route 90, Town of Montezuma, New York); *with* Dkt. No. 2, at 5 (proposed order to enjoin "Defendants from opening or operating any business from the property located at 7153 State Route 90N, Village of Cayuga, Town of Montezuma")).

The Cayuga Nation, however, argues that the Nation Court injunction applies "only to Defendant Parker – it does not apply to any of . . . the other eight named Defendants in these RICO proceedings"; that the Nation Court injunction "does not actually shutter the New

---

[19] There is no argument or suggestion that the injunction issued by the Nation Court is not entitled full faith and credit in this court or that it is otherwise unenforceable. *See Santa Clara Pueblo*, 436 U.S. at 66 n.21 ("Judgments of tribal courts, as to matters properly within their jurisdiction, have been regarded in some circumstances as entitled to full faith and credit in other courts." (citing *United States ex rel. Mackey v. Coxe*, 59 U.S. (18 How.) 100, 15 L.Ed. 299 (1856); *Standley v. Roberts*, 59 F. 836, 845 (8th Cir. 1894))).

Pipekeepers Store"; and that "neither Defendant Parker nor any of the other Defendants actively operating the New Pipekeepers Store have recognized the Nation Court Order, and the store continues to operate to this day." (Dkt. No. 47, at 2). The Cayuga Nation has not, however, explained or provided evidence as to why Defendants named in this case, but not in the Nation Court action, could operate Montezuma Pipekeepers without violating the Nation Court order permanently enjoining "Parker and Parker d/b/a Pipekeepers" from the operation of Pipekeepers. In any event, the scope of the Nation Court order is disputed by the parties and the interpretation of that order is critical to this Court's assessment of whether the request for injunctive relief is moot.

### C.      Analysis of the Tribal Exhaustion Rule

In general terms, when there is a proceeding in both tribal and federal court, the doctrine of tribal exhaustion requires that federal courts abstain from hearing certain claims relating to Indian tribes until those claims have been exhausted in tribal court. *Garcia v. Akwesasne Hous. Auth.*, 268 F.3d 76, 79 (2d Cir. 2001); *see Basil Cook Enters., Inc. v. St. Regis Mohawk Tribe*, 117 F.3d 61, 65 (2d Cir. 1997) ("[P]arties who challenge, under federal law, the jurisdiction of a tribal court to entertain a cause of action must first present their claim to the tribal court before seeking to defeat tribal jurisdiction in any collateral or parallel federal court proceeding.").

The Parker Defendants argue that the Court should abstain from determining this action until the claims in the Cayuga Nation Civil Court have been exhausted because the Nation Court "is a better venue to interpret [their] rights to operate their business under tribal law and ordinances." (Dkt. No. 45, at 12). The Cayuga Nation argues that the tribal exhaustion rule does not apply here because "no one has brought a federal action challenging the jurisdiction of a tribal court to entertain a cause of action," and because there are no further proceedings in the tribal court to exhaust. (Dkt. No. 47, at 4 (internal quotation marks omitted)).

The Cayuga Nation contends that "there are no further proceedings in the tribal court to 'exhaust'" because "[t]he Cayuga Nation Civil Court asserted jurisdiction and entered a final Order resolving the case on December 2, 2021," "[a]nd the time to appeal has expired." (*Id.*). But this appears to be factually incorrect. On February 10 or 11, 2022—the day of or the day after the filing of the Complaint this case—the Cayuga Nation filed an amended complaint in the Nation Court concerning the Montezuma Pipekeepers. (Dkt. No. 1; Dkt. No. 47, at 1; Dkt. No. 47-1, at 3–10). It appears that default judgment in the amount of $39,050 was entered in the Cayuga Nation Civil Court against Defendant Dustin Parker on March 21, 2022, and that the Cayuga Nation has filed a proceeding in New York State Court to domesticate that judgment. (Dkt. No. 45-2, at 4–5). The Court notes that in the state court action, counsel for Dustin Parker has sought an adjournment of the proceedings in order to file a motion for relief from the Nation Court judgment under Rule 26 of the Cayuga Nation Rules of Civil Procedure. *See* Letter for the Respondent Requesting Adjournment, *Cayuga Nation v. Parker*, Index No. E2022-0209 (N.Y. Sup. Ct. May 10, 2022), ECF No. 9. Similarly, in this action Parker's counsel has represented that that he "fully intends to pursue the defendants' tribal rights in the tribal forum to exhaustion." (Dkt. No. 48, at 3–4).

Rule 26 of the Cayuga Nation Rules of Civil Procedure, "Relief From Judgment or Order," allows for post-judgment motions for certain enumerated reasons "within a reasonable time period," and for, inter alia, mistake, newly discovered evidence, fraud or misconduct, or improper service, "not more than three (3) months after the judgment [or] order." Rule 26(b)(7). As not more than three months have passed since the Nation Court's March 11, 2022 order permanently enjoining the operation of Pipekeepers and the Nation Court's March 21, 2022 default judgment against Parker, it appears exhaustion is still possible. *See, e.g., Nat'l Farmers*

*Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 857 (1985) (remanding for abeyance or dismissal "[u]ntil petitioners," against whom default judgment had been entered in tribal court, "have exhausted the remedies available to them in the Tribal Court system"). Thus, it appears, there are remedies left to exhaust in Cayuga Nation Civil Court.

The Second Circuit, which itself has applied the tribal exhaustion rule only once, *see Basil Cook*, 117 F.3d at 61, has noted that the Supreme Court has applied the tribal exhaustion rule only twice, first in *National Farmers* and again in *LaPlante*,[20] and only in the "narrow context" of "the situation where a tribal court's jurisdiction over a dispute has been challenged by a later-filed action in federal court." *Garcia*, 268 F.3d at 82. The Circuit has acknowledged however, that the "policies underlying [the Supreme Court cases on tribal exhaustion] seem broader than this narrow context." *Id.* (*quoting Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803, 814 (7th Cir. 1993)). These policies include "the 'policy of supporting tribal self-government and self-determination,' the recognition that a 'federal court's exercise of jurisdiction over matters relating to reservation affairs can . . . impair the authority of tribal courts,' and the view that tribal courts 'play a vital role in tribal self-government.'" *Id.* (internal citations omitted) (quoting first *National Farmers*, 471 U.S. at 856, and then *LaPlante*, 480 U.S. at 14–15); *see also Basil Cook*, 117 F.3d at 65 (explaining that the tribal exhaustion rule not only "promotes tribal autonomy and dignity and encourages administrative efficiency by permitting the tribal courts to develop a full record prior to potential federal court involvement" but also "bolsters the legitimacy of tribal courts, encourages them to articulate fully the claims of jurisdiction, and enables later reviewing courts to take advantage of their expertise").

---

[20] *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9 (1987).

In *Basil Cook*, a "dispute over the management of a high stakes Bingo gaming establishment [('Bingo Palace')] on the reservation of the St. Regis Mohawk Tribe" arose between the Tribe and the plaintiffs—the Tribal members who operated the Bingo Palace. 117 F.3d at 63. "[E]scalating tensions between tribal officials and plaintiffs" led to the Tribe's ousting of the plaintiffs from the Bingo palace "with the aid of tribal police," followed by the Tribe's takeover of the operation of the Bingo Palace and seizure of records, property, and several thousand dollars in cash. *Id.* at 63–64. At or around the time of the seizure, Tribal officials served the plaintiffs with a tribal court complaint seeking monetary damages based on fraud, theft, conversion, and breach of fiduciary duties, and to quiet title to the Bingo Palace and its adjoining land. *Id.* at 64. The plaintiffs responded by (1) "denying the allegations and challenging the tribal court's jurisdiction over the dispute," and (2) filing suit under 42 U.S.C. § 1983 alleging unconstitutional deprivation of property and violation of state law of trespass, violation of the Indian Civil Rights Act, 15 U.S.C. § 1301–03, the *Bivens* doctrine,[21] and state law torts. *Id.* The plaintiffs moved in the district court "to enjoin further tribal court proceedings" and the defendants responded by moving to dismiss the complaint for failure to exhaust tribal remedies. *Id.* The district court "stayed further proceedings in federal court pending the Tribal Court's determination of jurisdiction." *Id.*[22] The Second Circuit affirmed, finding that the case fell "under any possible conception of the scope of tribal or reservation affairs" because:

> (1) both of the individual plaintiffs are enrolled tribal members of the St. Regis Mohawk Tribe and were engaged in a long-term, consensual business relationship with the Tribe; (2) the corporate defendant is controlled by enrolled members and similarly was engaged in a long-term business relationship with the Tribe; (3)

---

[21] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

[22] Regarding exhaustion, the Second Circuit explained: "Whether the decision by the tribal court constitutes exhaustion for the purposes of *National Farmers* depends on the procedures that exist at tribal law to challenge the ruling, and the Tribe's conception of an appealable order." *Basil Cook*, 117 F.3d at 68 (citing *LaPlante*, 480 U.S. at 16–17).

virtually all the events giving rise to the litigation occurred on reservation lands; and (4) the controversy involves the disposition of tribal resources, both the tribe's money and its land.

*Id.* at 66.

The Second Circuit again considered the tribal court exhaustion rule in *Garcia v. Akwesasne Housing Authority*, but found it inapplicable. 268 F.3d at 84. There, the plaintiff, a non-member, commenced an action against her former employer, the Akwesasne Housing Authority, an agency created by the St. Regis Mohawk Indian Tribe's Tribal Council. *Id.* at 78. The Second Circuit found there were "[s]everal circumstances" that, "considered together, militate[d]" against abstention and "suggest[ed] deference instead to the competing doctrine that a federal court must fulfill its "virtually unflagging obligation . . . to exercise [its] jurisdiction." *Id.* at 82 (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). These "circumstances" included: the absence of a pursuit in a tribal forum and lack of challenge by either party to the "authority of the tribal court to act"; the absence of an "intra-tribal" dispute, noting that the "party seeking relief in federal court" was "not a member of the tribe that she is suing"; and the presence of "theories of liability grounded (if anywhere) on federal and state law, not 'tribal law.'" *Id.* at 83 (explaining that in the absence of a tribal proceeding, the "federal proceeding does not implicate or in any way impair the authority of the tribal court to proceed" but noting that "[i]f a tribal proceeding were pending, our analysis might well be different"). The Circuit therefore found "[t]he foregoing circumstances . . . determinative in the absence of a competing proceeding in tribal court," and held: "where no ongoing tribal proceeding exists, and a non-member of the tribe properly invokes the jurisdiction of a federal court to litigate non-tribal law, the tribal exhaustion rule does not mandate abstention." *Id.* at 84;

*see also id.* (noting again that it did "not decide whether these circumstances would control the outcome if a tribal proceeding had been begun").

This case, where there is an underlying Nation Court proceeding, appears more analogous to *Basil Cook*, where the Second Circuit applied the tribal exhaustion rule, than to *Garcia*, where it did not. Indeed, the significant difference between *Basil Cook* and the present case is that here, neither party moved to enjoin the Nation Court proceeding. The Cayuga Nation argues that here, unlike *National Farmers*, *LaPlante*, and *Basil Cook*, neither party challenged "the jurisdiction of a tribal court." (Dkt. No. 47, at 4 (quoting *Garcia*, 268 F.3d at 80)). While it is true that the Cayuga Nation has not challenged the permanent injunction issued by the Nation Court, the Cayuga Nation does not appear to have sought enforcement of the Nation Court order, and a determination regarding the scope of that order is necessary to decide whether the Cayuga Nation's request for preliminary injunctive relief is moot. The record does not reflect why the Cayuga Nation has not sought to convert the Nation Court order to a state court injunction. At oral argument, counsel for the Cayuga Nation noted that the Cayuga Nation had not sought domestication of the Nation Court injunction, but did not deny that it could have done so. Moreover, the Cayuga Nation references "the possibility of a potentially less desirable enforcement of the Nation Court Order, where the other Defendants were not parties to the proceedings and the injunctive relief afforded did not specifically target them." (Dkt. No. 47, at 2). This suggests the existence of an enforcement mechanism for the Nation Court order as well as an inference that the Cayuga Nation is concerned that the Nation Court would not have the authority to effectively enforce the injunction and stop the Montezuma Pipekeepers' operation. *See Basil Cook*, 117 F.3d at 65 (noting that in *National Farmers*, the Supreme Court "added to its broad view of federal question jurisdiction the requirement that determinations of the reach of

tribal court jurisdiction 'be conducted in the first instance in the Tribal Court itself'" (quoting *National Farmers*, 471 U.S. at 856)). Thus, it would appear that the question as to the scope of and the enforceability of the injunction issued by the Nation Court should be evaluated by that court in the first instance.

Further, to the extent there must be "a threshold showing that the civil litigation at issue implicates tribal affairs" "[b]efore the duty to exhaust is triggered," *Basil Cook*, 117 F.3d at 66, the requirement is satisfied in this case. While it appears that of the five individual Defendants, only Parker is a member of the Cayuga Nation, it is undisputed that he is the owner and operator of Pipekeepers, and that Defendants are engaged a commercial operation on the Cayuga Nation reservation. Further, there is evidence that the controversy "involves the disposition of tribal resources" because Parker is operating a business, without a proper license, that competes with business operated by the Cayuga Nation. *Id.* (finding that the federal action implicated tribal affairs where the individual plaintiffs were tribal members engaged in a business with the tribe, the events "occurred on reservation lands," and the "controversy involves the disposition of tribal resources").[23] The Court therefore concludes that these circumstances—the presence of a proceeding in Cayuga Nation Civil Court, the concern about the Nation Court's authority to enforce the injunction, and the scope of that injunction, the presence of a dispute between Cayuga Nation and Parker, a member of the Cayuga Nation and owner and operator of Pipekeepers, regarding the operation of a commercial business governed by the Ordinance on reservation land—militate in favor of the application of the tribal exhaustion rule. *Cf. Garcia*,

---

[23] None of the parties argue that the exceptions to the exhaustion requirement apply in this case. *See Basil Cook*, 117 F.3d at 65 (explaining that "[1] where an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith, or [2] where the action is patently violative of express jurisdictional prohibitions, or [3] where exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction," exhaustion is excused (quoting *National Farmers*, 471 U.S. at 856 n.21)).

268 F.3d at 82–83 (finding that the "circumstances," including, inter alia, the absence of a tribal

court proceeding, the absence of a challenge to the "authority of the tribal court to act," and the

absence of an intra-tribal dispute militated against the application of the tribal exhaustion rule).[24]

      For all of these reasons, the Court finds that it would be premature for this Court to act

until the Cayuga Nation Civil Court action concerning the Ordinance is exhausted. *See National*

*Farmers*, 471 U.S. at 857 ("Until petitioners have exhausted the remedies available to them in

the Tribal Court system, it would be premature for a federal court to consider any relief.")

(internal citation omitted). At that point, the parties may return to this Court, where the Cayuga

Nation may pursue any viable RICO claims[25] together with remedies, injunctive and monetary,

---

[24] In *Garcia*, the Circuit also noted, in support of its conclusion that the tribal exhaustion rule was inapplicable, that the plaintiff's "theories of liability are grounded (if anywhere) on federal and state law, not 'tribal law.'" 268 F.3d at 83. Indeed, the Cayuga Nation argues this action has nothing to do with the Ordinance and is a federal RICO proceeding. (Dkt. No. 47, at 4). However, the presence of federal and state law theories of liability does not appear to be determinative where, unlike *Garcia*, there is an underlying tribal proceeding. Indeed, different legal theories are often present in cases where the tribal exhaustion rule has been applied. *See, e.g.*, *Basil Cook*, 117 F.3d at 64 (noting that tribal court proceeding alleged, inter alia, fraud, theft, and conversion, and sought to quiet title and federal action alleged, inter alia, constitutional violations under 42 U.S.C. § 1983 for deprivation of property); *LaPlante*, 480 U.S. at 11, 13 (noting that tribal member stated two causes of action in tribal court complaint, "the first named the Wellman Ranch and its individual owners as defendants and sought compensation for LaPlante's personal injuries and his wife's loss of consortium; the second alleged a claim for compensatory and punitive damages against Iowa Mutual and Midland Claims for bad-faith refusal to settle" and that Iowa Mutual's federal court complaint "sought a declaration that it had no duty to defend or indemnify the Wellmans or the Ranch because the injuries sustained by the LaPlantes fell outside the coverage of the applicable insurance policies").

[25] In order to provide some guidance to the parties, the Court notes that the Defendants' motions to dismiss the claims under RICO §§ 1962(c), (d) appear to have merit. "'Proximate cause . . . requires some direct relation between the injury asserted and the injurious conduct alleged,' and '[a] link that is too remote, purely contingent, or indirec[t] is insufficient.'" *Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 141 (2d Cir. 2018) (alteration in original). Here, there are no specific factual allegations in the Complaint showing that Defendants' alleged money laundering and sale of marijuana, however illegal, has harmed the Cayuga Nation. With respect to Defendants' trafficking of contraband cigarettes or contraband smokeless tobacco in violation of the CCTA, it appears that the direct harm was to the governmental entities entitled to the payment of taxes on cigarettes. *See New York v. United Parcel Serv., Inc.*, 942 F.3d 554, 597 (2d Cir. 2019); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 460, (2006) ("The requirement of a direct causal connection is especially warranted where the immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims."). The Court further notes that the decisions of customers not to purchase unstamped cigarettes from Cayuga Nation stores "were not themselves acts of racketeering," *Empire Merchs.*, 902 F.3d at 142, and the Cayuga Nation's alleged loss of revenue from the operation of Pipekeepers could have resulted from factors other than Defendants' sale of cigarettes in violation of the CCTA. *See Anza*, 547 U.S. at 459 (finding discontinuity between the RICO violation and the asserted injury, explaining that the plaintiff's "lost sales could have resulted from factors other than the [defendant's] alleged acts of fraud" and that "[b]usinesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of [the plaintiff's] lost sales were the product of [the defendant's] decreased prices").

that they were unable to obtain in Nation Court. *See Basil Cook Enters., Inc. v. St. Regis Mohawk Tribe*, 914 F. Supp. 839, 841–42 (N.D.N.Y. 1996) (noting that exhaustion in tribal court may provide the federal court with "the benefits of tribal explanations and expertise to the court in the event of further judicial review" (quoting *Middlemist v. Sec. of U.S. Dep't of Interior*, 824 F. Supp. 940, 945 (D. Mont. 1993)), *aff'd*, 117 F.3d 61 (2d Cir. 1997). Accordingly, the Court applies the tribal exhaustion rule and stays this action pending the parties' notification of the exhaustion of tribal proceedings.

## V.    CONCLUSION

For these reasons, it is

**ORDERED** that Defendants' motions to dismiss (Dkt. Nos. 34, 35) are **DENIED, in part:** the motions to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction are **DENIED**, and the motions are otherwise stayed; and it is further

**ORDERED** that this case is stayed pending the parties' notification of the exhaustion of proceedings in Cayuga Nation Civil Court; and it is further

**ORDERED** that the parties are directed to file a joint status report within sixty days of the date of this order.

**IT IS SO ORDERED.**

Dated: June 2, 2022
      Syracuse, New York

Brenda K. Sannes
U.S. District Judge