**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

CAYUGA NATION, by and through its lawful governing
body, the CAYUGA NATION COUNCIL,

                              Plaintiff,

v.

DUSTIN PARKER, NORA WEBER, JOSE VERDUGO,
JR., ANDREW HERNANDEZ, PAUL MEYER,
IROQUOIS ENERGY GROUP, INC., JUSTICE FOR
NATIVE FIRST PEOPLE, LLC, C.B. BROOKS LLC, and
JOHN DOES 1–10,

                              Defendants.

5:22-cv-00128 (BKS/ATB)

**Appearances:**

*For Plaintiff:*
David G. Burch, Jr.
Michael E. Nicholson
Gabriel M. Nugent
Barclay Damon LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, New York 13202

*For Defendants Dustin Parker, Nora Weber, and Andrew Hernandez:*
Daniel Hurteau
Nixon Peabody LLP
677 Broadway, 10th Floor
Albany, New York 12207

*For Defendants Paul Meyer, Justice for Native First People, LLC, and C.B. Brooks LLC:*
David H. Tennant
Law Office of David Tennant PLLC
3349 Monroe Avenue, Suite 345
Rochester, New York 14618

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiff Cayuga Nation, through its governing body, the Cayuga Nation Council, brings this action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. (Dkt. No. 1). The Cayuga Nation generally alleges that Defendants Dustin Parker, Nora Weber, Jose Verdugo, Jr., Andrew Hernandez, Paul Meyer, Iroquois Energy Group, Inc., Justice for Native First People, LLC, C.B. Brooks LLC, and John Does 1–10, are engaged in an unlawful scheme to co-opt the Nation's sovereign rights, erode its business and customer base, and steal its revenues "through the illegal sale of untaxed and unstamped cigarettes and marijuana, and various other merchandise" on the reservation. (*Id.* ¶ 2). Defendants are alleged to have committed a pattern of racketeering activities under § 1961(1), including trafficking in contraband cigarettes (18 U.S.C. §§ 2341–2346), money laundering (18 U.S.C. § 1956), engaging in monetary transactions in property derived from specified unlawful activity (18 U.S.C. § 1957), and distributing or possessing a controlled substance (21 U.S.C. § 841). The Complaint asserts: a substantive RICO violation, 18 U.S.C. § 1962(c) (Count I); investment of racketeering income, 18 U.S.C. § 1962(a) (Count II); and RICO conspiracy, 18 U.S.C. § 1962(d) (Count III). Presently before the Court are the Cayuga Nation's motion for a preliminary injunction under Federal Rule of Civil Procedure 65 "enjoining Defendants from opening or operating any business from the property located at 7153 State Route 90N in Montezuma, New York," (Dkt. No. 2), and Defendants'[1] motions to dismiss for failure to state a claim under Rule

---

[1] The motions to dismiss were filed on behalf of Defendants Dustin Parker, Nora Weber, Andrew Hernandez ("the Parker Defendants"), (Dkt. No. 34), and Defendants Paul Meyer, Justice For Native First People, LLC and C.B. Brooks LLC ("the Meyer Defendants"), (Dkt. No. 35); the Court's references to "Defendants" in this decision refers to all of these Defendants.

12(b)(6).[2] (Dkt. Nos. 34, 35). The motions are fully briefed. (Dkt. Nos. 30, 31, 37, 40, 44, 45).

The Court heard oral argument on May 4, 2022. For the reasons that follow, Plaintiff's motion

for a preliminary injunction is denied and Defendants' motions to dismiss under Rule 12(b)(6)

are granted in part and denied in part.

## II.   FACTS[3]

### A.   The Cayuga Nation Reservation – Cigarette Manufacturing and Sales

The Cayuga Nation is a federally recognized sovereign Indian Nation governed by the

Cayuga Nation Council. (Dkt. No. 1, ¶ 11). In the Treaty of Canandaigua of 1794, 7 Stat. 44,

"the United States recognized a federal reservation for the Cayuga Nation comprising 64,015

acres—located within what today are Seneca and Cayuga Counties in upstate central New York."

(*Id.* ¶ 25). As a sovereign Indian nation, the Cayuga Nation is entitled to conduct "certain

economic activity on its own reservation free from state tax and regulatory laws, even in

transactions with non-Indians." (*Id.* ¶ 35). The Cayuga Nation's activities include, as relevant

here, manufacturing Cayuga brand cigarettes, sale of cigarettes "wholesale" from a warehouse in

Seneca Falls "to retail stores and various businesses located within the Cayuga Nation's border,"

and operation of "convenience stores on tribal land," (Dkt. No. 30-1, ¶ 9; Dkt. No. 30-2, ¶¶ 2–3),

where the Cayuga Nation sells Cayuga and other "native-brand cigarettes," as well as premium-

brand cigarettes, (Dkt. No. 30-2, ¶¶ 4–6), to "enrolled Cayuga members and to non-Indians,"

---

[2] The Court previously denied Defendants' motion for dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction and stayed this action pending Plaintiff's exhaustion of proceedings in Cayuga Nation Civil Court. (Dkt. No. 49). In a joint status report filed on August 1, 2022, the parties notified the Court that proceedings had been exhausted, (Dkt. No. 54), and on August 2, 2022, the Court lifted the stay and advised the parties that the pending motions would be decided in due course. (Dkt. No. 55). Further, in view of the parties' agreement that remedies in Nation Court have been exhausted, and there being no indication that the Montezuma Pipekeepers has discontinued operation, the Court finds that the application for preliminary injunction is not moot.

[3] The facts set forth herein are drawn from the Complaint and the exhibits attached thereto, as well as the exhibits submitted by the parties in connection with Plaintiff's motion for a preliminary injunction. (Dkt. Nos. 1, 2, 7, 30, 31, 37, 47).

(Dkt. No. 37-1, ¶ 8). The Cayuga Nation maintains that to the extent it sells the Cayuga and other "native-brand cigarettes" "unstamped or untaxed," "it does so in compliance with the law and under the unique privilege afforded to it as an Indian nation." (Dkt. No. 37, at 7 n.2). It is undisputed, however, that while premium brand cigarettes sold to members of an Indian Nation for their own personal use are tax-exempt, New York's excise tax scheme requires that all premium brand cigarettes, even those sold on the Cayuga Nation reservation, have tax stamps.[4]

Regarding the sale of unstamped and untaxed Cayuga brand and other Native brand cigarettes, counsel for the Cayuga Nation explained at oral argument that because the Cayuga Nation is a sovereign Nation, only the Nation can sell Cayuga brand or other Native brand cigarettes. Counsel further explained that there are nations in New York that license individual members to sell Native brand cigarettes on reservation land, but that Defendant Dustin Parker has received no license from Cayuga Nation.

**B.    The Cayuga Nation Ordinance**

The license to which counsel for the Cayuga Nation referred, is provided for in the Cayuga Nation's Amended and Restated Business License and Regulation Ordinance (the "Ordinance"). The Ordinance prohibits the operation of "any type of business on Nation land without a business license issued by the Nation pursuant to this Ordinance." (Dkt. No. 47-1, at 12). As relevant here, the Ordinance further provides that "[n]o license shall issue to, or be held by, any person who . . . is engaging, or seeks to engage, in any business that, directly or

---

[4] Tax stamps evidence prepayment of New York cigarette excise taxes and are affixed to cigarettes, or cigarette packaging, by licensed tax-stamping agents, often wholesale dealers, after paying the excise taxes. *New York v. Grand River Enters. Six Nations, Ltd.*, No. 14-cv-910, 2020 WL 12969527, at *3, 2020 U.S. Dist. LEXIS 236928, at *7 (W.D.N.Y. Dec. 15, 2020) (citing N.Y. Tax L. ("NYTL") § 471). *See New York v. Mountain Tobacco Co.*, 942 F.3d 536, 540 (2d Cir. 2019). "All cigarettes sold by agents and wholesalers to Indian nations or tribes or reservation cigarette sellers located on an Indian reservation must bear a tax stamp." NYTL § 471(2).

indirectly, competes in whole or in part with any business conducted by the Nation or an entity or enterprise owned or controlled by the Nation." (*Id.* at 13).

B.J. Radford, the Chief Financial Officer ("CFO") of the Cayuga Nation, states that "because of the sovereign rights the Nation properly may exercise on its own reservation, which is recognized under both federal and state law," the Nation generates "significant revenues from cigarette sales." (Dkt. No. 37-1, ¶ 15). CFO Radford further states that:

> The Nation uses the proceeds from these cigarette sales to raise critical revenues for essential Cayuga governmental programs for its citizens and the public, to make quarterly distributions to its citizens, and to help the Nation reacquire lands on its reservation.
>
> The governmental programs funded by the Nations' cigarette sales include payments for health care services for Cayuga members, educational scholarships for Cayuga children, and housing assistance for Cayuga citizens. The Nation makes meat and vegetable distributions to more than 100 Cayuga households.

(*Id.* ¶¶ 1, 11–12). CFO Radford states that "cigarette sales help fund the Cayuga Nation's police department—which protects Nation members, Nation properties, and non-Indian customers who come to the reservation for gaming, purchases of cigarettes and other goods, and other activities—and the Nation's tribal court, as well as other essential governmental programs." (*Id.* ¶ 13). Even though the Cayuga Nation is not required to pay property taxes, it supports local communities through donations. (*Id.* ¶ 14). For example, "on September 17, 2020, the Nation made a $200,000 donation to the Union Springs Fire Department to support the purchase of 28 state-of-the art, self-contained breathing apparatuses to be used by firefighters." (*Id.*).

C.      **Opening of Pipekeepers Smoke Shop on the Cayuga Nation Reservation**

1.      **Seneca Falls Pipekeepers**

In May 2021, Defendant Paul Meyer,[5] the sole member of Justice for Native First People, LLC, signed a four-year commercial lease agreement on behalf of the LLC for a commercial property, owned by the Seneca-Cayuga Nation of Oklahoma but within the boundaries of the Cayuga Nation reservation, located at 126 E. Bayard Street in Seneca Falls, New York.[6] (Dkt. No. 30-3, ¶¶ 2–3; Dkt. No. 1, ¶ 37). Meyer states that "[i]n anticipation of subletting the property," which had previously been used as a convenience store and gasoline station, he "invested $80,000 to recommission the gas pumps" and updated the property. (Dkt. No. 30-3, ¶ 4). In June 2021, Defendant Dustin Parker, "an enrolled member of the Cayuga Nation," approached Meyer and "expressed interest in subletting the space . . . to operate a smoke shop and gas station." (Dkt. No. 31-1, ¶ 5; Dkt. No. 30-3, ¶ 6). In August 2021, Meyer and Parker agreed to a "four-year sublease . . . to run concurrently with" the underlying lease. (Dkt. No. 30-3, ¶ 8; Dkt. No. 30-1, ¶ 12).[7] In September 2021, Parker registered "Pipekeepers" as a business with Seneca County, "filed for a business license with the Town of Seneca," and obtained an inspection of the "business and property" by the Town of Seneca Enforcement Officer. (Dkt. No. 30-1, ¶ 13–15). However, Parker did not obtain a business license as required by the Cayuga Nation Ordinance. (Dkt. No. 47-1, at 28).

---

[5] Meyer is not Native American. (Dkt. No. 30-3, ¶ 7).

[6] According to the Complaint, the lease between Justice for Native First People, LLC and the Seneca-Cayuga Nation was "upon information and belief" for the "below market rate of $1,000 per month." (Dkt. No. 1, ¶ 39).

[7] According to the Complaint, "Justice for Native First People permitted Defendant Parker to operate the Pipekeepers business from the Property for a substantial payment each month, essentially profiting from the Pipekeepers' illicit cigarette business." (*Id.* ¶ 40).

"On September 4, 2021, Pipekeepers began operations as a small retail convenience store." (Dkt. No. 30-1, ¶ 16). Parker "noted on [Pipekeepers] signage that the store owner . . . was a member of the Cayuga Nation," (*id.* ¶¶ 17–18), and photographs in the record show a large sign outside the store that says: "Cayuga Nation Bayard Street Store," (Dkt. No. 1-1, at 5). Parker managed and operated the business and his wife, Nora Weber, assisted "with the day-to-day operations and maintain[ed] the stores [sic] financial books." (Dkt. No. 30-1, ¶ 20). Parker purchased his "inventory from other neighboring Nations." (*Id.* ¶ 32).

David Miller, a private investigator retained by the Cayuga Nation Police Department, visited the Seneca Falls Pipekeepers store in November 2021, and provided a declaration summarizing the visit as follows. (Dkt. No. 1-1, at 1–3). Miller observed Defendant Parker working behind the counter inside the store and wearing "a badge that stated 'Indian Police.'" (*Id.* at 2, 7). The store had "displays of numerous brands of Native American manufactured cigarettes." (*Id.* at 2, 7, 9–12). Miller asked Defendant Parker for, and purchased, a "bag of loose cigarettes" or "rollies," a "pack of Seneca cigarettes, which are a Native brand of cigarettes," and a pack of "Newport Menthol cigarettes, which are a national premium brand." (*Id.* at 2, 14, 16, 18). "None of the packages [Miller] received had any tax stamps affixed" and the receipt for the cigarettes did "not indicate any sales taxes were collected." (*Id.* at 2–3, 20).[8] Sergeant Kenneth Smith, a member of the Cayuga Nation Police Department states that Parker was also "illegally selling marijuana" at the Seneca Falls Pipekeepers. (Dkt. No. 2-2, ¶ 5).

---

[8] At oral argument, the parties agreed that neither the Cayuga Nation nor a member of the Cayuga Nation can legally sell "rollie" cigarettes or unstamped premium brand cigarettes like Newports.

According to Meyer, on or about November 21, 2021, the Seneca-Cayuga Nation informed him that the Cayuga Nation "was objecting to the smoke shop operated by my subtenant, apparently because it was cutting into their profits" and claiming that the smoke shop was illegal. (Dkt. No. 30-3, ¶ 10). In response, Meyer obtained a legal opinion from Attorney Michael Rhodes-Devey concerning the operation of a smoke shop by an enrolled Cayuga Nation member, which he provided to the Seneca-Cayuga Nation. (*Id.* ¶¶ 11–12; Dkt. No. 30-4, at 2–4 (legal opinion)).

According to Parker, in December 2021, Clint Halftown and Sharon Leroy, Cayuga Nation representatives, visited Pipekeepers and Halftown demanded that Parker "stop Pipekeepers [sic] business operations."[9] (Dkt. No. 30-1, ¶¶ 6–7, 25). Parker "rejected Halftown's demand" and Halftown "threatened to levy fines against Pipekeepers for failure to comply." (*Id.* ¶¶ 27–28).

On or about December 22, 2021, the Cayuga Nation purchased the 126 E. Bayard Street property from the Seneca-Cayuga Nation. (Dkt. No. 1, ¶ 4; Dkt. No. 47-1, at 25–26).[10] On January 1, 2022, the Cayuga Nation assumed possession of the property. (Dkt. No. 1, ¶ 49). According to the Complaint, the Cayuga Nation "found cigarettes totaling over 10,000,000" at the Seneca Falls Pipekeepers. (*Id.* ¶ 53). The Complaint alleges that Defendants "shipped, transported, received, possessed, sold, distributed, or purchased contraband cigarettes or contraband smokeless tobacco in violation of the Contraband Cigarette Trafficking Act, 18 U.S.C. §§ 2341–46." (*Id.*).

According to Parker, in January 2022, "Halftown" opened a convenience store and smoke shop, renamed Lakeside Trading, at the 126 E. Bayard Street location. (Dkt. No. 30-1, ¶ 46). Parker states that when the Cayuga Nation took over the 126 E. Bayard Street property, it confiscated "approximately $200,000 in inventory" and gas "with a retail value of approximately $400,000," and "[b]ased on the brands . . . being sold," he "believe[s] Lakeside is selling [his] inventory." (*Id.* ¶¶ 42, 47).

---

[9] Parker states that as "representatives in the Cayuga Nation, Halftown and Leroy have a great deal of power on [sic] the Nation's decision-making" and refers to them as the "Halftown faction." (Dkt. No. 30-1, ¶¶ 8–9).

[10] Parker avers that "Halftown, and the Halftown Faction, purchased 126 E. Bayard Street, Seneca, New York." (Dkt. No. 30-1, ¶ 33). There does not, however, appear to be any dispute that the property was purchased by the Cayuga Nation.

## 2.      Montezuma Pipekeepers

On January 12, 2022, Meyer's other LLC, Defendant C.B. Brooks LLC, sold 7153 State Route 90 in the Town of Montezuma, a residential home, to Parker for $180,000. (Dkt. No. 2-2, ¶ 6; Dkt. No. 7-1, at 4; Dkt. No. 31-1, ¶¶ 19, 22).[11] Parker purchased this property "with the intention[] of opening up a new Pipekeepers store" ("Montezuma Pipekeepers"). (Dkt. No. 30-1, ¶ 48). Parker states that the "property is zoned commercial and the business has obtained all necessary permits." (*Id.* ¶ 49).[12] According to Parker, the "new Pipekeepers has no affiliation to or materials that would demonstrate an affiliation with Halftown's faction." (*Id.* ¶ 50). The Cayuga Nation submitted pictures of the Montezuma property, which show a blue house with a wood fence. (Dkt. No. 7-2, at 1–3). The pictures do not show any signs. (*Id.*).

Sergeant Smith stated in a declaration dated February 9, 2022, that he "received information from an anonymous source that someone who has been 'selling weed' was possibly moving his sales operation to a new location . . . more specifically, to a blue house right behind a Circle K convenience store in the Town of Montezuma" and that "it was supposed to be a 'drive-through' style operation." (Dkt. No. 2-2, ¶¶ 3–4). Parker confirms in an affidavit dated March 15, 2022, that "[i]n February 2022, the [Montezuma] property was retrofitted to accommodate drive

---

[11] C.B. Brooks LLC "purchased the property on July 8, 2021, for $30,000." (Dkt. No. 31-1, ¶ 19). Meyer described the property as "a vacant four bedroom single family dwelling in dilapidated shape and an overgrown 1.5 acre lot filled with junk." (*Id.*). Meyer avers that he "undertook extensive work to clear the lot and repair the interior and exterior to maximize the property's value for commercial use" and paid for "professional tree removal, track earth moving equipment," and junk removal. (*Id.* ¶ 21).

[12] The zoning of the Montezuma property is disputed. Sergeant Smith states that he was "informed by Nation Counsel Lee Alcott that this house is located in an agricultural/residential zoning district which would not permit the use of the property as a retail business." (Dkt. No. 2-2, ¶ 4). The "Tax Map ID/Property Data" regarding the Montezuma property states "In Ag. District." (Dkt. No. 1-2, at 1). Meyer states that "[a]t the time of purchase, not-up-to-date property tax records indicated the property was residential, but the zoning map designated it for commercial use." (Dkt. No. 31-1, ¶ 20). Any dispute relative to the zoning of the Montezuma property is immaterial to the resolution of the present motions.

through services." (Dkt. No. 30-1, ¶ 51). Parker states that he also installed surveillance cameras and fencing, to ensure the safety of [his] staff and property." (*Id.* ¶ 52). "The new Pipekeepers store was opened on February 12, 2022." (*Id.* ¶ 53). There is no evidence presently before the Court showing what is being sold by the Montezuma Pipekeepers.

## III.    MOTION FOR PRELIMINARY INJUNCTION

### A.    Standard of Review

"A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n*, *Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).

Generally, preliminary injunctions are prohibitory or mandatory. *Id.* at 36. "Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it." *Id.* The "status quo . . . is, 'the last actual, peaceable uncontested status which preceded the pending controversy.'" *Id.* at 37 (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam)). A party seeking a mandatory injunction "must meet a heightened legal standard by showing 'a clear or substantial likelihood of success on the merits.'" *Id.* (quoting *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012)). The Court need not determine whether the preliminary injunction the Cayuga Nation seeks is prohibitory or mandatory because their application fails under even the lower legal standard.

### B.    Analysis

#### 1.    Irreparable Harm

The Cayuga Nation argues it has established irreparable harm because: (1) Pipekeepers damages the Cayuga Nation's reputation and goodwill by falsely operating "under the 'Cayuga

Nation' flag, claiming Cayuga Nation rights, privileges, customers, and revenues as its own,"
and deprives the Nation "of a significant and unknown amount of customers" as well as
"unknown business opportunities or ventures for the Nation"; and (2) damages are difficult to
establish and measure. (Dkt. No. 2-3, at 7). Defendants dispute that they are using the Cayuga
Nation flag and state that the "new store does not display or show any outward affiliation with
the Halftown faction" and shows "no affiliation to the Plaintiff's brand." (Dkt. No. 30, at 11).
Defendants assert that because the harm asserted "is the loss of business revenues, and that harm
is compensable with money damages, injunctive relief is clearly improper." (*Id.*). The Court
finds that the Cayuga Nation has failed to establish irreparable harm.

A showing of irreparable harm is "the single most important prerequisite for the issuance
of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118
(2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). "Irreparable
harm is 'injury that is neither remote nor speculative, but actual and imminent and that cannot be
remedied by an award of monetary damages.'" *New York ex rel. Schneiderman v. Actavis PLC*,
787 F.3d 638, 660 (2d Cir. 2015) (quoting *Forest City Daly Hous., Inc. v. Town of N.
Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999)). "The relevant harm is the harm that (a) occurs to
the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by
damages or a permanent injunction." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) (internal
footnote omitted).

Courts have found a "company's loss of reputation, good will, and business
opportunities" can constitute irreparable harm. *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393,
404 (2d Cir. 2004). "This is because these damages 'are difficult to establish and measure.'"
*Regeneron Pharms., Inc. v. United States Dep't of Health & Hum. Servs.*, 510 F. Supp. 3d 29, 40

(S.D.N.Y. 2020) (quoting *Register.com*, 356 F.3d at 404). As the Second Circuit has explained,
injunctive relief is appropriate where it would be "very difficult to calculate monetary damages
that would successfully redress the loss of a relationship with a client that would produce an
indeterminate amount of business in years to come." *Register.com, Inc.*, 356 F.3d at 404. Losses
to existing business, loss of customers, and "a decline in the opportunity for new business may
qualify as irreparable harm." *Id.* (citing, inter alia, *John E. Andrus Mem'l, Inc. v. Daines*, 600 F.
Supp. 2d 563, 571–72 (S.D.N.Y. 2009)); *see Environmental Servs., Inc. v. Recycle Green Servs.,
Inc.*, 7 F. Supp. 3d 260, 268, 279 (E.D.N.Y. 2014) (finding that the plaintiff "established
irreparable harm . . . through the loss of good will," in light of evidence that, as a result of the
defendant's alleged conduct, the plaintiff's "customers are not only refusing to do business with
[the plaintiff] in the future, but they are providing negative reviews about [the plaintiff] to other
customers," which "invariably damage [the plaintiff's] reputation."); *see also, e.g.*, *Johnson
Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004) (finding
irreparable harm where the defendant's alleged conduct would allow competitors to "lur[e] away
the business of a number of [the plaintiff's] long-term . . . clients," and noting that "there is little
guarantee that, should [the plaintiff] ultimately prevail in this action, these clients would return").
In other cases, "courts have found irreparable harm from a loss of goodwill or business
relationships . . . where the dispute between the parties leaves one party unable to provide its
product to its customers." *Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616,
621 (S.D.N.Y. 2010). In *Rex Medical*, for example, the plaintiff alleged that because the
plaintiff's sale of the defendant's device "accounts for all but 10 percent of [the plaintiff's]
revenue," if the defendant's distribution of its medical device was disrupted, the plaintiff's

customers "will seek out a competing product to meet their needs—costing [the plaintiff] market share, goodwill, and future sales." *Id.* at 623.

Although Cayuga Nation has provided evidence that the Seneca Falls Pipekeepers had Cayuga Nation signage and labeling, it has provided no evidence that the Montezuma Pipekeepers displays any affiliation with Cayuga Nation. The pictures it submitted show a blue residence surrounded by a fence, but no signs. (Dkt. No. 7-2, at 1–3). Further, Parker states in his affidavit that "[t]he new Pipekeepers has no affiliation to or materials that would demonstrate an affiliation with Halftown's faction." (Dkt. No. 30-1, ¶ 50). However, because (1) all businesses operating on Cayuga Nation's reservation must be licensed under the Ordinance; and (2) the Ordinance prohibits the issuance of licenses for any business that competes with "any business conducted by" the Cayuga Nation, there is some basis for inferring that the Montezuma Pipekeepers, by the very nature of its existence projects an impression that it exists with the Cayuga Nation's approval. Thus, the Court concludes there is some evidence from which to infer that Defendants, by operating on the Cayuga Nation reservation, are drawing on the Cayuga Nation's reputation as an operator of businesses on the reservation. But unlike *Environmental Services*, 7 F. Supp. 3d at 268, 279—where there was evidence that: the defendants' conduct caused the plaintiffs' customers to believe that the plaintiff was defrauding them; the defendants were making negative statements about the plaintiff to the plaintiff's customers; and the plaintiff's customers were refusing to do business with the plaintiff—here, the Cayuga Nation has not provided any evidence that that Defendants' conduct has had a negative impact on Cayuga Nation's customers' beliefs about Cayuga Nation businesses or that customers are refusing to do business at Cayuga Nation stores.

The Cayuga Nation's CFO states that "Pipekeepers undermines the reputation and goodwill of the Cayuga Nation by purporting to be controlled by the Nation and engaging in illegal and other conduct that is not, in fact, authorized by the Cayuga Nation." (Dkt. No. 37-1, ¶ 17). This conclusory statement is not supported by any evidence and thus fails to allow a finding of irreparable harm.[13] *See Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*, No. 10-cv- 3314, 2015 WL 4033019, at *11, 2015 U.S. Dist. LEXIS 84172, at *29 (S.D.N.Y. June 29, 2015) ("[C]onclusory statements of loss of reputation will not justify an irreparable harm finding.").

The Cayuga Nation further asserts it has sustained a loss in revenues due to Defendants' conduct: according to Cayuga Nation's CFO, since Defendants opened the Seneca Falls store in September 2021, they have generated revenues in excess of $1,500,000 and the Cayuga Nation has sustained a "correlating loss in revenues over the same time period to the Cayuga Nation." (Dkt. No. 37-1, ¶ 24). But in the absence of any evidence of reputational harm, alleged monetary harm is generally insufficient to show irreparable harm. *See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995) ("Generally, where we have found no irreparable harm, the alleged loss of goodwill was doubtful, and lost profits stemming from the inability to sell the terminated product could be compensated with money damages determined on the basis of past sales of that product and of current and expected future market conditions. In contrast, where we have found irreparable harm, the very viability of the plaintiffs' business or substantial losses of sales beyond those of the terminated product have been threatened."); *Register.com, Inc.*, 356 F.3d at 404 ("If an injury can be appropriately compensated by an award of monetary

---

[13] In its reply brief, the Cayuga Nation argues that customers "may walk out of the [Montezuma] Pipekeepers store thinking the Nation is selling illegal "rollies"; the Nation's reputation will have been damaged as a result. (Dkt. No. 37, at 13). This argument raises a valid concern but there is no evidence in the record regarding what customers believe after purchasing products from Pipekeepers.

damages, then an adequate remedy at law exists, and no irreparable injury may be found to justify specific relief."). Finally, even crediting the Cayuga Nation's assertion that monetary damages may be difficult to calculate and measure in this case, (Dkt. No. 2-3, at 7), in the absence of non-conclusory evidence of reputational injury or customer confusion or loss, the Court concludes that this assertion fails to show irreparable harm. *See Regeneron Pharms.*, 510 F. Supp. 3d at 39–40 (explaining that "[a] court can find irreparable harm based on "loss of reputation, good will, and business opportunities" "because these damages 'are difficult to establish and measure'" (quoting *Register.com*, 356 F.3d at 404)). Accordingly, the Court find that the Cayuga Nation has failed to show irreparable injury.

### 2.     Likelihood of Success

In addition, the Cayuga Nation has failed to establish a likelihood of success or serious question as to the merits of their RICO §§ 1962(c) and (d) claims.

### a.     Continuity

In their opposition to the preliminary injunction motion, Defendants argue that because the Seneca Falls Pipekeepers is closed, Plaintiff is unlikely to succeed because it cannot show "open-ended continuity" with respect to the alleged "threat of continuing criminal activity." (Dkt. No. 30, at 12). The Cayuga Nation responds that the Complaint has alleged the threat of continuing criminal activity and thus has adequately alleged open-ended continuity for purposes of a RICO claim. (Dkt. No. 37, at 10–11).

"To establish a substantive RICO violation, a plaintiff must show a 'pattern of racketeering activity,' . . . and to establish a RICO conspiracy, a plaintiff must show a conspiracy to commit a substantive RICO violation." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (quoting 18 U.S.C. § 1962(a)–(d)). "Thus, '[u]nder any prong of § 1962,

a plaintiff in a civil RICO suit must establish a 'pattern of racketeering activity.'" *Id.* (quoting *GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 465 (2d Cir. 1995)).

"The acts of racketeering activity that constitute the pattern must be among the various criminal offenses listed in § 1961(1), and they must be 'related, and [either] amount to or pose a threat of continuing criminal activity.'" *Spool*, 520 F.3d at 183 (quoting *Cofacrèdit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999)) (emphasis omitted). "The . . . 'continuity' requirement can be satisfied either by showing a 'closed-ended' pattern—a series of related predicate acts extending over a substantial period of time—or by demonstrating an 'open-ended' pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." *Id.* (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 241 (1989)). "The Second Circuit 'has never held a period of less than two years to constitute a substantial period of time." *Wade Park Land Holdings, LLC v. Kalikow*, No. 21-cv-1657, 2022 WL 657664, at *28, 2022 U.S. Dist. LEXIS 38828, at *89–90 (S.D.N.Y. Mar. 4, 2022) (internal quotation marks omitted) (quoting *Cofacrèdit, S.A.*, 187 F.3d at 242). In this case, there are no acts alleged to have occurred prior to May 20, 2021. (Dkt. No. 30-3, ¶ 4 (the date Defendant Justice for Native First People LLC entered the lease for 126 E. Bayard Street property)). Thus, there is no basis on which to find a "closed-ended" pattern. *Wade Park*, 2022 WL 657664, at *28, 2022 U.S. Dist. LEXIS 38828, at *89–90.

"To satisfy open-ended continuity, the plaintiff . . . must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacrèdit*, 187 F.3d at 242. The Second Circuit has identified "two ways to show open-ended continuity":

> (1) "where the acts of the defendant or the enterprise [are] inherently unlawful, such as murder or obstruction of justice, and [are] in pursuit of inherently unlawful goals, such as narcotics trafficking or embezzlement," *United States v. Aulicino*, 44 F.3d 1102, 1111 (2d Cir. 1995), or (2) "where the enterprise primarily conducts a legitimate business" but there is "some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity," *Cofacrèdit*, 187 F.3d at 243 (citing *H.J. Inc.*, 492 U.S. at 243).

*Grace Int'l Assembly of God v. Festa*, 797 F. App'x 603, 606 (2d Cir. 2019).

Defendants argue that because the Complaint alleges that "Parker's *now closed store* sold various products that it believes were illegal" and that Plaintiff itself "closed Pipekeepers when they purchased the property and without notification, evicted the Defendants on January 1, 2022," Plaintiff cannot show open-ended continuity." (Dkt. No. 30, at 12 (citing Dkt. No. 1, ¶¶ 37, 53)) (emphasis added). However, given the allegations regarding the work being performed at the Montezuma location and Defendant Parker's affidavit acknowledging his operation of the business at the Montezuma Pipekeepers, (Dkt. No. 30-1), Defendants' argument has little merit. In any event, "[t]he threat of future conduct is evaluated as it would appear at the time the conduct was committed." *See United States v. Aulicino*, 44 F.3d 1102, 1111 (2d Cir. 1995) (finding open-ended continuity despite the fact that scheme was abandoned). Open-ended continuity may be shown if, "*at the time of occurrence*," the racketeering activity threatens future criminal activity. *Morrow v. Black*, 742 F. Supp. 1199, 1207 (E.D.N.Y.1990). "Only if an activity has an 'inherently terminable' goal, such as a sale of land, is a threat of continued activity negated as a matter of law. *City of New York v. LaserShip*, Inc., 33 F. Supp. 3d 303, 311 (S.D.N.Y. 2014) (quoting *DeFalco v. Bernas*, 244 F.3d 286, 324 (2d Cir. 2001)).

In this case, the Cayuga Nation alleges that the Seneca Falls Pipekeepers opened its doors in September 2021 and began selling contraband cigarettes. (Dkt. No. 1, ¶ 37). While it closed in

December 2021, based on the allegations in the Complaint concerning the quantities of cigarettes confiscated at the time it was closed, it is reasonable to conclude that Defendants would have continued to traffic in contraband cigarettes indefinitely. (*Id.* ¶ 53). In addition, Parker essentially acknowledges he is continuing Pipekeepers' activities in Montezuma and Defendants take the position that Parker, as a member of the Cayuga Nation is authorized to sell unstamped, untaxed cigarettes. (Dkt. No. 30-1, ¶ 53). Accordingly, the Court concludes that Plaintiff has shown a likelihood of success with respect to open-ended continuity. *See LaserShip*, 33 F. Supp. 3d at 311 (finding the complaint adequately alleged open-ended continuity based on allegations that the defendant "could have continued to deliver unstamped cigarettes for as long as smoke shops kept selling them" and "allegedly did not stop shipping cigarettes . . . until [the] shipments were enjoined by court order").

### b.   Proximate Cause

"[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense 'not only was a "but for" cause of [its] injury, but was the proximate cause as well.'" *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010) (plurality opinion) (quoting *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)). "'Proximate cause . . . requires some direct relation between the injury asserted and the injurious conduct alleged,' and '[a] link that is too remote, purely contingent, or indirec[t] is insufficient.'" *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 141 (2d Cir. 2018) (alteration in original) (quoting *Hemi*, 559 U.S. at 9). As the Second Circuit explained, courts "rarely 'go beyond the first step' when assessing causation under civil RICO." *Id.* (quoting *Hemi*, 559 U.S. at 10). Further:

> "What falls within that 'first step' depends in part on . . .an assessment 'of what is administratively possible and convenient.'" *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1306

(2017) (quoting *Holmes*, 503 U.S. at 268). Relevant administrative difficulties in the civil RICO context include, among other factors:

> • whether it would be difficult to determine how much the tortious conduct injured the defendant, as compared to other factors; and

> • whether more directly injured victims would be better suited as plaintiffs.

*Id.* "RICO's 'requirement of a direct causal connection' between the predicate offense and the alleged harm," *Hemi*, 559 U.S. at 10–11 (quoting *Anza v. Ideal Steel Corp. (Anza I)*, 547 U.S. 451, 460–61 (2006), "applies not only to substantive RICO violations under 18 U.S.C. § 1962(c), but also to violations of RICO conspiracy under § 1962(d)," *Empire Merchants, LLC v. Reliable Churchill LLLP*, No. 16-cv-5226, 2017 WL 5559030, at *5, 2017 U.S. Dist. LEXIS 186669, at *14 (E.D.N.Y. Mar. 16, 2017) (quoting *Beck v. Prupis*, 529 U.S. 494, 505 (2000)), *aff'd*, 902 F.3d 132 (2d Cir. 2018).

Here, with respect to the money laundering, monetary transaction, and marijuana claims, the Cayuga Nation alleges that the property housing the Montezuma Pipekeepers was purchased "with illicit proceeds from the RICO enterprise," that Defendants possessed large quantities of cash, and that Defendants sold and intend to sell marijuana from the Pipekeepers stores." (Dkt. No. 1, ¶¶ 47, 51; Dkt. No. 2-3, at 8–9). However, there are no specific factual allegations in the Complaint showing that Defendants' alleged money laundering and sale of marijuana, however illegal has harmed the Cayuga Nation.

With respect to Defendants' trafficking of contraband cigarettes or contraband smokeless tobacco in violation of the CCTA, it appears that any direct harm would be to the governmental entities entitled to the payment of taxes on cigarettes. *See New York v. United Parcel Serv., Inc.*, 942 F.3d 554, 597 (2d Cir. 2019). The Cayuga Nation alleges that by offering unstamped or untaxed cigarettes for sale, which it alone is entitled to do on its federal reservation, Defendants

are attracting customers at the Cayuga Nation's expense. (Dkt. No. 1, ¶ 2). The Cayuga Nation also vaguely asserts that the Pipekeepers' Seneca Falls store "generated revenues in excess of $1,500,000 and the Cayuga Nation has sustained a correlating loss in revenues over the same time period." (Dkt. No. 37-1, ¶ 24). But the Cayuga Nation's loss of revenue could have resulted from factors other than Defendants' alleged sale of cigarettes in violation of the CCTA, and without additional factual details, neither the Complaint nor any submissions allow a plausible inference of direct causal connection. *See Anza I*, 547 U.S. at 459 (finding discontinuity between the RICO violation and the asserted injury, explaining that the plaintiff's "lost sales could have resulted from factors other than the [defendant's] alleged acts of fraud" and that "[b]usinesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of [the plaintiff's] lost sales were the product of [the defendant's] decreased prices"). "The requirement of a direct causal connection is especially warranted where the immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims." *Id.* at 460. And because customers' decisions not to purchase unstamped cigarettes from Cayuga Nation stores "were not themselves acts of racketeering," *Empire Merchants*, 902 F.3d at 142, the Cayuga Nation fails to sufficiently allege proximate cause in connection with its claims under RICO §§ 1962(c), (d).[14] Accordingly, the Court finds the Cayuga Nation has failed to show likelihood of success on the merits with respect to its RICO §§ 1962(c), (d) claims.

---

[14] The parties have not briefed proximate cause as to § 1962(a) and the Cayuga Nation has not briefed the merits of its § 1962(a) claim. There is, therefore, no basis on which to address it here.

### 3.       Balance of the Hardships

"[T]he balance of hardships inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided." *Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*, 922 F. Supp. 2d 435, 444 (S.D.N.Y. 2013) (alteration in original) (quoting *Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 411 (S.D.N.Y. 1999)). Even assuming that the Cayuga Nation has shown that the balance of the hardships tips in its favor, without a showing of a likelihood of success on the merits, this factor, alone, is insufficient to warrant injunctive relief.[15]

Accordingly, the Cayuga Nation's motion for a preliminary injunction is denied.

## IV.    MOTION TO DISMISS

### A.      Standard of Review – Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 550 U.S. at 555). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

---

[15] Since a preliminary injunction shall not issue in this case, the Court need not consider whether the issuance of an injunction would harm the public interest. *U.S. S.E.C. v. Citigroup Global Mkts. Inc.*, 673 F.3d 158, 163 n.1 (2d Cir. 2012) ("[W]hen a court orders injunctive relief, it should ensure that injunction does not cause harm to the public interest.").

### B.      Consideration of Materials Outside the Complaint

In support of their motion to dismiss, the Parker Defendants have submitted a letter dated

July 31, 2020 to Clint Halftown from the Office of the Secretary of the United States Department

of the Interior. (Dkt. No. 34-2). The Meyer Defendants have also relied on matters outside the

Complaint in support of their motion to dismiss, including two declarations by Paul Meyer, and

the exhibits thereto, and the declaration of Vincent Vance. (Dkt. No. 30-2; Dkt. No. 31-1; Dkt.

No. 35, at 1; Dkt. No. 44-1). The attachments to Meyer's first declaration include a copy of the

commercial lease agreement between Justice for Native First People, LLC and the Cayuga-

Seneca Nation, and the related tribal resolution, (Dkt. No. 31-2), an opinion letter dated

December 14, 2021 from an attorney to Justice for Native First People LLC regarding the

operation of the Seneca Falls Pipekeepers, (Dkt. No. 31-3), and a picture of the Seneca Falls

Pipekeepers, (Dkt. No. 31-4).

"Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to

consideration of the complaint itself." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

However, considering "materials outside the complaint is not entirely foreclosed on a 12(b)(6)

motion." *Id.* A complaint "is deemed to include any written instrument attached to it as an

exhibit or any statements or documents incorporated in it by reference." *Nicosia v. Amazon.com,

Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147,

152 (2d Cir. 2002)). "Where a document is not incorporated by reference, the court may

nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby

rendering the document integral to the complaint." *Id.* (quoting *DiFolco v. MSNBC Cable L.L.C.*,

622 F.3d 104, 111 (2d Cir. 2010) (internal quotation marks omitted)). Even where a document is

integral to the complaint, it must be "clear" that "no dispute exists regarding the authenticity or

accuracy of the document" and that "there exist no material disputed issues of fact regarding the

relevance of the document." *Faulkner*, 463 F.3d at 134. "[I]f material is not integral to or otherwise incorporated in the complaint, it may not be considered unless the motion to dismiss is converted to a motion for summary judgment and all parties are 'given a reasonable opportunity to present all the material that is pertinent to the motion.'" *Id.* (quoting Fed. R. Civ. P. 12(d)).

The Court finds no basis for considering any of the above materials. Although the Complaint references "the Property lease Defendant Meyer executed with Seneca-Cayuga Nation of Oklahoma on Defendant Justice for Native First People, LLC's behalf," (Dkt. No. 1, ¶ 38), that is the sole reference to the lease. Moreover, the lease is referenced only as background information regarding the circumstances that enabled Defendant Justice for Native First People LLCs to permit the Parker Defendants "to operate" the Seneca Falls Pipekeepers on the property that is the subject of the aforementioned lease. There is, therefore, no basis for finding that the lease is incorporated by reference in, or integral to, the Complaint. *See McLennon v. City of New York*, 171 F. Supp. 3d 69, 88–89 (E.D.N.Y. 2016) ("To be incorporated by reference, the complaint must make a clear, definite and substantial reference to the documents." (internal quotation marks and citation omitted)). The Complaint references none of the other documents and the Court finds no basis for considering them in connection with the pending motions to dismiss.

### C.    Analysis

#### 1.    Proximate Cause

For the reasons stated *supra* Section III.B.2., the Court concludes that the Complaint fails to allege proximate cause. Accordingly, Defendants' motions to dismiss the Cayuga Nation's

substantive RICO claim, 18 U.S.C. § 1962(c), and claim of RICO conspiracy, 18 U.S.C. § 1962(d) is granted.[16]

### 2.    Defendants Meyer, Native First People, LLC, and C.B. Brooks LLC

There is an alternative basis for dismissal of the § 1962(c) claim against the Meyer Defendants. The Meyer Defendants argue for dismissal of the RICO claims against them on the ground that the allegations in the Complaint fail to meet the "operation or management test" set forth in *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). (Dkt. No. 35-1, at 8). The Cayuga Nation does not respond to the Meyer Defendants' legal argument but asserts that Meyer Defendants' "property dealings have formed the bedrock of the RICO enterprise's ground operation," and that the Meyer Defendants enabled Pipekeepers to engage in its racketeering by leasing "the old Pipekeepers to Defendants at a below-market rate" and "obtained and sold the New Pipekeepers Store to Defendants for a six-hundred percent profit." (Dkt. No. 40, at 15). The Court agrees with the Meyer Defendants that the Complaint fails to allege facts that would allow a plausible inference that the Meyer Defendants participated in the operation or management of the alleged RICO enterprise sufficient to assert a substantive RICO claim under § 1962(c).

Under RICO § 1962(c), it is unlawful "for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). "In *Reves v. Ernst & Young*, the Supreme Court interpreted the operative language to require a RICO defendant charged with violating section 1962(c) to have had 'some part in *directing* [the enterprise's] affairs.'" *D'Addario v. D'Addario*, 901 F.3d 80, 103 (2d Cir. 2018) (emphasis in

---

[16] As noted *supra* note 14, the parties have not addressed proximate as to § 1962(a). There is, therefore, no basis on which to dismiss this claim. *See generally Ideal Steel Supply Corp. v. Anza (Anza II)*, 652 F.3d 310 (2d Cir. 2011).

original) (quoting *Reves*, 507 U.S. at 179). "A RICO defendant will not be liable for mere participation in a racketeering act, but will sustain liability under the statute for participation in the 'operation or management of an enterprise through a pattern of racketeering activity.'" *Id.* (quoting *Reves*, 507 U.S. at 184). The Second Circuit has characterized the "operation or management" test as a "relatively low hurdle for plaintiffs to clear, . . . especially at the pleading stage," but has emphasized that a RICO plaintiff "must plausibly allege that each defendant played '*some* part in directing the enterprise's affairs' if the RICO claim is to survive a motion to dismiss." *Id.* at 103–04 (quoting *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004)) (emphasis in original).

Here, the Complaint alleges that Parker led the RICO operation "under the cloak of the Property lease Meyer executed . . . on Justice for Native First People, LLC's behalf. (Dkt. No. 1, ¶ 38). While Justice for Native First People, LLC's lease was for the "below market rate of $1,000 per month," the Meyer Defendants, "permitted Defendant Parker to operate the Pipekeepers business from the Property for a substantial payment each month, essentially profiting from Pipekeepers' illicit cigarette business." (*Id.* ¶¶ 39–40). The Complaint alleges that after the Seneca Falls Pipekeepers was shut down, Defendants sought "a financial backer and new brick and mortar out of which to continue their unlawful activities," and that on January 11, 2022, Meyer, working through C.B. Brooks LLC, transferred a single family residence in Montezuma to Parker. (*Id.* ¶¶ 63–64). C.B. Brooks LLC, had purchased the residence for $30,000 in July 2021 and sold it to Parker for $180,000 in January 2022. (*Id.* ¶ 65; Dkt. No. 1-2, at 2–3). The Complaint alleges nothing about the relationship between any of the Parker Defendants and Meyer or his LLCs. Although Meyer facilitated the locations for Pipekeepers— in Seneca Falls and Montezuma, and the Complaint alleges that C.B. Brooks LLC made a

significant profit on the sale of the Montezuma residence, there are no facts about either property or the transactions themselves that would allow a plausible inference that Meyer and Justice for Native First People, LLC, as the Seneca Falls Pipekeepers landlord or that Meyer and C.B. Brooks LLC, as the seller in the Montezuma Pipekeepers real estate transaction, had any part in directing the alleged enterprise's affairs. *See, e.g.*, *Cont'l Petroleum Corp. v. Corp. Funding Partners, LLC*, No. 11-cv-7801, 2012 WL 1231775, at *6, 2012 U.S. Dist. LEXIS 51841, at *16 (S.D.N.Y. Apr. 12, 2012) (dismissing RICO claim for failure to "make any concrete factual assertions as to the mechanics of the interactions among defendants, including facts indicating that the disparate defendants functioned as a unit, or supporting the inference that defendants had a common interest in the success of the so-called enterprise"); *Flexborrow LLC v. TD Auto Fin. LLC*, 255 F. Supp. 3d 406, 416 (E.D.N.Y. 2017) (finding the plaintiffs' substantive RICO claim failed because "[e]ven construing the complaint in a light most favorable to plaintiffs, their allegations establish that defendant 'merely provide[d] professional services'. . . by entering into a financing agreement with that company and making loans" "in an arms length commercial transaction" "to facilitate the sale of automobiles" and there were "no allegations that defendant directed or advised on Emporio and Khan's vehicle sales, communicated with customers on their behalf, or 'had any control' over Emporio or Khan"). Thus, the Complaint fails to allege a plausible substantive RICO § 1962(c) claim against Defendants Meyer, Justice for Native First People, LLC, or C.B. Brooks LLC. Accordingly, the Meyer Defendants' motion to dismiss is granted as to RICO § 1962(c).

Finally, as the Meyer Defendants do not address liability for alleged investment of racketeering income, 18 U.S.C. § 1962(a), the Court does not address liability under that provision. *See, e.g.*, *Atl. Int'l Movers, LLC v. Ocean World Lines, Inc.*, 914 F. Supp. 2d 267, 275

(E.D.N.Y. 2012) ("To allege an investment injury under section 1962(a), plaintiff must plead two (2) elements: (1) that defendants used or invested racketeering income to acquire or maintain an interest in the alleged enterprise; and (2) that plaintiff suffered an injury as a result of that investment by defendants.").[17]

## V.    CONCLUSION

For these reasons, it is

**ORDERED** that Plaintiff's motion for a preliminary injunction (Dkt. No. 2) is **DENIED**; and it is further

**ORDERED** that the Parker Defendants' motions to dismiss (Dkt. No. 34) is **GRANTED** to the extent it seeks dismissal of Count I (18 U.S.C. § 1962(c)) and Count III (18 U.S.C. § 1962(d)), and is otherwise **DENIED**; and it is further

**ORDERED** that the Meyer Defendants' motion to dismiss (Dkt. No. 35) is **GRANTED** to the extent it seeks dismissal of Count I (18 U.S.C. § 1962(c)) and Count III (18 U.S.C. § 1962(d)), and is otherwise **DENIED**; and it is further

**ORDERED** that Count I (18 U.S.C. § 1962(c)) and Count III (18 U.S.C. § 1962(d)) of the Complaint are **DISMISSED.**

**IT IS SO ORDERED.**

Dated: <u>August 12, 2022</u>

Brenda K. Sannes
U.S. District Judge

---

[17] The Cayuga Nation has not requested permission to amend and the Court does not therefore consider whether to permit amendment.