**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

CAYUGA NATION, by and through its lawful governing
body, the CAYUGA NATION COUNCIL,

$\qquad$ Plaintiff,

$\qquad$ 5:22-cv-00128 (BKS/ATB)

v.

DUSTIN PARKER, NORA WEBER, JOSE VERDUGO,
JR., ANDREW HERNANDEZ, PAUL MEYER,
IROQUOIS ENERGY GROUP, INC., JUSTICE FOR
NATIVE FIRST PEOPLE, LLC, C.B. BROOKS LLC, and
JOHN DOES 1–10,

$\qquad$ Defendants.

---

PAUL MEYER, JUSTICE FOR NATIVE FIRST PEOPLE,
LLC, and C.B. BROOKS LLC,

$\qquad$ Third-Party Plaintiffs,

v.

CLINTON HALFTOWN and JOHN DOES 1–10,

$\qquad$ Third-Party Defendants.

---

DUSTIN PARKER, NORA WEBER, and ANDREW
HERNANDEZ,

$\qquad$ Third-Party Plaintiffs,

v.

CLINT HALFTOWN,

$\qquad$ Third-Party Defendant.

---

**Appearances:**

*For Plaintiff Cayuga Nation and Third-Party Defendant Clint Halftown:*
David G. Burch, Jr.
Michael E. Nicholson
Gabriel M. Nugent
Barclay Damon LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, New York 13202

*For Defendants and Third-Party Plaintiffs Dustin Parker, Nora Weber, and Andrew Hernandez:*
Daniel Hurteau
Nixon Peabody LLP
677 Broadway, 10th Floor
Albany, New York 12207

*For Defendants and Third-Party Plaintiffs Paul Meyer, Justice for Native First People, LLC, and C.B. Brooks LLC:*
David H. Tennant
Law Office of David Tennant PLLC
3349 Monroe Avenue, Suite 345
Rochester, New York 14618

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.     INTRODUCTION

Plaintiff Cayuga Nation, through its governing body, the Cayuga Nation Council, brings this action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. (Dkt. No. 1). The Cayuga Nation generally alleges that Defendants Dustin Parker, Nora Weber, Jose Verdugo, Jr., Andrew Hernandez, Paul Meyer, Iroquois Energy Group, Inc., Justice for Native First People, LLC, C.B. Brooks LLC, and John Does 1–10, are engaged in an unlawful scheme to co-opt the Nation's sovereign rights, erode its business and customer base, and steal its revenues "through the illegal sale of untaxed and unstamped cigarettes and marijuana, and various other merchandise" on the reservation. (*Id.* ¶ 2). Defendants are alleged to

2

have committed a pattern of racketeering activities under § 1961(1), including trafficking in contraband cigarettes (18 U.S.C. §§ 2341–2346), money laundering (18 U.S.C. § 1956), engaging in monetary transactions in property derived from specified unlawful activity (18 U.S.C. § 1957), and distributing or possessing a controlled substance (21 U.S.C. § 841). Following motion practice, the Court dismissed Plaintiff's substantive RICO claim as well as its RICO conspiracy claims, 18 U.S.C. §§ 1962(c) and (d), but, noting that Defendants had not addressed "liability for alleged investment of racketeering income," permitted Plaintiff's investment of racketeering income claim under § 1962(a) to move forward. *Cayuga Nation v. Parker ("Cayuga Nation I")*, No. 22-cv-128, 2022 WL 3347327, at *12, 2022 U.S. Dist. LEXIS 144120, at *35 (N.D.N.Y. Aug. 12, 2022). All Defendants have answered the Complaint. (Dkt. Nos. 57, 60, 61). Parker, Weber, and Hernandez (the "Parker Defendants"), and Meyer, Justice for Native First People, LLC, and C.B. Brooks LLC (the "Meyer Defendants"), have filed counterclaims against Cayuga Nation alleging: breach of sublease; breach of commercial lease; specific performance; trespass; tortious interference with contract; conversion; trespass to chattels; and violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. (Dkt. Nos. 60, 61). In addition, the Parker Defendants and Meyer Defendants have filed Third-Party Complaints against third-party defendant Clint Halftown,[1] alleging: tortious interference with contract; trespass; conversion; trespass to chattels; and violation of the Computer Fraud and Abuse Act. (Dkt. Nos. 64, 65). Defendants seek compensatory and punitive damages, specific performance, and attorneys' fees and costs. Presently before the Court are the Cayuga Nation's and Halftown's respective motions to dismiss the counterclaims and Third-Party Complaints under Federal Rules

---

[1] The Meyer Defendants also named "John Does 1–10" as third-party defendants in their Third-Party Complaint. (Dkt. No. 64, at 1).

of Civil Procedure 12(b)(1) and 12(b)(6). (Dkt. Nos. 75, 76). The motions are fully briefed. (Dkt. Nos. 77, 78, 79, 80, 81, 82). For the reasons that follow, the Cayuga Nation's motion to dismiss the counterclaims is granted in part and denied in part and Halftown's motion to dismiss the Third-Party Complaints is granted.

## II.    FACTS[2]

The Court assumes familiarity with the facts set forth at length in *Cayuga Nation I*, 2022 WL 3347327, at *1–5, 2022 U.S. Dist. LEXIS 144120, at *2–12. The Court sets forth additional facts below from the Complaint, counterclaims, Third-Party Complaints, and the parties' submissions as necessary to the analysis.

As a sovereign nation, the Cayuga Nation is free to conduct "certain economic activity on [its] own reservations free from interference by the State, including with regard to the application of state tax obligations." (Dkt. No. 1, ¶ 30). One of these economic activities is the manufacture and sale of "Cayuga brand" and "other 'native brand'" cigarettes on the reservation. (*Id.* ¶ 35). The Cayuga Nation "is engaged in several business enterprises, including owning and operating convenience stores called Lakeside Trading on the Nation's land." (Dkt. No. 65, ¶ 10). Lakeside Trading stores "sell tobacco related products, such as unstamped cigarettes and marijuana." (*Id.* ¶ 11).

Third-Party Defendant Clint Halftown "is a member of the Cayuga Nation's governing body, the Cayuga Nation Council, and the Nation's federal representative." (Dkt. No. 76-1, at 8; *see also* Dkt. No. 1, ¶ 12 (citing a letter from the Assistant Secretary of Indian Affairs recognizing "the Halftown Council 'as the Nation's governing body without qualification' and

---

[2] The facts are drawn from Defendants' Answers, including their counterclaims, (Dkt. No. 60, 61), the Third-Party Complaints, (Dkt. Nos. 64, 65), the Complaint, (Dkt. No. 1), and the attachments to those pleadings. The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

that '[t]he Halftown Council is the Nation's government for all purposes'" (emphasis omitted))).

In addition, Halftown, "along with others, owns and operates Great Swamp Enterprises, Inc.," a

"wholesale cigarette distribution company" that sells tobacco products to "the Cayuga Nation

and to other tribes," and to Lakeside Trading and "other stores" for resale. (Dkt. No. 65, ¶¶ 13–

14; *see also* Dkt. No. 64, ¶¶ 5, 7).[3] "Halftown is personally compensated for his position at Great

Swamp Enterprises by receiving a 'cut' (percentage) of the wholesale sales" and receives

"compensation through Great Swamp Enterprises that exceeds any other officer's

compensation." (Dkt. No. 64, ¶¶ 8–9). "Halftown runs G[reat] S[wamp] E[nterprises] as his own

personal business and profits under the guise of being affiliated with Cayuga Nation." (Dkt. No.

65, ¶ 18). "Halftown has treated the organs of the Cayuga Nation as his own business." (Dkt. No.

64, ¶ 11).

        In 2021, Meyer, through Justice for Native First People, LLC, entered into a four-year

lease with the Seneca-Cayuga Nation of Oklahoma ("Seneca-Cayuga") for a commercial

property located at 126 East Bayard Street, Seneca Falls, New York, (Dkt. No. 60, ¶ 14), a

property located within the Cayuga Nation reservation, (Dkt. No. 1, ¶ 37). A Seneca-Cayuga

tribal resolution authorized the transaction. (Dkt. No. 60, ¶ 15). The lease provided that Justice

for Native First People "was free to sublet all or a part of the premises" during the four-year

term. (*Id.* ¶ 16). Prior to Meyer's execution of the lease, the building, which had previously been

used as a convenience store and gas station, "had been vacant for nine years." (Dkt. No. 64, ¶

19). "In anticipation of subletting the property, [the Meyer Defendants] invested $80,000 to

recommission the gas pumps, perform heating, plumbing and electrical work, install a partial

---

[3] Unlike the Parker Defendants, the Meyer Defendants do not allege that Halftown has an ownership interest in GSE; they contend GSE is "tribally-owned" and that Halftown is an officer. (Dkt. No. 64, ¶ 7). Whether Halftown has an ownership interest in GSE is immaterial to the disposition of the present motions.

new roof, and purchase shelving." (*Id.* ¶ 20). The Meyer Defendants configured the front half of the 1,000 square-foot building as a convenience store and the back half as office space and storage. (*Id.* ¶ 21).

In or about June 2021, Parker, an enrolled member of the Cayuga Nation, approached Meyer and "expressed interest in subletting the front half of the" 126 East Bayard Street building "to operate a smoke shop and gas station." (Dkt. No. 60, ¶¶ 18–19; Dkt. No. 64, ¶ 23; Dkt. No. 65, ¶ 25). Meyer and Parker "agreed to a four-year sublease terms [sic] to run concurrently with the" Seneca-Cayuga lease. (Dkt. No. 60, ¶ 20; Dkt. No. 64, ¶ 27).

On or about September 1, 2021, Parker "began operating his store, called Pipekeepers Tobacco & Gas" ("Pipekeepers"). (Dkt. No. 60, ¶ 22; Dkt. No. 64, ¶ 28). On or about November 21, 2021, "Meyer was approached by his landlord, the Seneca-Cayuga Nation of Oklahoma, who reported that the faction of the Cayuga Nation headed by Clint Halftown was objecting to the smoke shop operated by Dustin Parker, his subtenant, apparently because it was cutting into their profits." (Dkt. No. 64, ¶ 29). The "Halftown faction was claiming the smoke shop was illegal." (*Id.* ¶ 30).

"Within a few months of opening Pipekeepers, Halftown began harassing Parker by sending personnel to Pipekeepers with demands to close Pipekeepers." (Dkt. No. 65, ¶ 30). "After Parker rejected Halftown's demands to close his business, the Cayuga Nation ostensibly purchased the East Bayard Property at the end of December 2021." (*Id.* ¶ 33). On or about December 27, 2021, Meyer learned "that the Seneca-Cayuga Nation of Oklahoma had just sold the building to the Halftown faction." (Dkt. No. 64, ¶ 33).

"On January 1, 2022, Halftown forcibly evicted Pipekeepers" from the 126 East Bayard Street property without notification" or "warrant" and without "judicial process." (Dkt. No. 65,

¶¶ 35–37). "To execute the . . . eviction, Halftown hired dozens of armed, private security guards to enter the East Bayard Property." (*Id.* ¶ 40). When "Meyer visited the property" that day, he "discovered armed guards stationed in front of the convenience store and gas pumps, with 'Store Closed' and yellow police tape strung along the permitter [sic] of the property, and cement barricades preventing entry." (Dkt. No. 64, ¶ 34). The security guards "confiscate[d] the entire inventory and property located at Pipekeepers, including cash, computers and various other personal property." (Dkt. No. 65, ¶ 40). "The seizure resulted in Halftown taking approximately $200,000 worth of inventory and gas, with a retail value of approximately $400,000." (*Id.* ¶ 42). "The seizure also resulted in Halftown taking password protected computers that were property of Pipekeepers, Parker, Weber, and Hernandez," (*id.* ¶ 43), as well as "tools, equipment and other personal property belonging to [the Meyer Defendants] and stored in the back half of the building," (Dkt. No. 64, ¶ 36). Further, "[u]pon information and belief": "Halftown, or others at his direction," (1) "hacked into the Pipekeepers' computers, taking and using information and data on those computers, including financial information for the store and personal information for Parker and Weber"; and (2) "obtained access to email and other communications between and among . . . Parker, Weber, Hernandez and others." (Dkt. No. 65, ¶¶ 48–49).

"Shortly after seizing the personal property, Halftown, using the Cayuga Nation as a cover, opened a new Lakeside Trading convenience store at the East Bayard Property and began selling the Pipekeepers' inventory." (*Id.* ¶ 44; *see also id.* ¶ 47 ("Halftown used the Cayuga Nation as a front for taking personal retribution and revenge on Pipekeepers.")). "Halftown profits from the sales at Lakeside Trading by selling cigarettes through this company, G[reat] S[wamp] E[nterprises]." (*Id.* ¶ 46). The Parker Defendants "have been unable to retrieve their property from the store, and Halftown has not provided compensation for the unlawful

confiscation of the property, inventory, cash, computers and business." (*Id.* ¶ 45). The Cayuga Nation "has "deprived and continue[s] to deprive" the Meyer Defendants "of the possession and use of their personal property." (Dkt. No. 64, ¶ 52).

## III.   STANDARD OF REVIEW

"A court faced with a motion to dismiss pursuant to both Rules 12(b)(1) and 12(b)(6) must decide the jurisdictional question first because a disposition of a Rule 12(b)(6) motion is a decision on the merits and, therefore, an exercise of jurisdiction." *Mann v. N.Y. State Ct. of Appeals*, No. 21-cv-49, 2021 WL 5040236, at *3, 2021 U.S. Dist. LEXIS 209018, at *8 (N.D.N.Y. Oct. 29, 2021) (citation omitted); *see also Vidurek v. Koskinen*, 789 F. App'x 889, 892 (2d Cir. 2019) (evaluating doctrine of sovereign immunity under Rule 12(b)(1)). "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (citation omitted). The Court may also "refer to evidence outside the pleadings" and "take judicial notice of documents in the public record, including state court filings." *Krajisnik Soccer Club, Inc. v. Krajisnik Football Club, Inc.*, No. 20-cv-1140, 2021 WL 2142924, at *2, 2021 U.S. Dist. LEXIS 99456, at *5 (N.D.N.Y. May 26, 2021) (citations omitted).

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, a counterclaim or third-party complaint "must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 550 U.S. at 555). The Court must accept as true all factual allegations in the

complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Courts have observed that while "[t]he pleading standards may be 'lessened somewhat for third-party claims, which may be read in conjunction with the original pleadings,'" the third-party plaintiff must "set forth 'enough facts to state a claim to relief that is plausible on its face.'" *Sands Harbor Marina Corp. v. Wells Fargo Ins. Servs. of Oregon, Inc.*, 156 F. Supp. 3d 348, 361 (E.D.N.Y. 2016) (first quoting *Arkwright Mut. Ins. Co. v. Bojoirve, Inc.*, No. 93-cv-3068, 1996 WL 361535, at *2, 1996 U.S. Dist. LEXIS 9013, at *6 (S.D.N.Y. June 27, 1996); and then quoting *Twombly*, 550 U.S. at 570).

## IV.    DISCUSSION

### A.    Counterclaims

#### 1.    Sovereign Immunity

The Cayuga Nation moves to dismiss the Parker and Meyer Defendants' counterclaims on the ground that they are barred by the doctrine of sovereign immunity. (Dkt. No. 75-1, at 8–10). Defendants respond that the Cayuga Nation waived its immunity when it initiated the present action and that the counterclaims are permissible under the "immovable property" and "recoupment" exceptions to sovereign immunity. (Dkt. No. 77, at 11–17; Dkt. No. 78, at 13–18).

"As 'domestic dependent nations,' federally recognized tribes possess 'the common-law immunity from suit traditionally enjoyed by sovereign powers.'" *Cayuga Indian Nation of New York v. Seneca Cnty., New York*, 978 F.3d 829, 835 (2d Cir. 2020) ("*Cayuga III*") (quoting *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014)). Therefore, "without

congressional authorization" or a waiver of tribal sovereign immunity, *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978) (quoting *United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 512 (1940)), "courts must dismiss[ ] any suit against a tribe." *Oneida Indian Nation v. Phillips*, 981 F.3d 157, 169 (2d Cir. 2020) ("*Phillips*") (quoting *Cayuga Indian Nation of New York v. Seneca Cnty., N.Y.*, 761 F.3d 218, 220 (2d Cir. 2014) ("*Cayuga I*") (citation and quotation marks omitted); *see Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014). Further, as relevant here, a plaintiff tribe does not waive sovereign immunity by filing suit and sovereign immunity from suit extends to counterclaims against a plaintiff tribe. *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 509 (1991) ("Possessing . . . immunity from direct suit, we are of the opinion [the Indian nations] possess a similar immunity from cross-suits." (quoting *United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 513 (1940))); *see Cayuga Indian Nation of New York v. Seneca Cnty., New York*, 260 F. Supp. 3d 290, 299 (W.D.N.Y. 2017) ("*Cayuga II*") ("This principle extends to counterclaims lodged against a plaintiff tribe." (quoting *Ute Indian Tribe of the Uintah & Ouray Reservation v. Utah*, 790 F.3d 1000, 1009 (10th Cir. 2015))).

It is undisputed that there has been no congressional authorization for the counterclaims Defendants bring in this case. Thus, sovereign immunity applies and bars Defendants' counterclaims unless, as the Meyer Defendants argue, (Dkt. No. 78, at 13–14), the Cayuga Nation waived sovereign immunity when it bought 126 East Bayard Street and allegedly assumed the commercial lease, or whether an exception otherwise applies.

The Meyer Defendants argue that when the Cayuga Nation purchased the 126 East Bayard Street property, it took the land subject to the pre-existing commercial lease, including the contractual provision in which the Seneca-Cayuga Nation waived sovereign immunity. (*Id.* at

10

11–14). While tribal sovereign immunity may be waived, it is well "settled that a waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.'" *Santa Clara Pueblo*, 436 U.S. at 58 (quoting *United States v. Testan*, 424 U.S. 392, 399 (1976)). Section 19.09 of the commercial lease agreement between the Seneca-Cayuga Nation and "Paul Meyer-Member, Justice for Native First People, LLC," contains a limited waiver of the Seneca-Cayuga Nation's sovereign immunity; it provides, in relevant part:

> Section 19.10 Limited Waiver of Sovereign Immunity. The (Landlord/Lessor) Seneca-Cayuga Nation aka Seneca-Cayuga Tribe of Oklahoma, a Federally Recognized Tribe, with a constitution ratified on May 15, 1937, and it's Business Committee, wherein such Committee is acting in its capacity as a political governing body of the Seneca-Cayuga Nation Landlord *grants a clear and unequivocal limited waiver of its sovereign immunity from suit and collection only for the limited purposes* as set forth in this Section 19.10 as follows: (a) the dispute shall be brought by and limited to Tenant and no other party or entity; (b) the dispute shall be limited to causes of action arising under this Agreement (c) any action is limited only to actions brought in the United States District Court for the Northern District of Oklahoma; (d) any such award or damages resulting from the dispute shall be limited to the occupancy rights of the subject property and potential sub-lease revenues referenced in this Agreement and no other assets of the Landlord; and (e) this limited waiver of Landlord's sovereign immunity shall terminate when this Agreement terminates.

(Dkt. No. 61, at 38 (emphasis added)). Citing Oklahoma and New York law,[4] the Meyer Defendants argue that when the Cayuga Nation purchased 126 East Bayard Street, it took the premises subject to the existing commercial lease, including the waiver of sovereign immunity. (Dkt. No. 78, at 11–14 (citing inter alia *Ferguson v. District Court of Oklahoma Cnty.*, 544 P.2d 498, 499 (Okla. 1975); *52 Riverside Realty Co. v. Ebenhart*, 119 A.D.2d 452, 453 (N.Y. App.

---

[4] The lease further provides that it is governed by Oklahoma law. (*See* Dkt. No. 61, at 38 ("All matters pertaining to this agreement (including its interpretation, application, validity, performance and breach) in whatever jurisdiction action may be brought, shall be governed by, construed and enforced in accordance with the laws of the State of Oklahoma.")).

Div. 1986))). However, the commercial lease provision at issue expresses a waiver of the *Seneca-Cayuga Nation's* rights, and indicates that the Seneca-Cayuga Nation's "Business Committee . . . acting in its capacity as a political governing body of the Seneca-Cayuga Nation" granted the waiver. (Dkt. No. 61, at 38). Nothing in the body of the commercial lease says anything that would allow a conclusion that the Cayuga Nation similarly authorized a waiver of its sovereign immunity. As stated, a waiver of sovereign immunity must be "unequivocally expressed." *Santa Clara Pueblo*, 436 U.S. at 58; *see Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 (1982) ("Without regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact *unless surrendered in unmistakable terms*.") (emphasis added). Thus, the Court finds no basis for concluding that the Cayuga Nation surrendered its sovereign immunity when it allegedly assumed the commercial lease. *See World Touch Gaming, Inc. v. Massena Mgmt., LLC*, 117 F. Supp. 2d 271, 275 (N.D.N.Y. 2000) (holding that because waiver of tribal sovereign immunity "must be express" and individual signing the sales and lease agreement was not authorized by the tribal council to waive immunity and tribal council did not "expressly waive the Tribe's sovereign immunity, the Tribe's sovereign immunity was not waived, and it is immune from suit"). In any event, because the lease requires that "any action" may only be brought in the United States District Court for the Northern District of Oklahoma, (Dkt. No. 61, at 38), it does not appear that any waiver of sovereign immunity would extend to a suit filed in this Court. *See e.g.*, *Presidential Gardens Assocs. v. U.S. ex rel. Sec'y of Hous. & Urb. Dev.*, 175 F.3d 132, 141–42 (2d Cir. 1999) ("Thus, the suit Plaintiffs–Appellants have brought belongs in the Court of Federal Claims, and is jurisdictionally barred from being brought in the Connecticut District Court.").

Next, the Meyer Defendants argue that the "immovable property exception" to sovereign immunity applies. "Generally speaking, [the immovable property] exception refers to a common law doctrine that curtails sovereign immunity in legal actions contesting a sovereign's rights or interests in real property located within another sovereign's territory." *Cayuga III*, 978 F.3d at 834. The Supreme Court has yet to determine whether the immovable property exception applies to tribal sovereign immunity. *See Upper Skagit Indian Tribe v. Lundgren*, 138 S. Ct. 1649, 1654 (2018) (declining to determine the applicability of the immovable property exception to tribal sovereign immunity, observing that "[d]etermining the limits on the sovereign immunity held by Indian tribes is a grave question"). Further, even if applicable, the parties have not addressed how the immovable property exception would apply where, as here, it appears that 126 East Bayard Street is located within the bounds of the Cayuga Nation reservation.[5] (Dkt. No. 1, ¶ 37; Dkt. No. 61, at 46). *See Phillips*, 981 F.3d at 170 (finding that "[e]ven if the exception applied to tribal sovereign immunity generally, it would not apply here, where it is undisputed that the Nation did not purchase the 19.6 Acre Parcel in 'the character of a private individual' buying lands in another sovereign's territory").

Finally, Defendants argue that their counterclaims fall within the recoupment exception to sovereign immunity. (Dkt. No. 77, at 15–17; Dkt. No. 78, at 22–24 (arguing that the counterclaims "arise out the same transaction or occurrence and can be limited to a set-off against the Cayuga Nation's claimed RICO damages," and are therefore permissible claims for recoupment for which sovereign immunity has been waived)). The Cayuga Nation replies that because the counterclaims do not rise from the same transaction or occurrence as its RICO claim

---

[5] The Meyer Defendants argue that the Cayuga Nation was acting as a "private party" when it purchased the property at issue, noting that the property is "within the taxing and regulatory jurisdiction of the City of Waterloo, County of Seneca, and New York State," (Dkt. No. 78, at 17), but have not alleged any facts suggesting 126 East Bayard Street was outside the boundaries of the reservation.

and because Defendants seek affirmative relief, "Defendants['] attempt to recast them as recoupment claims in an effort to get around the Nation's sovereign immunity" fails. (Dkt. No. 79, at 7). The Court agrees in part.

"[C]ase law has developed a significant limitation to the general bar of sovereign immunity in the context of counterclaims." *United States v. Forma*, 42 F.3d 759, 764 (2d Cir. 1994). As the Second Circuit has explained, "[d]espite sovereign immunity, 'a defendant may, without statutory authority, recoup on a counterclaim an amount equal to the principal claim.'" *Id.* (quoting *United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 511 (1940)). While "a suit in the name of the [sovereign] does not amount to a waiver of sovereign immunity subjecting the [sovereign] to an affirmative adverse judgment on a counterclaim," a "counterclaim may be asserted against a sovereign by way of set off or recoupment to defeat or diminish the sovereign's recovery." *Id.* (quoting *United States v. Agnew*, 423 F.2d 513, 514 (9th Cir. 1970)). "[A] [counter]claim sounding in recoupment must arise 'out of the transaction that grounds the main action' and must request only a set-off of damages, not affirmative recovery." *Oneida Indian Nation of New York v. New York*, 194 F. Supp. 2d 104, 136 (N.D.N.Y. 2002) ("*Oneida*") (quoting *Forma*, 42 F.3d at 765). "Whatever the theory, the equitable doctrine permits a defendant to assert a claim in order to reduce or eliminate the amount of damages recoverable by the plaintiff so long as the claim arises from the same contract, transaction or occurrence as plaintiff's claim." *United States v. Livecchi*, 605 F. Supp. 2d 437, 450 (W.D.N.Y. 2009), *aff'd*, 711 F.3d 345 (2d Cir. 2013) (citing *United States v. Green*, 33 F. Supp. 2d 203, 223 (W.D.N.Y. 1998)).

The Second Circuit has "construed the transaction or occurrence standard liberally:

> In determining whether a claim arises out of the transaction . . . that
> is the subject matter of the opposing party's claim, this Circuit

14

> generally has taken a broad view, not requiring an absolute identity
> of factual backgrounds . . . but only a logical relationship between
> them. This approach looks to the logical relationship between the
> claim and the counterclaim, and attempts to determine whether the
> essential facts of the various claims are so logically connected that
> considerations of judicial economy and fairness dictate that all the
> issues be resolved in one lawsuit.

*Cabiri v. Gov't of Republic of Ghana*, 165 F.3d 193, 197 (2d Cir. 1999) (quoting *United States v. Aquavella*, 615 F.2d 12, 22 (2d Cir. 1979)).

The Cayuga Nation's remaining claim against Defendants falls under 18 U.S.C. § 1962(a), which prohibits the investment of racketeering income.[6] "Under the plain language of this section, a violation of § 1962(a) consists of investing income derived from a pattern of racketeering activity to acquire an interest in, establish, or operate an enterprise" and "a plaintiff must allege injury 'by reason of' defendants' investment of racketeering income in an enterprise." *Ouaknine v. MacFarlane*, 897 F.2d 75, 82–83 (2d Cir. 1990). A plaintiff "asserting a civil RICO claim based on a violation of subsection(a) must show injury caused not by the pattern of racketeering injury itself, but rather by the use or investment of the proceeds of that activity." *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 321 (2d Cir. 2011). Courts have held that a plaintiff must show an investment injury, "separate and apart from any injury caused by the predicate acts themselves." *See Wood v. General Motors Corp.*, No. 08-cv-5224, 2015 WL 1396437, at *8, 2015 U.S. Dist. LEXIS 37782, at *23 (E.D.N.Y. March 25, 2015 (citation

---

[6] 18 U.S.C. § 1962(a) provides:

> It shall be unlawful for any person who has received any income derived, directly
> or indirectly, from a pattern of racketeering activity . . . to invest, directly or
> indirectly, any part of such income, or the proceeds of such income, in the
> acquisition of any interest in, or the establishment or operation of, any enterprise
> which is engaged in, or the activities of which affect, interstate or foreign
> commerce.

omitted) (collecting cases); *DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 770 F. Supp. 2d 497, 522–23 (E.D.N.Y. 2011).

Here, the Cayuga Nation alleges that Defendants "used income that was derived from a pattern of racketeering activity in an interstate enterprise, specifically using monies derived from unlawful conduct to facilitate the import of contraband and other goods from across state lines." (Dkt. No. 1, ¶ 87). According to the Complaint, "Defendant Parker and his affiliate Defendants" were "flush with cash and inventory from" the illegal enterprise at the Pipekeepers store located at 126 East Bayard Street. (*Id.* ¶¶ 6, 45–46). After that store was closed, the Meyer Defendants allegedly purchased a single-family residence at 7153 State Route 90N, Montezuma, New York, and then sold it to the Parker Defendants, who planned to open a second Pipekeepers store. (*Id.* 64, 67). Plaintiff seeks damages for "lost customers, business opportunities, and business revenue in the amount of $5,000,0000" and an injunction "permanently enjoining Defendants from operating or financing an illicit cigarette business within the boundaries of the Cayuga Nation Reservation." (*Id.* ¶ 89).

The Defendants' counterclaims arise from the same time period: their allegations revolve around the Cayuga Nation's enforcement action against the alleged racketeering enterprise at 126 Bayard Street. The Defendants challenge, inter alia: "the forcible entry onto the real property, forcible eviction of the sub-tenant (Dustin Parker) and forcible ouster of the leaseholder (Meyer Defendants)." (Dkt. No. 78, at 23).

But this case does not concern the Defendants' legal interest in 126 East Bayard Street. At issue here is the Defendants' investment of proceeds of racketeering activity that occurred at that location. Defendants' breach of commercial lease and sub-lease, tortious interference with contract, specific performance, trespass, and attorneys' fees and costs claims, while perhaps

related matters, arise from separate transactions and occurrences. *Cf.*, *United States v. Dorio*, 483 F. Supp. 3d 145, 149, 154 (D. Conn. 2020) (finding the defendant's counterclaims arose from same "transaction or occurrence" where the United States alleged that the defendant was "indebted to the VA . . . because she failed to comply with the terms of a scholarship agreement" and each counterclaim relied "on the same underlying facts as the claim in the Complaint, including" the defendant's "obligation[s] with the VA under the . . . program," the defendant's "scholarship repayment obligation," and "the very same debt which the Government's original action seeks to collect"); *see also McClendon v. United States*, 885 F.2d 627, 630 (9th Cir. 1989) ("[A] tribe's waiver of sovereign immunity may be limited to the issues necessary to decide the action brought by the tribe; the waiver is not necessarily broad enough to encompass related matters, even if those matters arise from the same set of underlying facts.").

The Parker Defendants' Computer Fraud and Abuse Act claim, which alleges that the Cayuga Nation "knowingly and intentionally accessed the computers without authorization or exceeded authorized access to the computers, and thereby obtained information from the computers," including "Pipekeepers' email and other communications," (Dkt. No. 60, ¶¶ 71–72), "venture[s] outside the subject of the original cause of action," *Oneida*, 194 F. Supp. 2d at 136 (quoting *United States v. Tsosie*, 92 F.3d 1037, 1043 (10th Cir. 1996)). Indeed, the Parker Defendants have not provided any argument as to how this counterclaim arises from the same transaction or occurrence as the Cayuga Nation's investment of racketeering income claim.

In addition to arising out of a separate transaction or occurrence, Defendants' breach of commercial lease and sub-lease, tortious interference with contract, trespass, attorneys' fees and costs, and Computer Fraud and Abuse Act claims fail as recoupment counterclaims because Defendants seek affirmative relief in the form of compensatory and punitive damages in

connection with these claims.[7] "[R]ecoupment is defined as "a method by which a defendant may reduce the amount of damages it is liable to pay." *Cayuga Indian Nation of New York v. Vill. of Union Springs*, 293 F. Supp. 2d 183, 194 (N.D.N.Y. 2003) (citing *Canadian St. Regis Band of Mohawk Indians ex rel. Francis v. New York*, 278 F. Supp. 2d 313, 354 (N.D.N.Y. 2003) ("*St. Regis*")). Thus, because any relief granted in connection with the aforementioned counterclaims would result in a judgment against the Cayuga Nation for damages and a claim for recoupment "must request only a set-off of damages, not affirmative recovery," *Oneida*, 194 F. Supp. 2d at 126, Defendants' breach of lease and sub-lease, specific performance, tortious

---

[7] The Parker Defendants' requests for relief are as follows:

- Breach of Commercial Lease/Sub-Lease (Breach of Contract) claim – compensatory damages for "lost customers, business opportunities, and business revenue in an amount to be determined at trial." (Dkt. No. 60, at 19).
- Trespass of 126 East Bayard Street – compensatory damages for "lost customers, business opportunities, and business revenue in an amount to be determined at trial." (*Id.* at 19–20).
- Tortious Interference with Contract – "monetary damages in an amount to be determined at trial" as well as punitive damages. (*Id.* at 20).
- Conversion – monetary and punitive damages for the Cayuga Nation's alleged "taking and subsequent use, possession and sale of its personal property." (*Id.* at 20–21).
- Trespass to Chattels – compensatory and punitive damages for the Cayuga Nation's interference "with the use of personal property, including inventory, cash, computers, and other personal effects" at 126 East Bayard Street. (*Id.* at 21–22).
- Computer Fraud and Abuse Act – compensatory and punitive damages and attorneys' fees and costs.
- Attorneys' Fees and Costs – as a prevailing party on the ground that they are provided for in the sub-lease and lease agreements. (*Id.* at 23).

The Meyer Defendants' requests for relief are as follows:

- Breach of Commercial Lease Agreement – monetary damages. (Dkt. No. 61, at 16).
- Specific Performance – restoration of "Justice for Native First People LLC as the lawful occupant and tenant of 126 E. Bayard Street." (*Id.* at 17).
- Tortious Interference with Contract –  compensatory and punitive damages. (*Id.* at 17–18).
- Trespass – compensatory and punitive damages. (*Id.* at 18).
- Conversion –  punitive damages as a result of the Cayuga Nation's alleged conversion of "the personal property of Meyer Defendants stored at 126 E. Bayard Street." (*Id.* at 19).
- Attorneys' Fees and Costs – as a prevailing party on the ground that they are provided for in the commercial lease agreement. (*Id.* at 19).

interference with contract, trespass, attorneys' fees and costs, and Computer Fraud and Abuse

Act counterclaims must be dismissed. Such a judgment is precluded even under the recoupment

exception to sovereign immunity. *See Forma*, 42 F.3d at 765 ("[A] party sued by the United

States may recoup damages . . . so as to reduce or defeat the government's claim . . . though no

affirmative judgment . . . can be rendered against the United States." (quoting *In re Greenstreet*,

209 F.2d at 663)); *see United States v. Shaw*, 309 U.S. 495, 504 (1940) ("[N]o judgment may be

entered against the government even though the court has ascertained, through its processes, that

the government is actually indebted to the defendants.").

Moreover, the Court notes that in connection with their specific performance

counterclaim, the Meyer Defendants seek an order restoring "Justice for Native First People LLC

as the lawful occupant and tenant of 126 E. Bayard Street." (Dkt. No. 61, at 17). This request

seeks relief beyond that the Cayuga Nation seeks—damages as a result of Defendants'

investment of racketeering income and an order enjoining Defendants from operating an "illicit

cigarette" and marijuana business, and thus is barred by sovereign immunity. *Cf., Oneida* , 194

F. Supp. 2d at 137 (finding counterclaim permissible because the defendants' counterclaims for

"a declaration by the Court" that the Oneida Nation had "no rights to the subject lands" was

"relief similar to that sought by" the Oneida Nation, which sought "a determination from the

Court that they have possessory rights to the lands at issue and that Defendants' interests in these

lands are void").

On the other hand, at this stage of the proceedings, absent further briefing regarding

damages recoverable by Cayuga Nation under § 1962(a), the Court cannot find, as a matter of

law, that the trespass to chattels and conversion claims fail to state valid claims for recoupment.[8]

---

[8] The parties did not address how these counterclaims would reduce damages recoverable for the sole remaining claim
– the investment of racketeering proceeds under § 1962(a). *See Wood*, 2015 WL 1396437, at *8, 2015 U.S. Dist.

In its § 1962(a) claim the Cayuga Nation seeks damages for "lost customers, business opportunities, and business revenue in the amount of $5,000,0000." (Dkt. No. 1, ¶ 89). The conversion and trespass to chattels counterclaims allege that the Cayuga Nation interfered with the inventory, cash, computers, and other personal effects at the 126 East Bayard Street Pipekeepers. (Dkt. No. 60, ¶¶ 56–68; Dkt. No. 61, ¶¶ 42–46). The Parker Defendants allege that on January 1, 2022, the Cayuga Nation "confiscated the inventory and property located at Pipekeepers, including cash, computers and various other personal property belonging to Pipekeepers" from the 126 East Bayard Street property. (Dkt. No. 60, ¶ 26). The Parker Defendants assert "[s]hortly after seizing the Pipekeepers' property, the Plaintiff opened a new Lakeside Trading convenience store at the East Bayard Property and began selling the Pipekeepers' inventory." (*Id.* ¶ 30). The Parker Defendants contend that the "seizure resulted in approximately $200,000 worth of inventory and gas, with a retail value of approximately $400,000 confiscated by" the Cayuga Nation. (*Id.* ¶ 28). The Meyer Defendants allege that in anticipation of subletting the property, it "invested $80,000 to recommission the gas pumps, perform heating, plumbing and electrical work, install a partial new roof, and purchase shelving." (Dkt. No. 61, ¶ 6). They further allege that the Cayuga Nation "converted tools, equipment and other personal property belonging to [the Meyer Defendants] and stored in the back half of the building." (*Id.* ¶ 22).

As Defendants' inventory, cash, computers, improvement of the premises at 126 East Bayard Street are allegedly now being utilized by the Cayuga Nation in furtherance of its cigarette business—the same business Defendants are alleged to have damaged—it may be that

---

LEXIS 37782, at *23 (ruling that under § 1962(a) a plaintiff must show an investment injury, "separate and apart from any injury caused by the predicate acts themselves"); *DeSilva*, 770 F. Supp. 2d at 522–23.

the claims of conversion and trespass to chattels arise from the same transaction and occurrence as the RICO § 1962(a) investment of racketeering income claim. And, the cash, value of the inventory, and improvements to 126 East Bayard Street, all of which are allegedly being used by the Cayuga Nation in furtherance of their own business, may constitute a valid recoupment against an award of damages under § 1962(a). *See St. Regis*, 278 F. Supp. 2d at 354 ("[I]f the Tribes recover, the defendants are seeking to reduce the amount of that recovery by improvements made to the subject property, other than those which may be attributable to the Tribes. Similarly, the defendants are seeking to reduce the amount of the Tribal plaintiffs' recovery, if any, by the amount of any consideration which the Tribes may have received for the subject property. It is difficult to imagine any more apt descriptions of recoupment."). However, to the extent Defendants seek compensatory and punitive damages beyond the value of the cash, inventory, and investment in 126 East Bayard Street, those claims for relief are dismissed.[9]

Accordingly, the Cayuga Nation's motion to dismiss Defendants' breach of contract, specific performance, trespass, attorneys' fees and costs, and Computer Fraud and Abuse Act claims is granted. The Cayuga Nation's motion to dismiss is also granted to the extent it seeks dismissal of Defendants' claims for compensatory and punitive damages in connection with their trespass to chattels and conversion claims.

---

[9] Also, to the extent the theory on which the trespass to chattels claim is based is the Cayuga Nation's alleged "interference with information stored on a computer"—it seeks affirmative relief because it does not amount to a request for a reduction in the Cayuga Nation's recovery for investment of racketeering proceeds under § 1962(a). *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 437 (2d Cir. 2004) ("[C]ourts have drawn a distinction between interference by dispossession, which does not require a showing of actual damages, and interference by unauthorized use or intermeddling which requires a showing of actual damages.") (internal citations omitted).

### 2.       Failure to State a Claim

The Cayuga Nation moves to dismiss Defendants' trespass to chattels and conversion claims on the ground that they are inadequately pled. (Dkt. No. 75-1, at 15–16). Defendants oppose this motion. (Dkt. No. 77, at 20–21; Dkt. No. 78, at 26–27).

### a.       Conversion

"To state a claim for conversion under New York law, a plaintiff must show that someone, intentionally and without authority, assume[d] or exercise[d] control over personal property belonging to someone else, interfering with that person's right of possession." *Jung v. Chorus Music Studio, Inc.*, No. 13-cv-1494, 2014 WL 4493795, at *8, 2014 U.S. Dist. LEXIS 128103, at *20 (S.D.N.Y. Sept. 11, 2014) (internal quotation marks and citation omitted). "An essential element of conversion is the 'unauthorized dominion' to the exclusion of the right of the plaintiff." *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp*, LLC, 813 F. Supp. 2d 489, 535 (S.D.N.Y. 2011) (citation omitted). "The plaintiff must also allege that the defendant converted a specific, identifiable piece of property." *Obeid v. Mack*, No. 14-cv-6498, 2016 WL 1069678, at *4, 2016 U.S. Dist. LEXIS 34748, at *13 (S.D.N.Y. Mar. 17, 2016) (citing *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 207 (S.D.N.Y. 2008)).

Here, Defendants allege that on January 1, 2022, the Cayuga Nation took possession, without authority, of Defendants' cash, computers, inventory, tools, equipment, including improved gas pumps and premises, at 126 East Bayard Street and has excluded Defendants, since that date, from the premises, and has utilized the property and premises as its own, selling Defendants' inventory for its own benefit. These allegations sufficiently state a plausible claim for relief for conversion. The Cayuga Nation argues that Defendants' description of the property allegedly converted is "too vague and indefinite to support a claim." (Dkt. No. 75-1, at 16 (internal quotation marks omitted)). The Court disagrees. Here, Defendants have identified gas

pumps, improvements to the premises, including shelving, cash, inventory, and computers. (Dkt. No. 60, ¶ 26; Dkt. No. 61, ¶ 6). These allegations sufficiently describe specific, identifiable property. *See Goldberger v. Rudnicki*, 94 A.D.3d 1047, 1047-48 (N.Y. App. Div. 2012) (allegations that defendant "intentionally, and without authority, assumed or exercised control over, inter alia, equipment, money, and accounts receivable belonging in part to the plaintiff" stated a claim for conversion). Accordingly, the Cayuga Nation's motion to dismiss Defendants' conversion claim is denied.

**b.    Trespass to Chattels**

The Cayuga Nation moves to dismiss the Parker Defendants' trespass to chattels claim on the ground that it is duplicative of their conversion claim. (Dkt. No. 75-1, at 16). In response, the Parker Defendants argue that their trespass to chattels claim concerns the Cayuga Nation's alleged possession of their computers and accessing of "the computers to obtain key personal and financial data against the Parker Defendants." (Dkt. No. 77, at 21). While a "claim for trespass to chattels overlaps with a claim for conversion," that does not appear to be a basis for dismissal at this stage. *Lavazza Premium Coffees Corp. v. Prime Line Distribs. Inc.*, 575 F. Supp. 3d 445, 475 (S.D.N.Y. 2021) (explaining that there is a cause of action for trespass when a defendant "merely interfered with plaintiff's property" and a cause of action for conversion when the plaintiff's "dominion, rights, or possession" is the basis for the action) (citation omitted). This Court has not found any decisions dismissing claims for trespass to chattels as duplicative of claims for conversion at the motion to dismiss stage. The Court has, by contrast, found decisions permitting both types of claims to proceed. *See, e.g.*, *DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 283 (S.D.N.Y. 2014) (explaining that "[b]ecause the elements of a trespass-to-chattels claim are substantially similar to the elements of a conversion claim, the Court applies the same analysis" to both claims, and denying motion to dismiss as to certain defendants); *Baron v. Suissa*, 167

23

A.D.3d 689, 690 (N.Y. App. Div. 2018) (reversing dismissal of complaint alleging claims of both conversion and trespass to chattels).

Accordingly, the Cayuga Nation's motion to dismiss for failure to state a trespass to chattels or conversion claim is denied.[10]

## B.    Third Party Complaints

Clint Halftown moves to dismiss the Third-Party Complaints on the ground that, as a governmental official, all claims against him are barred by sovereign immunity. (Dkt. No. 76-1, at 10–14). Defendants oppose dismissal, arguing that Halftown "cannot seek shelter within tribal immunity" where, as here, he acted "outside the scope of his delegated authority." (Dkt. No. 80, at 10–12; Dkt. No. 81, at 11–14).[11]

A litigant "cannot circumvent tribal immunity by merely naming officers or employees of the Tribe when the complaint concerns actions taken in defendants' official or representative capacities and the complaint does not allege they acted outside the scope of their authority." *Chayoon v. Chao*, 355 F.3d 141, 143 (2d Cir. 2004); *Sun v. Mashantucket Pequot Gaming Enter.*, 309 F.R.D. 157, 162 (D. Conn. 2015) ("Tribal sovereign immunity also 'extends to all tribal employees acting within their representative capacity and within the scope of their official authority.'" (quoting *Bassett v. Mashantucket Pequot Museum & Research Ctr. Inc.*, 221 F. Supp. 2d 271, 278 (D. Conn. 2002)).

Here, Defendants offer no allegations that would allow a plausible inference that Halftown was acting in his individual capacity with respect to the eviction of Defendants from 126 East Bayard Street and seizure of property. Indeed, Defendants provide no factual details

---

[10] In view of this disposition, the Court need not reach the parties' remaining arguments.

[11] In their Third-Party Complaint, the Meyer Defendants state that Halftown is sued in his individual capacity. (Dkt. No. 64, ¶ 5). The Parker Defendants do not expressly state that they are suing Halftown in his individual capacity.

that would allow the Court to infer that Halftown was acting outside his official capacity; the allegations regarding his role are vague. For example, Defendants allege that "the faction of the Cayuga Nation headed by Clint Halftown was objecting to the smoke shop operated by Dustin Parker . . . because it was cutting into their profits," (Dkt. No. 64, ¶ 29),  Halftown "began harassing Parker by sending personnel to Pipekeepers with demands to close Pipekeepers," "Halftown forcibly evicted Pipekeepers from the East Bayard Property without any pre-waring [sic] or notification (written or otherwise)," such as a warrant, and "Halftown hired dozens of armed, private security guards to enter the East Bayard Property and confiscate the entire inventory," (Dkt. No. 65, ¶¶ 30, 35, 40). They further allege that Halftown has an ownership interest in GSE, a company that sells cigarettes to the Lakeside Trading store now operating from 126 East Bayard Street and that "Halftown has treated the organs of the Cayuga Nation as his own business." (Dkt. No. 64, ¶ 11). Defendants provide no factual details that would allow a plausible inference that Halftown was acting individually or outside the scope of his tribal authority in connection with the eviction, confiscation, and use of Defendants' inventory, computers, and property. *See Frazier v. Turning Stone Casino*, 254 F. Supp. 2d 295, 310 (N.D.N.Y. 2003) (finding the individual tribal officials were protected by sovereign immunity where the plaintiffs did "nothing more than allege that [individual tribal officials] violated state law and, thus, acted outside the scope of their authority, explaining that there were "no allegations . . . that these Defendants acted "without any colorable claim of authority").

Halftown's ownership interest in a company that may supply the new Lakeside Trading store, without more, is likewise insufficient to show he was acting outside his official capacity. *See, e.g.*, *Gristede's Foods, Inc. v. Unkechauge Nation*, No. 06-cv-1260, 2006 WL 8439534, at *6, 2006 U.S. Dist. LEXIS 98321, at *29 (E.D.N.Y. Dec. 22, 2006) (explaining that although

defendant Harry Wallace, who was "named as a senior tribal official of the Unkechauge Nation . . . [was] also being sued in his capacity as the owner and operator of Poospatuck Smoke Shop," because the "complaint does not allege that Wallace, in running the Poospatuck Smoke Shop, was acting outside his tribal authority . . . if the Unkechauge are immune from suit, as the complaint currently reads, Wallace is likewise immune").

The Meyer Defendants argue that Halftown may be sued in his official capacity under *Ex Parte Young*, 209 U.S. 123 (1908), in connection with their "prospective and retrospective relief for trespass." (Dkt. No. 81, at 10–11). While *Ex Parte Young* does allow suits for prospective injunctive relief, *Puyallup Tribe, Inc. v. Dep't of Game*, 433 U.S. 165, 171–72, (1977) ("[W]hether or not the Tribe itself may be sued in a state court without its consent or that of Congress, a suit to enjoin violations of state law by individual tribal members is permissible."), in this case, as Halftown notes, "both groups of Defendants have exclusively sought monetary relief," (Dkt. No. 82, at 7; *see* Dkt. No. 64, ¶¶ 47, 56 (the Meyer Defendants alleging and seeking monetary damages from Halftown in connection with trespass claim; Dkt. No. 65, ¶ 69, 89 (the Parker Defendants requesting an award of monetary and punitive damages for Halftown's alleged trespass)). Accordingly, *Ex Parte Young* does not provide a basis for allowing the claims against Halftown to proceed.

Accordingly, Halftown's motion to dismiss the Third-Party Complaints is granted.[12]

## V.   CONCLUSION

For these reasons, it is

**ORDERED** that Plaintiff's motion to dismiss the counterclaims (Dkt. No. 75) is **DENIED** as to Defendants' claims of conversion and trespass to chattels, to the extent their

---

[12] In view of this disposition, the Court need not reach Defendants' remaining arguments.

claims seeks recoupment, and is otherwise **GRANTED** in its entirety and all counterclaims,

except the claims of conversion and trespass to chattels to the extent they seek recoupment, are

**DISMISSED**;[13] and it is further

       **ORDERED** that Halftown's motion to dismiss (Dkt. No. 76) the Third-Party Complaints

is **GRANTED** and the Third-Party Complaints (Dkt. Nos. 64, 65) are **DISMISSED**.

       **IT IS SO ORDERED.**

Dated: <u>January 9, 2023</u>

Brenda K. Sannes
Chief U.S. District Judge

---

[13] The Meyer Defendants assert that "the detailed factual contentions underlying" their state law tort and contract more than satisfy the *Iqbal/Twombly* pleadings requirements but request permission to amend their counterclaims and Third-Party Complaint in the event the Court finds "any cause of action insufficiently pled." (Dkt. No. 78, at 8; Dkt. No. 81, at 6). As the Court finds, with the exception of the conversion and trespass to chattels counterclaims, that these claims are barred by sovereign immunity and neither party has sought to amend on that ground, the Court does not address amendment here.