**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

CAYUGA NATION, by and through its lawful governing
body, the CAYUGA NATION COUNCIL,

                                         Plaintiff,

v.

DUSTIN PARKER, NORA WEBER, PAUL MEYER,
JUSTICE FOR NATIVE FIRST PEOPLE, LLC, C.B.
BROOKS LLC, and JOHN DOES 1–10,

                                         Defendants.

5:22-cv-00128 (BKS/TWD)

---

**Appearances:**

*For Plaintiff:*
Michael E. Nicholson
David G. Burch, Jr.
Barclay Damon LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, New York 13202

*For Defendants Dustin Parker and Nora Weber:*
Daniel J. Hurteau
Kasey Kaspar Hildonen
Robert McManigal
Nixon Peabody LLP
677 Broadway, 10th Floor
Albany, New York 12207

*For Defendants Paul Meyer, Justice for Native First People, LLC, and C.B. Brooks, LLC:*
Joseph A. Camardo
Camardo Law Firm, PC
127 Genesee Street
Auburn, New York 13021

Hon. Brenda K. Sannes, Chief United States District Judge:

MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff Cayuga Nation, by and through its governing body, the Cayuga Nation Council, claims that Defendants Dustin Parker and Nora Weber, Paul Meyer, Justice for Native First People, LLC, and C.B. Brooks, LLC, have used or invested racketeering income in an enterprise, in violation of the Racketeer Income and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a). (*See generally* Dkt. No. 1). Presently before the Court are Defendants Parker and Weber's (the "Parker Defendants") motion for summary judgment under Federal Rule of Civil Procedure 56, (Dkt. No. 164), and Defendants Meyer, Justice for Native First People, C.B. Brooks' ("the Meyer Defendants") motion for judgment on the pleadings under Rule 12(c), (Dkt. No. 162). The Nation opposes the Parker and Meyer Defendants' motions. (Dkt. Nos. 191, 192). The Parker and Meyer Defendants have filed replies. (Dkt. Nos. 204, 205).[1] For the reasons that follow, the Parker Defendants' motion for summary judgment and the Meyer Defendants' motion for judgment on the pleadings are denied.

## II.    SUMMARY JUDGMENT

### A.    Facts[2]

#### 1.    The Parties

The Cayuga Nation is "a sovereign and federally-recognized Indian nation." (Dkt. No. 192-1, ¶ 5). "Lakeside Enterprises" is "the business side of the Cayuga Nation," (Dkt. No. 164-2,

---

[1] Also pending are the Parker Defendants' motions to exclude the Nation's expert testimony and for spoliation sanctions, (Dkt. No. 164), and the Nation's motion for spoliation sanctions against the Parker Defendants, (Dkt. No. 163). The Court will issue address these motions in a separate order issued in due course.

[2] The facts are drawn from the Parker Defendants' statement of material facts, (Dkt. No. 164-12), Plaintiff's response to the Parker Defendants' statement of material facts, (Dkt. No. 192-2, at 1–6 (¶¶ 1–13)), and statement of additional material facts, (*id.* at 6–11 (¶¶ 1–38)), and the Parker Defendants' response to Plaintiff's statement of additional material facts, (Dkt. No. 204-1), to the extent the facts are well-supported by citations to the record, as well as the

2

at 39), and "through multiple Nation-owned business [sic] located on the Cayuga Nation Reservation," the Nation "engages in certain tax-free retail operations," including the sale of cigarettes and cannabis. (Dkt. No. 192-1, ¶ 9; Dkt. No. 164-3, at 14, 16). According to B.J. Radford, the Nation's Chief Financial Officer, the Nation's tax-free retail operations has led to a "customer base that patrons the Nation's retail stores to make certain tax-free purchases." (Dkt. No. 192-1, ¶ 10). At present, Lakeside Enterprises has a business office, a cannabis processing facility and retail location, gaming facilities, two gas stations and convenience stores, and a cigarette factory and warehouse "called Great Swamp," which makes "Cayuga" cigarettes. (Dkt. No. 164-2, at 39, 41–42, 44–45; Dkt. No. 164-3, at 14). The Nation's convenience stores or retail facilities are named "Lakeside Trading." (Dkt. No. 164-3, at 16–17). The first Lakeside Trading opened in Union Springs, New York in or about 2003. (*Id.* at 17). The Nation's Lakeside Trading stores "sell native made cigarettes only." (*Id.* at 21). The 2022 opening of the Nation's second Lakeside Trading in Seneca Falls, New York, is outlined below.

Defendant Dustin Parker is an enrolled citizen of the Cayuga Nation and has been since birth.[3] (Dkt. No. 164-5, at 22). Defendant Nora Weber is a citizen of the Dine Nation. (Dkt. No. 164-6, at 13). Parker and Weber have lived together since at least 2011. (*Id.* at 17). Prior to the events at issue in this case, both Parker and Weber worked in various capacities for the Nation, including in connection with Lakeside Trading. (Dkt. No. 164-5, at 21, 23, 27–28).

---

exhibits attached thereto and cited therein. The facts are construed in the light most favorable to Plaintiff as the non-moving party. *See Dall. Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Although the Parker Defendants have submitted two reports by the Nation's experts, it appears they submitted the reports in support of their motion to exclude these experts. As they are unsworn and neither party relies on the reports in the context of the motion for summary judgment, the Court has not considered them either.

[3] The Nation does not dispute Parker's citizenship but "clarifies" that Parker "has been subject to banishment proceedings and has been banished from the Cayuga Nation Reservation." (Dkt. No. 192-2, ¶ 1 (citing *Parker v. Halftown*, No. 5:24-cv-00886 (BKS/TWD), Dkt. No. 2-6)).

Defendant Paul Meyer is the "sole interest holder" of Defendant Justice for Native First People, LLC ("JNFP"), an "L.L.C holding company." (Dkt. No. 164-4, at 42–44). Meyer also owned or operated Defendant C.B. Brooks, L.L.C. (*Id.* at 41). Meyer testified that both LLCs have been dissolved. (*Id.* at 41–43).

### 2.    Bayard Street Pipekeepers

Meyer, through JNFP, leased a property located at 126 East Bayard Street in Seneca Falls, New York ("Bayard Street Property") from the Seneca Cayuga Nation of Oklahoma. (*Id.* at 42–44). The Bayard Street Property is on the Cayuga Nation Reservation. (Dkt. No. 192-1, ¶ 12). Meyer testified that the Bayard Street Property was in "poor condition" and that he, through JNFP, "refresh[ed]" the property—fixing the roof and the gas pumps. (Dkt. No. 164-4, at 47–48). Meyer testified that "at some point," he and Parker "ran into each other" and Meyer "may have mentioned" that he was "fixing . . . up" "the store." (*Id.* at 50). Parker leased the Bayard Street Property from JNFP. (*Id.* at 62–63). "The lease called for monthly rent of $10,000." (Dkt. No. 164-4, ¶ 4; Dkt. No. 192-2, ¶ 4).[4] Parker made the lease payments to JNFP by making the payments in cash to Meyer, and estimated making up to 6 payments in total. (Dkt. No. 164-5, at 83–84).

On Labor Day 2021, Parker opened a store and gas station named "Pipekeepers" at the Bayard Street Property. (Dkt. No. 164-12, ¶ 7; Dkt. No. 192-2, ¶ 7). Parker was the owner and Weber was the manager of the Bayard Street Pipekeepers. (Dkt. No. 164-5, at 48; Dkt. No. 164-6, at 48–49; *see also* Dkt. No. 164-12, ¶ 5; Dkt. No. 192-2, ¶ 5 ("Pipekeepers Smoke Shop . . . is a sole proprietorship owned by Dustin Parker.")). The Bayard Street Pipekeepers sold native-made cigarettes and tobacco products from the Seneca Nation and Mohawk Nation, cannabis and

---

[4] The Nation notes that there is no written lease in the record. (Dkt. No. 192-2, ¶ 4).

cannabis-related products, gas, along with "normal convenience store items," including "[d]rinks, chips, food items, candy, sunglasses, [and] cellphone chargers." (Dkt. No. 164-5, at 88–89, 119–20). The native-brand cigarettes sold at the Bayard Street Pipekeepers did not contain a New York State tax stamp and customers did not pay a state excise tax on cigarettes or tobacco products. (*Id.* at 164, 166; Dkt. No. 192-2, ¶ 31; Dkt. No. 204-1, ¶ 31).[5] Parker testified that he has never registered Pipekeepers as a cigarette retailer with the State of New York Department of Taxation and Finance because it is tax exempt as "we are a self-determining sovereign people." (Dkt. No. 164-5, at 159). Parker testified that for the same reason, Pipekeepers does not require a New York license to sell cannabis products. (*Id.* at 167–68).

According to Radford, the Bayard Street Pipekeepers was, in the Nation's opinion, "being operated as an illegal smoke shop" and in December 2021, the Nation purchased the Bayard Street Property from the Seneca Cayuga Nation. (Dkt. No. 164-3, at 22–23). Radford testified that "[t]he Nation [police force], in the early morning hours of December 31, 2021, went in the building, packed up all the inventory, and took possession of its property." (*Id.* at 28). At some point in January 2022, a second Lakeside Trading store was opened at the Bayard Street Property. (*Id.* at 24). The second Lakeside Trading store sells cigarettes and tobacco items, cannabis, gas, and convenience store items. (*Id.* at 16–17). Radford testified that although the Nation does not maintain records of such information, "[s]ales to Nation citizens is a very small portion of [its Lakeside Trading] business." (*Id.* at 101).

---

[5] Meyer testified that he was aware that the Bayard Street Pipekeepers was operating as "a gas station and a convenience store" and "became aware" that Parker was selling untaxed cigarettes. (Dkt. No. 164-4, at 53).

### 3.    Montezuma Pipekeepers

Parker testified that when he "found out" that the Nation had purchased the Bayard Street
Property, he called Meyer, who responded that he had a property located in Montezuma, New
York ("Montezuma property"). (Dkt. No. 164-5, at 104)). C.B. Brooks sold the Montezuma
Property to Parker for $180,000.[6] (Dkt. No. 164-4, at 69). Parker testified that the cash for the
purchase came from "Pipekeepers." (Dkt. No. 164-5, at 35). The Montezuma Property is on the
Cayuga Nation Reservation. (Dkt. No. 192-1, ¶ 14).

Parker testified that the profits from the Bayard Street Pipekeepers were used to purchase
the inventory to stock the Montezuma Pipekeepers, (Dkt. No. 164-5, at 195–96). The
Montezuma Pipekeepers opened on February 12, 2022. (Dkt. No. 30-1, ¶ 53). The Montezuma
Pipekeepers is comprised of two separate buildings.[7] (Dkt. No. 164-5, at 52). There is a
freestanding store that customers can enter to purchase cannabis (but not tobacco-related
products) and there is a separate building with a drive-thru window, where customers can
purchase tobacco-related products and cannabis. (*Id.* at 54, 145, 156–57). Montezuma
Pipekeepers only sells "native brand cigarettes." (*Id.* at 120). None are stamped and all tobacco
products are sold tax free. (Dkt. No. 192-2, ¶¶ 31–32; Dkt. No. 204-1, ¶¶ 31–32). Weber is the
manager of the Montezuma Pipekeepers and Parker works in the store along with 10 to 12
employees. (Dkt. No. 164-5, at 50, 56–58). Pipekeepers utilizes a "drop safe" for its cash and
pays employee wages, and all bills, in cash. (*Id.* at 61–64, 71–72).

---

[6]Meyer stated that initially, there was a mortgage agreement between C.B. Brooks and Parker for the full purchase
price. (Dkt. No. 164-4, at 69–70). Meyer testified that Parker did not make any payments under the mortgage for the
first year. (*Id.* at 82). Meyer testified that although he could not recall when Parker paid the mortgage, Parker
eventually paid it in full, in cash. (*Id.* at 86). The deed is in Parker's name. (Dkt. No. 164-5, at 33).

[7] Parker and Weber also reside in one of the buildings on the Montezuma Property. (Dkt. No. 164-5, at 54).

Parker stated that the revenues for Pipekeepers in 2024 was "[l]ess than 10 million," but that he was "not sure" if the revenues were less than 9 million or 8 million. (*Id.* at 186). Parker explained that the "less than 10 million" was "a guess"—"what the ballpark is." (*Id.*). Parker testified that on a given day, Montezuma Pipekeepers took in "[b]etween 6 and maybe 16,000," for tobacco and "6 or 7" thousand for cannabis. (*Id.* at 187). Parker testified that his salary is approximately $2,000 per week (in cash). (*Id.* at 180). Weber is also paid in cash. (*Id.* at 64).

### B.    Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson*, 477 U.S. at 247. The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.*, 352 F.3d at 780 (citation omitted). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

### C.    Preliminary Issues

#### 1.    Radford Declaration

The Nation has identified B.J. Radford as both a fact and expert witness in this case, (Dkt. No. 164-8, at 3–4), and has filed a declaration by Radford in opposition to the Parker Defendants' motion for summary judgment, (Dkt. No. 192-1). In their reply, the Parker Defendants ask the Court to strike Radford's declaration as it is "full of legal conclusions and unsupported assertions." (Dkt. No. 204, at 12). In the Facts section above, *see supra* Part II.A., the Court has included certain limited facts from paragraphs 5, 9, 10, 11, 12, and 14 of Radford's declaration. The facts the Court has included provide background, appear to be facts regarding

which Radford has personal knowledge, or are otherwise largely undisputed.[8] The Court

therefore declines to strike the declaration as a whole. However, as the Parker Defendants note,

Radford's declaration also contains several legal conclusions, (*see*, *e.g.*, Dkt. No. 192-1, ¶¶ 5

("As a sovereign and federally-recognized Indian nation, the Nation is afforded the unique and

exclusive right to engage in certain tax-free retail operations on its sovereign Reservation, which

effectively provides the Nation with single-retailer status with respect to such tax-free retail

sales."), ¶ 6 ("[O]nly a sovereign enjoys the sovereign prerogative within its own territory," and,

as such, the Nation "is the only entity that can operate tax-free retail stores on the Cayuga nation

Reservation."), ¶ 9 ("[T]he Nation *lawfully* engages in certain tax-free retail operations through

multiple Nation-owned businesses.") (emphasis added)), and conclusory allegations based on the

aforementioned legal conclusions, (*see*, *e.g.*, *id.* ¶ 17 ("Taking all of this into account, all sales

made by the Pipekeepers store on the Cayuga Nation's Reservation constitute sales that would

have otherwise been made by the Nation were Pipekeepers not to exist. And all sales Pipekeepers

has made since its first day of operation are sales that would otherwise have been made by the

Nation, causing the loss to the Nation of all the attendant profits.")). It is well-settled that

"ultimate or conclusory facts and conclusions of law . . . cannot be utilized on a summary

judgment motion" and are "properly disregarded." *BellSouth Telecomms., Inc. v. W.R. Grace &*

*Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (citation omitted). The Court has therefore disregarded

these aspects of Radford's declaration.

---

[8] The Parker Defendants do not appear to dispute, for example, that the Nation sells tax-free items through its businesses or that both the Bayard Street and Montezuma Properties are located on the Cayuga Nation Reservation (Dkt. No. 192-1, ¶¶ 12, 14).

2.    **Injury to Cannabis Business**

Although neither party addresses this issue, there is a serious question as to whether

injury to the Nation's cannabis business is recoverable under RICO. *See Shulman v. Kaplan*, 58

F.4th 404, 411 (9th Cir. 2023) (dismissing the plaintiff's RICO claim stemming from alleged

injury to her cannabis-related business as RICO was not intended to protect "cannabis-related

commerce"). While "New York's Marijuana Regulation & Taxation Act ('Cannabis Law'),

enacted in 2021, legalize[d] adult use cannabis and regulate[d] its production, manufacturing,

distribution, and sale in New York," *Variscite NY Four, LLC v. New York State Cannabis

Control Bd.*, 152 F.4th 47, 53 (2d Cir. 2025) (quotation marks omitted) (alternation in original)

(citing N.Y. Canbs. §§ 1, 3, 61-89), marijuana is a "controlled substance" under federal law, 21

U.S.C. §§ 802(6), 812(c)(10), and it remains unlawful under federal law to "knowingly or

intentionally" "manufacture, distribute, or dispense, or possess with intent to manufacture,

distribute, or dispense" marijuana. 21 U.S.C. § 841(a).

In *Shulman*, the plaintiff asserted RICO claims based on mail and wire fraud and alleged

injury to her California cannabis business and related property. *Id.* at 407. Because RICO does

not define "business" or "property," the Ninth Circuit first looked to the state law of California

for guidance. *See id.* at 410 (observing that "courts usually look to state law to determine

whether a particular interest amounts to property," (citing *Diaz v. Gates*, 420 F.3d 897, 900 (9th

Cir. 2005) (en banc)). The Circuit found that although California law "recognize[d] licensed

cannabis businesses as well as a property interest in cannabis," California's law conflicted with

the Controlled Substances Act, codified as amended at 21 U.S.C. § 801 et seq., which not only

"declare[d] it unlawful to knowingly or intentionally 'manufacture, distribute, or dispense, or

possess'" marijuana, *id.* at 411 (quoting 21 U.S.C. § 841), but provided that "all 'such substances

. . . shall be subject to forfeiture to the United States and *no property right shall exist in them*.'"

*Id.* (quoting 21 U.S.C. § 881(a)(1). The Circuit further noted that Congress, when enacting

RICO, had "expressly defined 'racketeering activity' to include the 'manufacture, importation,

receiving, concealment, buying, selling, or otherwise dealing in' cannabis." *Id.* (quoting 18

U.S.C. § 1961(1)(D)). The Ninth Circuit therefore concluded that "[b]ecause RICO's definition

of racketeering activity necessarily encompasses dealing in cannabis, it would be inconsistent to

allow a business that is actively engaged in . . . commerce in cannabis to recover damages under

RICO for injury to that business" and held that the plaintiff lacked a "statutory right to bring a

claim under RICO." *Id.* at 411–12.

The Court finds *Shulman's* reasoning persuasive and that it may warrant dismissal of the

Nation's RICO claim to the extent it seeks to recover for injury to its cannabis-related business.

However, unlike *Shulman,* where the plaintiff's RICO claim arose solely from her claim of

damages to her cannabis-related business, in this case, the Nation has also claimed damage to its

tobacco-related business, thus, presumably, a portion of its RICO claim could continue. In any

event, as no court in the Second Circuit appears to have addressed this issue and the parties have

not yet had the opportunity to submit briefing, the Court reserves decision. The parties are

directed to brief this issue in their trial briefs, which are due on November 18, 2025.

    **D.**    **Analysis**

        **1.**    **Standing**

The Parker Defendants argue that the Nation lacks Article III standing "to pursue its

RICO claims because it seeks to vindicate sovereign regulatory interests, such as tax

enforcement, rather than direct proprietary injuries." (Dkt. No. 164-11, at 19–20). The Nation

does not respond to this argument directly but asserts in its opposition that it is the "Nation's lost

profits" that are "the direct result of the Parker Defendants undermining the Nation's legitimate

business." (Dkt. No. 192, at 16). The Court finds the Parker Defendants' argument to be without

merit. The Complaint and record before the Court indicate that the Nation is seeking to recover for Lakeside Trading's alleged lost profits; there is no evidence that the Nation is seeking payment of taxes on cigarettes or any other product. As the Parker Defendants do not claim that the Nation's lost business profits allegations are insufficient to establish injury for purposes of Article III standing, the Court has no basis for questioning the Nation's standing in this case. *See Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990) ("The RICO civil liability provision confers standing on '[a]ny person injured in his business or property by reason of a violation of section 1962.'" (quoting 18 U.S.C. § 1964(c))).

### 2.    Section 1962(a)

As the Court understands it, the Nation's § 1962(a) RICO investment injury claim is as follows: (1) the Parker Defendants engaged in the unlawful predicate acts at the Bayard Street Pipekeepers of selling unstamped and untaxed cigarettes, in violation of the Contraband Cigarette Trafficking Act ("CCTA"), 18 U.S.C. § 2341 et seq., money laundering, in violation of 18 U.S.C. § 1956, and distributing or possessing cannabis, a Class I controlled substance, in violation of 21 U.S.C. § 841, (2) which generated racketeering income (3) that the Parker Defendants used to establish the Montezuma Pipekeepers, which sells tax-free cigarettes and cannabis, (4) causing harm to the Nation's Lakeside Trading retail business, which also sells tax-free cigarettes and cannabis. (*See generally* Dkt. No. 192). The Parker Defendants move for summary judgment arguing that the Nation has failed to adduce evidence of predicate acts, racketeering income, impact on interstate commerce, distinct investment injury, and injury to the Nation or any Nation business. (Dkt. No. 164-11, at 11–19). The Nation opposes the Parker Defendants' motion. (Dkt. No. 192, at 8–19).

"Among its civil remedies, RICO provides a private right of action . . . for a 'person injured in his business or property by reason of a violation of section 1962.'" *Ideal Steel Supply*

*Corp. v. Anza*, 652 F.3d 310, 321 (2d Cir. 2011) (quoting 18 U.S.C. § 1964(c)). "To establish a

RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an

injury to business or property; and (3) that the injury was caused by the violation of [§] 1962."

*Laydon v. Cooperatieve Rabobank U.A.*, 55 F.4th 86, 100 (2d Cir. 2022) (quoting *Cruz v.

FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013)). Once a plaintiff establishes a

defendant's violation of § 1962, the plaintiff must then show injury to business or property "*by

reason* of a violation of section 1962." *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir.

1983) (quoting 18 U.S.C. § 1964(c)).

      In this case, the RICO subsection at issue is § 1962(a), which makes it "unlawful for any

person who has received any income derived . . . from a pattern of racketeering activity . . . to

use or invest . . . any part of such income, or the proceeds of such income, in acquisition of any

interest in, or the establishment or operation of, any enterprise which is engaged in, or the

activities of which affect, interstate . . . commerce." 18 U.S.C. § 1962(a). To show a violation of

§ 1962(a), a plaintiff must establish "(1) that the defendants used or invested racketeering

income to acquire or maintain an interest in the alleged enterprise; and (2) that the plaintiffs

suffered injury as a result of that investment by the defendants." *4 K & D Corp. v. Concierge

Auctions, LLC*, 2 F. Supp. 3d 525, 543 (S.D.N.Y. 2014) (quoting *R.C.M. Exec. Gallery Corp. v.

Rols Capital Co.*, 901 F. Supp. 630, 642 (S.D.N.Y. 1995)).

      **a.    Racketeering Income**

      The Parker Defendants argue that there is no evidence in the record of "racketeering

income" "as there is no evidence of predicate acts, and certainly not a 'pattern' of them." (Dkt.

No. 164-11, at 11–12). "'Racketeering activity' is defined to include any 'act' indictable under

various specified federal statutes," *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018) (quoting 18

U.S.C. § 1961(1)), including, as relevant here, the CCTA, 18 U.S.C. § 2341–2342, 18 U.S.C. §

1956 (money laundering), and 21 U.S.C. § 841 (possession or distribution of a controlled

substance). To establish "a pattern of racketeering activity," a plaintiff must "identify[] two or

more predicate crimes 'within a single scheme that were related and that amounted to, or

threatened the likelihood of, continued criminal activity.'" *Med. Marijuana, Inc. v. Horn*, 604

U.S. 593, 613 (2025) (quoting *H. J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 237

(1989)); *see also* §§ 1961(1) and (5), 1962.

Section 2342 of the CCTA states, in relevant part, that "[i]t shall be unlawful for any

person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband

cigarettes or contraband smokeless tobacco." 18 U.S.C. § 2342(a). The CCTA defines

"contraband cigarettes" as:

> a quantity in excess of 10,000 cigarettes, which bear no evidence of
> the payment of applicable State or local cigarette taxes in the State
> or locality where such cigarettes are found, if the State or local
> government requires a stamp, impression, or other indication to be
> placed on packages or other containers of cigarettes to evidence
> payment of cigarette taxes, and which are in the possession of any
> person [who is not otherwise licensed or permitted to possess such
> cigarettes].

18 U.S.C. § 2341(2). To demonstrate a violation of CCTA, the plaintiff must show that the

defendant "(1) knowingly shipped, transported, received, possessed, sold, distributed or

purchased (2) more than 10,000 cigarettes (3) that did not bear State . . . tax stamps (4) under

circumstances where the law required the cigarettes to bear such stamps." *City of New York v.*

*Hatu*, No. 18-cv-848, 2019 WL 2325902, at *11, 2019 U.S. Dist. LEXIS 91576, at *32

(S.D.N.Y. May 31, 2019) (quoting *City of New York v. Gordon*, 155 F. Supp. 3d 411, 420

(S.D.N.Y. 2015)). Section 471 of the New York Tax Law provides, in relevant part:

> There is hereby imposed and shall be paid a tax on all cigarettes
> possessed in the state by any person for sale, except that no tax shall
> be imposed on cigarettes sold under such circumstances that this

14

state is without power to impose such tax, including sales to qualified Indians for their own use and consumption on their nations' or tribes' qualified reservation. . . . The tax imposed by this section is imposed on all cigarettes sold on an Indian reservation to non-members of the Indian nation or tribe and to non-Indians and evidence of such tax shall be by means of an affixed cigarette tax stamp. . . . It shall be presumed that all cigarettes within the state are subject to tax until the contrary is established, and the burden of proof that any cigarettes are not taxable hereunder shall be upon the person in possession thereof.

N.Y. Tax Law § 471(1).

Here, the Nation has presented evidence, much of which is undisputed, that the "native brand cigarettes sold by Pipekeepers do not contain New York State tax stamps and are not stamped at the wholesale level," (Dkt. No. 192-2, ¶ 32; Dkt. No. 204-1, ¶ 32), a "large" portion of Pipekeepers' customers are non-native, (Dkt. No. 164-5, at 206), "Pipekeepers does not pay New York State excise tax on cigarettes or tobacco products sold at the store," (Dkt. No. 192-2, ¶ 30; Dkt. No. 204-1, ¶ 30), customers do not pay an excise tax on cigarettes or tobacco products when they buy them from Pipekeepers, (Dkt. No. 192-2, ¶ 31; Dkt. No. 204-1, ¶ 31), and that customers come to Pipekeepers for the opportunity to purchase tax free cigarettes, (Dkt. No. 192-2, ¶ 36; Dkt. No. 204-1, ¶ 36). From this evidence, a reasonable factfinder could conclude that the Parker Defendants, who owned and managed Pipekeepers, knowingly received, possessed, or sold cigarettes that did not bear the tax stamps required under New York law.

As to the CCTA's specified "quantity" of contraband cigarettes, which must be "in excess of 10,000," the Court notes that the Nation has failed to submit any evidence regarding the number of unstamped cigarettes the Bayard Street Pipekeepers possessed, sold, or purchased.[9] Nevertheless, viewed in the light most favorable to the Nation as the nonmoving

---

[9] This is a curious omission as the Nation itself purports to have had access to the Bayard Street Pipekeepers' inventory and alleged in the complaint that its "accounting of the remaining inventory" from the Bayard Street Pipekeepers "found cigarettes totaling over 10,000,000." (Dkt. No. 1, ¶ 53).

party, the evidence that the Bayard Street Pipekeepers operated from Labor Day 2021 to
December 31, 2021, sold unstamped cigarettes, sold cartons of cigarettes, kept a backstock, and
reordered during that four-month time period, could allow a reasonable factfinder to infer that
the Bayard Street Pipekeepers possessed, sold, or purchased an excess of 10,000 cigarettes. (Dkt.
No. 192-2, ¶ 32; Dkt. No. 204-1, ¶ 32; Dkt. No. 164-5, at 97–98; Dkt. No. 164-12, ¶ 7; Dkt. No.
192-2, ¶ 7). *See*, *e.g.*, *Globe Wholesale Tobacco Distribs. Inc. v. Worldwide Wholesale Trading
Inc.*, No. 06-cv-2865, 2007 WL 2826630, at *3, 2007 U.S. Dist. LEXIS 72656, at *9 (S.D.N.Y.
Sept. 28, 2007) (concluding at motion to dismiss state that "although plaintiff does not
specifically allege a quantity in excess of 10,000 cigarettes, such a quantity reasonably may be
inferred from the wholesale nature of [the defendant's] business."). The Parker Defendants argue
that their conduct is not indictable because Pipekeepers' "sales were conducted openly and
. . . inventory was sourced from legitimate, native-owned wholesalers." (Dkt. No. 164-11, at 13).
The Parker Defendants cite no authority to support this argument and, from the evidence that a
"large" portion of Pipekeepers' customers are non-native, (Dkt. No. 164-5, at 206), a reasonable
factfinder could conclude that the Parker Defendants' possession and sale of unstamped native
cigarettes is a chargeable CCTA offense, *see*, *e.g.*, *United States v. Morrison*, 686 F.3d 94, 105–
06 (2d Cir. 2012) (addressing conviction under CCTA and explaining that the Supreme Court
had "specifically upheld New York's tax regimen, as it pertained to on-reservation sales to non-
Native Americans" and that "New York's decision," at that time, "for political and practical
reasons, to refrain from enforcing [New York's tax law] did not grant [the defendant] leave to
sell massive quantities of untaxed cigarettes to non-Native Americans").[10] The Court therefore

---

[10] For a discussion of New York State's previous forbearance policy *see* *Cayuga Indian Nation of New York v. Gould*,
14 N.Y.3d 614 (2010); *see also Morrison*, 686 F.3d at 98–102.

concludes that the Nation has identified evidence that, if credited, could allow a reasonable

factfinder to conclude that Parker and Weber violated the CCTA and engaged in at least one

predicate act.

Further, in view of the undisputed evidence that the Parker Defendants possessed and

sold cannabis at the Bayard Street Pipekeepers from Labor Day 2021 to December 31, 2021, (*see*

Dkt. No. 164-5, at 120 (Parker testifying that Bayard Street Pipekeepers sold cannabis and

cannabis-related products)), a reasonable jury could conclude that they engaged in conduct

indictable under 21 U.S.C. § 841(a)(1) ("[I]t shall be unlawful for any person knowingly or

intentionally--(1) to manufacture, distribute, or dispense, or possess with intent to manufacture,

distribute, or dispense, a controlled substance."). Thus, the Nation has adduced evidence from

which a factfinder could conclude the Parker Defendants engaged in racketeering activity

through the commission of two related predicate acts between Labor Day 2021 and December

31, 2021, and that while short in duration, the Bayard Street Pipekeepers enterprise was

sufficiently open-ended for purposes of RICO liability.[11]

**b.    Interstate Commerce**

The Parker Defendants argue that the Nation failed to identify evidence that would satisfy

the interstate commerce element as it sourced all cigarettes and cannabis from in-state suppliers.

---

[11] The Parker Defendants do not address the continuity requirement. While the Bayard Street Pipekeepers' four-month operation would be insufficient to establish "closed-ended continuity," which requires "a series of related predicates extending over a substantial period of time," the evidence that the Bayard Street Pipekeepers sold both unstamped cigarettes and cannabis and cannabis-related products during the entirety of its four-month operation, ending only when the Nation bought the property, is sufficient to raise a question of fact as to "open-ended continuity." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999); *see also United States v. Aulicino*, 44 F.3d 1102, 1114 (2d Cir. 1995) (finding sufficient evidence of a threat of continued activity even though "[t]he [kidnapping] ring's activities were abandoned," explaining that the kidnappings "were not a discrete and finite project that came to a natural end")."'Open-ended' continuity . . . entails proving the threat of long-term criminal conduct." *Fresh Meadow Food Servs., LLC v. RB 175 Corp.*, 282 F. App'x 94, 99 (2d Cir. 2008). "A fact-specific inquiry, open-ended continuity may inhere . . . in the fact that the acts are part of an ongoing entity's regular course of business" and is "'satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business . . . or of conducting or participating in an ongoing and legitimate RICO enterprise.'" *Id.* (quoting *H.J. Inc.*, 492 U.S. at 243).

(Dkt. No. 164-11, at 14). The Nation responds that there is sufficient evidence in the record of Pipekeepers' effect on interstate commerce. (Dkt. No. 192, at 12–13).

"The law in this Circuit does not require RICO plaintiffs to show more than a minimal effect on interstate commerce." *DeFalco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001). Here, in discussing the Pipekeepers' customers, Parker testified that he "had people come from Florida," and from Canada. (Dkt. No. 164-5, at 207). The Parker Defendants oppose the Nation's reliance on this evidence, asserting it is "inadmissible hearsay." (Dkt. No. 204, at 9). Even assuming such testimony is hearsay to the extent it is based on what Parker's customers told him and that no Pipekeepers customers would be available to testify at trial regarding their travels, *see Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) (explaining that a party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment . . . absent a showing that admissible evidence will be available at trial"), the Court has little difficulty concluding there is evidence from which a reasonable juror could find Pipekeepers had an effect on interstate commerce. Where, as here, "a RICO enterprise's business is [alleged] narcotics trafficking, that enterprise must be viewed as substantially affecting interstate commerce, even if individual predicate acts occur solely within a state." *United States v. Miller*, 116 F.3d 641, 674 (2d Cir. 1997); *see also*, *e.g.*, *Proyect v. United States*, 101 F.3d 11, 13–14 (2d Cir. 1996) (explaining that "[i]n the case of section 841(a)(1), the class of regulated activities, even if narrowly defined as the manufacture of controlled substances, undoubtedly has a substantial impact on interstate commerce," and explaining that "[t]he fact that certain intrastate activities within this class, such as growing marijuana solely for personal consumption, may not actually have a significant effect on interstate commerce is therefore irrelevant"). Thus, the Court

concludes that the Nation has identified a material issue of fact as to the interstate commerce element.

### c.       Investment Injury

Relying on this Court's previous dismissal of the Nation's claims under RICO's substantive and conspiracy provisions, 18 U.S.C. § 1962(c) and (d), for failure to allege proximate cause, the Parker Defendants argue that there is no "factual support establishing a distinct investment injury or a causal nexus between the alleged reinvestment of racketeering proceeds and a separate, actionable injury" to the Nation's business. (Dkt. No. 164-11, at 15). The Nation responds that the Parker Defendants' investment of the Bayard Street Pipekeepers' income into opening the Montezuma Pipekeepers, the sole competitor on the Cayuga Reservation to its Lakeside Trading retail stores, which also sell tax-free cigarettes, has harmed its sales. (Dkt. No. 192, at 13–19). Neither party cited the relevant legal authority governing a § 1962(a) claim, namely *Ideal Steel v. Anza*, 652 F.3d 310 (2d Cir. 2011), and instead principally rely principally on pre-*Ideal Steel* cases. Nonetheless, applying binding Second Circuit precedent to the facts the parties have identified in support of their arguments, the Court finds there are material issues requiring trial.

In *Ideal Steel*, the Second Circuit explained the different focuses of subdivisions (c) and (a) as follows:

> Subsection (c) of § 1962 . . . makes it unlawful for any person employed by or associated with a commerce-affecting enterprise "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Thus, "the compensable injury flowing from a violation of that provision 'necessarily *is the harm caused by predicate acts* sufficiently related to constitute a pattern.'"
>
> Subsection (a), in contrast, focuses the inquiry on conduct different from the conduct constituting the pattern of racketeering activity. After there have been sufficient predicate acts to constitute such a

> pattern, what is forbidden by subsection (a) is the investment or use
> of the proceeds of that activity to establish or operate a commerce-
> affecting enterprise. Thus, the plaintiff asserting a civil RICO claim
> based on a violation of subsection (a) must show injury caused not
> by the pattern of racketeering activity itself, but rather by the use or
> investment of the proceeds of that activity.

*Ideal Steel*, 652 F.3d at 321 (internal citations omitted). It further explained because subsection

(c) and subsection (a) protect against different harms, "the proper referent of the proximate cause

analysis" for each subsection was also different:

> With respect to Ideal's claim under § 1962(c), "[t]he proper referent
> of the proximate-cause analysis [was the] alleged practice of
> conducting [the defendant's] business through a pattern of" mail and
> wire fraud in connection with its tax obligations, "defrauding the
> State." Given this frame of reference, Ideal's injury, i.e., loss of sales
> to [the defendant], was "attenuated," because the direct victim of
> that activity was the State of New York. . . . With respect to the
> claim under § 1962(a), the proper referent in the proximate-cause
> analysis is defendants' "use or invest[ment]" of the funds, derived
> directly or indirectly from the alleged pattern of racketeering
> activity, to establish or operate [a second branch in a new location].

*Id.* at 323 (internal citations omitted).

In this case, the Nation has presented evidence that the Parker Defendants had emptied

the safe at the Bayard Street Pipekeepers before the Nation took over the store and used the

profits from the Bayard Street Pipekeepers to purchase the inventory necessary to "fill[] up the

Montezuma Pipekeepers," (Dkt. No. 164-5, at 195–96), and that Parker paid "$180,000" in cash

that came from "Pipekeepers" for the Montezuma Property, (*id.* at 106). This evidence is

sufficient to raise a material issue of fact requiring trial as to whether the Parker Defendants

invested racketeering income from the Bayard Street Pipekeepers' enterprise to establish the

Montezuma Pipekeepers.

Further, in view of the evidence the Nation has presented that its Lakeside Trading stores

were the only stores (other than Pipekeepers) "engag[ed] in certain tax-free operations," on the

Cayuga Nation Reservation, in that they sold tax-free, *stamped*, cigarettes and were federally licensed to manufacture the Cayuga brand of cigarettes, (Dkt. No. 192-1, ¶ 9; Dkt. No. 164-2, at 80 (Dwyer testifying "we . . . made sure there was a stamp on the bottom" of the cigarettes); Dkt. No. 164-3, at 56), a reasonable factfinder could conclude that Lakeside Trading had a "dominant market position with no serious competition" and "lost business when" the Montezuma Pipekeepers opened and offered tax-free cigarettes" on the Cayuga Reservation. *Ideal Steel*, 652 F.3d at 324. The Parker Defendants argue that because Pipekeepers is the "very alleged enterprise through which the Nation claims the supposed racketeering occurred" and "[c]aselaw from this Circuit is clear that 'reinvesting' profits back into the same enterprise cannot satisfy § 1962(a)," they are entitled to summary judgment as a matter of law. (Dkt. No. 204, at 8 (citing *W. 79th St. Corp. v. Congregation Kahl Minchas Chinuch*, No. 03-cv-8606, 2004 WL 2187069, at *1, 2004 U.S. Dist. LEXIS 19501, at *1 (S.D.N.Y. Sept. 29, 2004)). It is true that the facts, even viewed in the light most favorable to the Nation, suggest that Montezuma Pipekeepers is, essentially, the same business in name and function as the Bayard Street Pipekeepers, and thus differs on one point from *Ideal Steel*, where the defendant "created a new company . . . to purchase the [second] property for the new . . . store." *Ideal Steel*, 652 F.3d at 322. But in *Ideal Steel*, the "new company" was not the sole basis for the Circuit's conclusion that § 1962(a) applied, the Circuit also stated: "even if Congress did not intend subsection (a)'s prohibition to reach the use of RICO tainted funds by the RICO violator in its own ongoing operation, the legislative history does not permit the inference that Congress meant to allow such entities, with impunity, to use those funds to branch out to new locations." 652 F.3d at 322. The Court therefore concludes that the Nation has identified facts from which a reasonable jury could find

the Parker Defendants reinvested racketeering income in a new location. Accordingly, the Parker Defendants motion for summary judgment on the Nation's § 1962(a) claim is denied.

## III.    JUDGMENT ON THE PLEADINGS

In their post-discovery, Rule 12(c) motion for judgment on the pleadings, the Meyer Defendants seek dismissal on the grounds that the complaint contains conclusory allegations and improper labels and is "devoid of any allegations supporting the required investment or. . . injury" necessary to state a claim under 18 U.S.C. § 1962(a). (Dkt. No. 162-2, at 8). The Nation opposes the Meyer Defendants' motion and argues that it "adequately pled an 18 U.S.C. § 1962(a) cause of action" and that there are "significant issues of material fact that require this case proceed to trial." (Dkt. No. 191, at 4).

### A.    Facts[12]

The Court provided a summary of the facts alleged in the Complaint in its Order granting in part and denying in part Defendants' motion to dismiss. (Dkt. No. 59). The Court assumes the parties' familiarity with this summary and sets forth the facts relevant to the present motion in the analysis below.

### B.    Standard of Review

"Rule 12(c) provides that '[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings.'" *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021) (quoting Fed. R. Civ. P. 12(c)). "For a complaint to withstand judgment on the pleadings, it 'must contain sufficient factual matter, accepted as true,

---

[12] Unless otherwise noted, the facts discussed are drawn from the Nation's complaint and the attached exhibits. (Dkt. No. 1). *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) ("[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (citation omitted). The Court assumes the truth of and draws all reasonable inferences from the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

to state a claim to relief that is plausible on its face,' which is the same standard that governs a motion to dismiss under Rule 12(b)(6)." *Beck v. Manhattan Coll.*, 136 F.4th 19, 22 (2d Cir. 2025) (quoting *Matzell v. Annucci*, 64 F.4th 425, 433 (2d Cir. 2023)); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("To survive dismissal, the plaintiff must provide the grounds upon which [the] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007))). Though a court may not "give effect to a complaint's assertions of law or legal conclusions couched as factual allegations;" it must "accept well pleaded factual assertions as true; and . . . draw all reasonable factual inferences in favor of the plaintiff." *1-800 Contacts, Inc. v. JAND, Inc.*, 119 F.4th 234, 246 (2d Cir. 2024) (quoting *Lynch v. City of New York*, 952 F.3d 67, 75–76 (2d Cir. 2020).

As to the materials a court may consider on a Rule 12(c) motion, because "the standards for dismissal pursuant to Rule 12(c) are the same as for a dismissal pursuant to Rule 12(b)(6), and the standard set by *Twombly* for evaluation of the viability of the pleading is the same under each Rule," *Ideal Steel*, 652 F.3d at 324 (internal citations omitted), the court generally confines its review to "'the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case,'" *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (quoting *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009)). However, a court need not grant a Rule 12(c) motion filed after discovery has begun "if evidence that had already been produced during discovery would fill the perceived gaps in the Complaint." *Ideal Steel*, 652 F.3d at 325; *see also id.* (explaining that "*Twombly* is meant to allow the parties and the court to avoid the expense of

discovery and other pretrial motion practice . . . '[w]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief" (quoting *Twombly*, 550 U.S. at 558)).

### C.    Analysis

In seeking dismissal of the Nation's § 1962(a) RICO investment injury claim (Count II), the Meyer Defendants rely heavily on the Court's order granting their Rule 12(b)(6) motion to dismiss Count I (§ 1962(c) (conducting or participating in racketeering enterprise)) and Count II (§1962(d) (RICO conspiracy)) of the complaint. (*See generally* Dkt. No. 162-2 (citing Dkt. No. 59)). The Meyer Defendants assert that the Nation's § 1962(a) claim "is based upon the same factual pattern that [the Nation's §§ 1962(c) and (d) claims] were based upon," (*id.* at 5), and note that the Court found "[t]hose facts were insufficient to establish the cause of action under 19 U.S.C. § 1962(c)," (*id.* at 7). In opposition, the Nation takes issue with the Meyer Defendants' choice of dispositive motion, (Dkt. No. 191, at 4 (asserting that the Meyer Defendants "have chosen not to confront th[e] evidence," which has "been borne out in the several-year discovery process," by moving for summary judgment)), and argues that the complaint sufficiently alleges a violation of § 1962(a) and that "the record makes clear that judgment cannot be issued on the pleadings alone," (*id.*).

In its prior decision, the Court found that the complaint failed to allege any predicate act—possession or sale of contraband cigarettes, money laundering, and possession or distribution of cannabis—proximately caused the alleged injury to the Nation's Lakeside Trading businesses. (*See* Dkt. No. 59, at 19–20 (finding "there are no specific factual allegations in the Complaint showing that Defendants' alleged money laundering and sale of marijuana, however illegal has harmed the Cayuga Nation" and that "[w]ith respect to Defendants' trafficking of contraband cigarettes or contraband smokeless tobacco . . . it appears that any direct harm would be to the governmental entities entitled to the payment of taxes on cigarettes" (citing *New York v.*

*United Parcel Serv., Inc.*, 942 F.3d 554, 597 (2d Cir. 2019))). The Court further found that the complaint failed to allege facts concerning the relationship between the Parker Defendants and Meyer Defendants and thus failed to allege the "operation and management" element as to the Nation's § 1962(c) claim against the Meyer Defendants. (*Id.* at 25–26).

Here, the Meyer Defendants' principal argument is that the § 1962(a) claim should be dismissed because it incorporates the same facts alleged in the 1962(c) action in Count I which the Court found insufficient. (Dkt. No. 162-2, at 7). The Meyer Defendants do not indicate whether they are seeking dismissal for failure to allege proximate cause, failure to allege "operation and management," or both. Regardless, the Court declines to dismiss the complaint on this basis, particularly where, as here, discovery is complete, and the Meyer Defendants have not, in their motion, engaged with the facts alleged in the complaint or provided any legal analysis. As discussed at length above, *see supra* Part II.D., the factual showing necessary for a RICO investment injury claim under § 1962(a) differs materially from the showing necessary to establish a substantive or conspiracy claim under § 1962(c) or (d). Accordingly, the Meyer Defendants' motion for judgment on the pleadings on the ground that dismissal is dictated by the Court's prior Order is denied.

The Meyer Defendants include a second, more specific argument, asserting that the complaint "fails to allege any facts supporting the required investment or the necessary injury, which must be separate and distinct from the predicates [sic] acts." (Dkt. No. 162-2, at 8). The Court disagrees.

To show a violation of § 1962(a), a plaintiff must establish "(1) that the defendants used or invested racketeering income to acquire or maintain an interest in the alleged enterprise; and

(2) that the plaintiffs suffered injury as a result of that investment by the defendants." *4 K & D Corp.*, 2 F. Supp. 3d at 543 (quoting *R.C.M. Exec. Gallery Corp.*, 901 F. Supp. at 642).

Accepting as true the facts alleged in the complaint, Defendants operated the Bayard Street Pipekeepers for a four-month period, selling untaxed and unstamped cigarettes as well as cannabis, generating "well in excess of $1,500,000 in proceeds." (Dkt. No. 1, ¶¶ 52–54, 56). The complaint alleges that, at first, Parker paid the Meyer Defendants a below-market rate of $1,000 per month to lease the property but later, after the Bayard Street Pipekeepers opened (selling untaxed and unstamped cigarettes as well as cannabis), Parker made "a substantial payment each month" to the Meyer Defendants. (*Id.* ¶¶ 36, 39–40). The complaint alleges that shortly after the Nation took over the Bayard Street Pipekeepers, Parker, working with Meyer and C.B. Brooks LLC, the entity that initially purchased the Montezuma Property, were working to "to operate their RICO enterprise out of the [Montezuma Property] and had, within less than two months after losing the Bayard Street Property, already "installed a drive-thru window" readying the Montezuma Property for business. (*Id.* ¶¶ 64, 65, 67). From these allegations, it is plausible to infer that the Meyer Defendants, together with the Parker Defendants, used racketeering income from the Bayard Street Pipekeepers to invest in the purchase and development of the Montezuma Property, where the Montezuma Pipekeepers began operations less than two months after the Nation seized the Bayard Street Pipekeepers.[13] In addition, the complaint sufficiently alleged that prior to any Pipekeepers stores, its Lakeside Trading business enjoyed a dominant market position with respect to cigarette and cannabis sales on the Cayuga Reservation and that the Montezuma Pipekeepers' operation has harmed that business. (*Id.* ¶¶ 30, 34, 35, 51); *see Ideal*

---

[13] The Nation also appears to argue that racketeering income was "reinvested and utilized to lease the first store," namely the Bayard Street Pipekeepers. (Dkt. No. 191, at 10). However, the Nation fails to explain how the first Pipekeepers constituted a *reinvestment* of racketeering proceeds.

*Steel*, 652 F.3d at 322 (explaining that RICO's "legislative history does not permit the inference that Congress meant to allow such entities, with impunity, to use [racketeering proceeds] to branch out to new locations"). Accordingly, the Meyer Defendants' motion for judgment on the pleadings is denied.

## IV.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that the Parker Defendants' motion for summary judgment (Dkt. No. 164) is **DENIED**; and it is further

**ORDERED** that the Meyer Defendants' motion for judgment on the pleadings (Dkt. No. 162) is **DENIED**; and it is further

**ORDERED** that the parties brief the issue of whether the damages for alleged injury to the Nation's cannabis business are recoverable under RICO in their trial briefs, which are due on November 18, 2025.

**IT IS SO ORDERED.**

Dated: <u>November 3, 2025</u>
           Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge