UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

CAYUGA NATION, by and through its lawful governing body, the CAYUGA NATION COUNCIL,

                          Plaintiffs,

v.

DUSTIN PARKER, NORA WEBER, PAUL MEYER, JUSTICE FOR NATIVE FIRST PEOPLE, LLC, and C.B. BROOKS LLC,

                          Defendants.

5:22-cv-00128 (BKS/TWD)

---

**Appearances:**

*For Plaintiff:*
Michael E. Nicholson
David G. Burch, Jr.
Barclay Damon LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, New York 13202

*For Defendants Dustin Parker and Nora Weber:*
Daniel J. Hurteau
Kasey Kaspar Hildonen
Robert McManigal
Nixon Peabody LLP
677 Broadway, 10th Floor
Albany, New York 12207

*For Defendants Paul Meyer, Justice for Native First People, LLC, and C.B. Brooks, LLC:*
Joseph A. Camardo
Camardo Law Firm, PC
127 Genesee Street
Auburn, New York 13021

**Hon. Brenda K. Sannes, Chief United States District Judge:**

MEMORANDUM-DECISION AND ORDER

## I.   INTRODUCTION

Plaintiff Cayuga Nation, by and through its governing body, the Cayuga Nation Council, claims that Defendants Dustin Parker and Nora Weber, Paul Meyer, Justice for Native First People, LLC, and C.B. Brooks, LLC, have used or invested racketeering income in an enterprise, in violation of the Racketeer Income and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a). (*See generally* Dkt. No. 1). Presently before the Court is a motion by Defendants Parker and Weber ("Parker Defendants") to exclude or limit the Nation's proposed expert witnesses. (Dkt. No. 164). The Nation has filed a response in opposition and the Parker Defendants have filed a reply. (Dkt. Nos. 192, 204). For the reasons that follow, the Court reserves decision and directs further briefing.

## II.   BACKGROUND

The facts and history of this case are set forth at length in this Court's November 3, 2025 Order denying Defendants' motions for summary judgment and judgment on the pleadings. (Dkt. No. 226). The Court assumes familiarity with these facts and does not summarize them here. Any additional facts relevant to the pending motion are set forth as necessary in the discussion below.

## III.   EXPERT TESTIMONY

### A.   Legal Standard

Federal Rule of Evidence 702 "governs the admissibility of expert testimony." *Showers v. Pfizer, Inc.*, 819 F.3d 642, 658 (2d Cir. 2016). That Rule permits "[a] witness who is qualified as an expert by knowledge, skill, experience, training or education" to "testify in the form of an opinion" under certain conditions. Fed. R. Evid. 702. To be qualified to testify, the "expert's

2

scientific, technical, or other specialized knowledge" must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). In addition, "the testimony" must be "based on sufficient facts or data" and be "the product of reliable principles and methods." Fed. R. Evid. 702(b)–(c). Finally, the expert must have reliably applied "the principles and methods to the facts of the case." Fed. R. Evid. 702(d). "The proponent of the expert testimony has the burden to establish these admissibility requirements." *Showers*, 819 F.3d at 658.

A district court has "broad discretion" in evaluating expert testimony. *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir. 1995). Once a court determines that an expert is qualified to testify, "Rule 702 imposes on the trial judge an obligation to determine whether the expert's specialized knowledge will assist the trier of fact, i.e., will be not only relevant, but reliable." *United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015). The court must determine "whether the proffered testimony has a sufficiently 'reliable foundation' to permit it to be considered." *Campbell v. Metropolitan Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. at 579, 597 (1993)). The court should ask whether (1) "the testimony is grounded on sufficient facts or data; (2) . . . the testimony 'is the product of reliable principles and methods'; and (3) . . . 'the witness has applied the principles and methods reliably to the facts of the case.'" *Amorgianos v. Amtrak*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting Fed. R. Evid. 702). The court is to concentrate only on "principles and methodology," and "not on the conclusions that they generate." *Daubert*, 509 at 595. Of course, "the types of factors that are appropriate to consider" in evaluating expert testimony "will 'depend[ ] upon the particular circumstances of the particular case at issue[.]'" *Showers*, 819 F.3d at 658 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). Nevertheless,

3

"[i]t is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions[.]" *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005).

"[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, [federal law] mandate[s] the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266. "An expert's opinions that are without factual basis and are based on speculation or conjecture are similarly inappropriate material for consideration on a motion for summary judgment." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008). The court is not required to admit conclusory opinions which are "connected to existing data only by the ipse dixit of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered" to admit the expert opinion. *Id.* Still, the court should keep in mind "the liberal admissibility standards of the federal rules" and acknowledge "that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Amorgianos*, 303 F.3d at 267.

## IV. DISCUSSION

### A. B.J. Radford

The Nation has identified B.J. Radford, its Chief Financial Officer, as a fact and expert witness on the issues of causation and damages and indicates that she will testify regarding the sovereignty of Indian nations, Indian nation economics, markets, and retail operations, and the Nation's lost profits. (Dkt. No. 164-8, at 3). The Parker Defendants register two objections to Radford's expected expert testimony: first, that Radford provided no "expert report," and second, that Radford provided no methodology, data, or calculations in support of her opinions. (Dkt. No. 164-11, at 28).

4

The Parker Defendants argue that the Nation's disclosure regarding Radford did not satisfy the Nation's Rule 26 obligations because it was not an "expert report." (Dkt. No. 164-11, at 28). However, Radford, who is also a fact witness and employed by the Nation, was not "retained or specially employed to provide expert testimony in the case" and is not an individual "whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B). Thus, the Nation was "not required to provide a written report," but could satisfy its Rule 26 obligations by providing a disclosure identifying "the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705," and "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C)(i)–(ii).

The Parker Defendants next argue that because Radford's proposed opinions require specialized economic analysis and because "Radford provides no methodology, no data, and no calculations," the Court should limit Radford's testimony to her personal knowledge of the "Nation's books and records" and preclude her from offering any expert opinion testimony. (Dkt. No. 164-11, at 28–29). The Nation responds that because Rule 26(a)(2)(C) "makes no reference to 'methodology,' 'data,' or 'calculations,'" the expert summary it provided was sufficient, and the Parker Defendants' argument is without merit. (Dkt. No. 192, at 25). As the parties' arguments are devoid of further analysis, the Court declines to further address the sufficiency of Radford's summary. However, the Court's gatekeeping obligations, *see Brenord v. Cath. Med. Ctr. of Brooklyn & Queens, Inc.*, 133 F. Supp. 2d 179, 188 n.4 (E.D.N.Y. 2001) (recognizing district court's ability "to evaluate expert testimony *sua sponte* and exclude such testimony where appropriate" (citing cases)), and the Parker Defendants' objection to the admissibility of the opinion of the Nation's damages expert, James Flynn, *see infra* Part IV.B., whose opinion

5

rests entirely on Radford's causation opinion, require the Court to address the admissibility of Radford's opinion.

In her declaration, Radford states that the Nation, as a "sovereign and federally-recognized Indian nation, . . . is afforded the unique and exclusive right to engage in certain tax-free retail operations," which it provides it with "single-retailer status with respect to . . . tax free retail sales" "on its own Reservation to the exclusion of all others." (Dkt. No. 192-1, ¶¶ 5–6)). Radford further states that given the Nation's "single-retailer status," every sale by Montezuma Pipekeepers caused one of the two Lakeside Trading stores to lose a sale. (Dkt. No. 192-1, ¶ 17 ("[A]ll sales made by the Pipekeepers store . . . constitute sales that would have otherwise been made by the Nation.")).[1] At the summary judgment stage, the Court declined to consider Radford's opinions regarding the Nation's "exclusive right" to sell tobacco and cannabis products tax-free and "single-retailer status" to the extent they constituted legal conclusions. (*See*, *e.g.*, Dkt. No. 226, at 8–9 (disregarding, as legal conclusions, Radford's opinions that "[a]s a sovereign and federally-recognized Indian nation, the Nation is afforded the unique and exclusive right to engage in certain tax-free retail operations on its sovereign Reservation, which effectively provides the Nation with single-retailer status with respect to such tax-free retail sales"; "only a sovereign enjoys the sovereign prerogative within its own territory," and, as such, the Nation "is the only entity that can operate tax-free retail stores on the Cayuga nation Reservation"; "the Nation lawfully engages in certain tax-free retail operations through multiple Nation-owned businesses" (quoting Dkt. No. 192-1, ¶¶ 5, 6, 9)). The Court also discussed its concerns regarding Radford's opinions during the November 7, 2025 telephone conference. The

---

[1] The Court notes that the Nation's claim of lost profits has not, to date, included any claim (or evidence) that Montezuma Pipekeepers caused a *decline* in either Lakeside Trading business; its claim, as the Court understands it, is that these businesses' profits would have been greater if the Montezuma Pipekeepers did not exist.

6

Court reminded the parties that the responsibility for advising the jury on the law falls solely to the Court, *see Rondout Valley Cent. Sch. Dist. v. Coneco Corp.*, 321 F. Supp. 2d 469, 480 (N.D.N.Y. 2004) ("[I]t is axiomatic that an expert is not permitted to provide legal opinions, legal conclusions, or interpret legal terms; those roles fall solely within the province of the court." (citing *Hygh v. Jacobs*, 961 F.2d 359, 363–64 (2d Cir. 1992)); *see also Hygh*, 961 F.2d at 363 (holding that courts are "require[ed]" to "exclu[de]" "expert testimony that expresses a legal conclusion"), and noted that neither Radford nor the Nation had identified the legal authority that purportedly "afford[s]" the Nation the exclusive right (to the exclusion of a Nation member) to engage in tax-free tobacco and cannabis sales on the Reservation or provided any analysis of New York Tax Law §§ 471, 471-e,[2] and directed further briefing prior to trial.

But even assuming the Nation can provide the legal authority for its assertion that it is entitled to "single retailer status" for tax-free sales on the Reservation, the Court questions the reliability of Radford's broad causation opinion: that every Montezuma Pipekeepers's sale caused one of the Lakeside Trading stores to lose a sale. Underlying Radford's opinion is the assumption that the existence of another tax-free smoke shop, i.e., Montezuma Pipekeepers, is the *only* factor that would cause a customer not to make a purchase from a Lakeside Trading store. Not only is this opinion unlikely to satisfy the Nation's burden of establishing proximate cause, *see First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 770 (2d Cir. 1994) (discussing proximate cause in RICO fraud case and explaining that "[a]lthough the likelihood that the injury would result from the wrongful conduct is a consideration," "[t]he key reasons for requiring direct causation include avoiding unworkable difficulties in ascertaining what amount

---

[2] The parties' briefing should also discuss licensing scheme established in New York's "Marihuana Regulation & Taxation Act," *see* N.Y. Canbs. § 1 *et seq*.

7

of the plaintiff's injury was caused by the defendant's wrongful action as opposed to other external factors, and in apportioning damages between causes"), but courts have repeatedly excluded expert testimony "where an expert assumed, without analysis, that plaintiff would have made every one of defendant's sales," *In re Elysium Health-ChromaDex Litig.*, No. 17-cv-7394, 2022 WL 421135, at *20, 2022 U.S. Dist. LEXIS 25063, at *72 (S.D.N.Y. Feb. 11, 2022); *see Dependable Sales & Serv., Inc. v. TrueCar, Inc.*, 311 F. Supp. 3d 653, 663 (S.D.N.Y. 2018) (finding expert's "causation analysis . . . flawed in part because it flows from the conclusion that each sale by a TrueCar-affiliated dealer was necessarily a sale lost by a plaintiff, as opposed to some other dealer"); *see also Am. Home Prod. Corp. v. Johnson & Johnson*, 682 F. Supp. 769, 771 (S.D.N.Y. 1988) (criticizing experts' "assumption that the entire difference between the number of anticipated physician recommendations and the number of actual physician recommendations is attributable to false or misleading advertising" by the defendant, explaining that this "highly questionable premis[e]" "ignores the multitude of other factors which might have influenced physicians to recommend" the medication at issue).

Here, Radford provides no facts or analysis regarding the economics of the tobacco, cigarette, or cannabis market on the 64,015-acre Cayuga Nation Reservation, which is "located within what today are Seneca and Cayuga Counties in upstate central New York." (Dkt. No. 1, ¶ 25). Nor does Radford address the assumptions underlying her assertion that the existence of Montezuma Pipekeepers (a tax-free retailer) is the only reason a customer did not purchase tobacco or cannabis products from a Lakeside Trading store (also tax-free retailers). Implicit in Radford's opinion, for instance, are the assumptions that a customer would never make a purchase from a store on the Reservation that sold *taxed* tobacco or cannabis products, that brand loyalty plays no part in any customer decisions, that the locations of the stores had no bearing on

a customer's decision and that no other unlicensed stores existed on the Reservation. Thus, because Radford fails to account for any factor that might inform a customer's decision to patronize Montezuma Pipekeepers or Lakeside Trading—other than the appeal of a tax-free purchase—the Court questions the reliability of her opinion that each Montezuma Pipekeepers' sale caused one of the Lakeside Trading stores to lose a sale. *See Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 319 (S.D.N.Y. 2009) (excluding expert testimony that "in a 'but for' world," plaintiff "would have made each and every one of [the] sales that were made by bottlers or distributors other than [plaintiff]"). The parties are therefore directed to brief the issue of the reliability of Radford's proposed expert testimony. Accordingly, the Court reserves decision on this issue.

    **B.**    **James S. Flynn**

The Parker Defendants seek to preclude or limit the testimony of accountant James S. Flynn, whom the Nation proffers to quantify Lakeside Trading's lost profits, as "fundamentally unsupported by sufficient facts or data." (Dkt. No. 164-11, at 29). The Nation opposes the Parker Defendants' motion. (Dkt. No. 192, at 26–30).

Flynn is "a certified public accountant, certified valuation analyst and a chartered global management accountant specializing in business valuation." (Dkt. No. 164-9, at 20). Flynn's opinions are "based on the operating assumption that because the tax-free selling of tobacco and cannabis within a tribal nation represents a market that is closed to all others, any and all sales of tobacco, tobacco-related products and cannabis products sold by [Pipekeepers] . . . represent a loss of sales and profit" from, and thus damages to, the Nation's Lakeside Trading businesses. (*Id.* at 2).

9

To determine the Nation's lost sales with respect to tobacco products,[3] Flynn multiplied the tobacco product[4] "quantities/units sold" by Montezuma Pipekeepers from February 2022 to December 2024 by the Nation's "average sales price of the [same] product."[5] Next, Flynn calculated the Nation's costs to sell such products by multiplying the Nation's average cost per product by the "quantities/units" sold by Montezuma Pipekeepers.[6] (*Id.* at 6). Finally, Flynn subtracted the amount it would have cost the Nation to sell the products Montezuma Pipekeepers sold during the relevant time-period from the dollar amount of lost sales. (*Id.*). Flynn's total calculations as to tobacco products are as follows:

| February 2022 to May 2025 - Tobacco Products | |
|---|---|
| Nation's Lost Sales *(quantity of tobacco products sold by Montezuma Pipekeepers x Nation's average sales price per product = $ Lost Sales)* | $8,511,887 |
| Nation's Cost to Sell *(quantity of tobacco products sold by Montezuma Pipekeepers x Nation's average cost per product = Cost to Sell)* | $5,361,080 |
| Nation's Gross Profit Loss/Damages | $3,150,807 |

---

[3] Flynn states that he relied on the tobacco sales data the Parker Defendants provided, which included "quantities sold, sales price, cost of sales and gross profit by product for the period of February 2022 through December 2024" as well as the "tobacco . . . pricing data" the Nation provided, including "the average sales price and average cost by product" for the period of 2022 through May 2025. (Dkt. No. 164-9, at 3).

[4] The parties sold some of the same brands, but "in situations where the Defendant sold . . . brand names" that the Nation did not sell, Flynn used "an average gross profit percentage for similar products sold by [the Nation]" and multiplied the Montezuma Pipekeepers' "net sales of that product by the [Nation's] average gross profit percentage for similar products," to determine the Nation's "lost gross profit and estimated damages." (Dkt. No. 164-9, at 6). And as the Nation received no Montezuma Pipekeepers tobacco-sales data for the time period of January 2025 to May 2025, Flynn used "Defendants' provided listings of product quantities/units sold" during the same time period for the previous year (January 2024 to May 2024), the Nation's "average 2025 sales price of the product: and the Nation's "2025 cost per product" in his lost profit calculation. (*Id.*).

[5] Flynn explained that he did not use the Montezuma Pipekeepers' "dollar values of their sales" for tobacco products because the Nation "would have set its own sales price for these same or similar products." (Dkt. No. 164-9, at 5).

[6] Flynn explained that the [Nation's] cost of products sold would have been their own negotiated cost of the products, not necessarily the same cost that Defendants purchase products for." (Dkt. No. 164-9, at 5–6).

To calculate the Nation's lost profits from the Montezuma Pipekeepers' in-store sale of cannabis products, Flynn used "the listings of in-store cash sales for the 4 days of May 29, 2025 through June 1, 2025," "calculated an average net sales per day and applied that average net sales per day to the period February 2022 through May 2025." (Dkt. No. 164-9, at 7). To calculate the Nation's lost profits for the Montezuma Pipekeepers' on-line sales from January 2024 to May 2025, Flynn used Defendants' "summaries of on-line sales" for that time-period. (*Id.*). "Using the net sales as calculated" in connection with tobacco products, Flynn "used the [Nation's] lost gross profit and estimated damages on those products for February 2022 through May 2025." (*Id.*).

| February 2022 to May 2025 - Cannabis Products | |
|---|---|
| Nation's Lost Sales *(quantity of cannabis products sold by Montezuma Pipekeepers x Nation's average sales price per product = $ Lost Sales)* | $10,383,115 |
| Nation's Cost to Sell *(quantity of cannabis products sold by Montezuma Pipekeepers x Nation's average cost per product = Cost to Sell)* | $5,191,557 |
| Nation's Gross Profit Loss/Damages | $5,191,558 |

Although the Parker Defendants advance a number of arguments in support of their motion to preclude or limit Flynn's damages opinion, (*see, e.g.*, Dkt. No. 164-11, at 29 (challenging Flynn's extrapolation of the amount of the Nation's alleged damages "solely from data produced by Pipekeeepers," failure to reconcile evidence that both Lakeside Trading stores "show[ed] stable or even increasing [cigarette] sales during the alleged 'loss' period," and failure to account for the presence of "competing sellers")), many of their arguments stem from their contention that Flynn's reliance on the "unsupported" assumption that all Montezuma Pipekeepers' sales (tobacco or cannabis) "would otherwise have been made by the Nation" in formulating his damages calculations calls into question the reliability of his opinion in its entirety, (*see id.* at 29–33). The Nation opposes preclusion and asserts that because Flynn is a

11

damages expert, he "does not need to perform h[is] own causation analysis to offer useful expert testimony" and was entitled to rely on Radford's opinion as to causation. (Dkt. No. 192, at 26 (quoting *Luitpold Pharms., Inc. v. ED. Geistlich Sohne A.G. Fur Chemische Industrie*, No. 11-cv-681, 2015 WL 5459662, 2015 U.S. Dist. LEXIS 123591, at *27 (S.D.N.Y. Sep. 16, 2015) (alteration in original)).

As the Nation correctly recognizes, expert witnesses are "permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592. However, "[w]here the record indicates that the expert failed to consider necessary factors or that his analysis rests on faulty assumptions, the trial court has discretion to exclude his proffered testimony for lack of probative value." *Lightfoot v. Union Carbide Corp.*, No. 98–7166, 175 F.3d 1008 (table), 1999 WL 110424 at *2, 1999 U.S. App. LEXIS 3329, at *7 (2d Cir. Mar. 1, 1999). In this case, Flynn bases his damages calculations on the assumption, i.e., Radford's causation opinion, that every time Montezuma Pipekeepers sold a tax-free cannabis or tobacco product, it caused one of the Nation's Lakeside Trading stores to lose a sale. As discussed, Radford's opinion appears to be unsupported—in large part because it does not account for *any* factor that might influence a customer's decision, other than tax-free availability. *See R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 273 (S.D.N.Y. 2010) (excluding expert opinion where experts "did not simply fail to consider every plausible alternative cause—rather, the record lacks any evidence that [either expert] actually investigated *any* other possible causes"). In some circumstances, a party may be able to address an expert's use of a faulty assumption through cross-examination, "calling into question the weight that the jury should accord the[] testimony," *R.F.M.A.S.*, 748 F. Supp. 2d at 269, but if Radford's opinion that each Montezuma Pipekeepers sale caused a loss to a Nation store is unreliable, it would call into question Flynn's

damages calculations, which assume that all Montezuma Pipekeepers sales caused a loss to the Nation. *See Luitpold Pharms.*, 2015 WL 5459662, at *11, 2015 U.S. Dist. LEXIS 123591, at *28–29 (explaining that if first expert's "opinions were admissible," the second expert's "reliance on them would not pose an issue" but because the first expert's "opinions [were] precluded, the fundamental assumption underlying [the second expert's] analysis disappear[ed]" and second expert's report could not "withstand even the initial scrutiny the Court must apply in its role as gatekeeper of expert evidence"). Accordingly, the Court reserves decision on the admissibility of Flynn's expert testimony pending further briefing on Radford's opinion.[7]

## V.   CONCLUSION

For these reasons, it is hereby

**ORDERED** that the Nation file further briefing by November 20, 2025, and that the Parker Defendants file a response by November 25, 2025.

**IT IS SO ORDERED.**

Dated: November 17, 2025
       Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge

---

[7] In the event the Nation surmounts the above-referenced hurdle, the Court will consider the Parker Defendants' remaining arguments, including their challenge to Flynn's methodology, reliance on Nation-provided profit-margins and cost, and computations.