UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

CAYUGA NATION, by and through its lawful governing body, the CAYUGA NATION COUNCIL,

                Plaintiffs,

v.

DUSTIN PARKER, NORA WEBER, PAUL MEYER, JUSTICE FOR NATIVE FIRST PEOPLE, LLC, and C.B. BROOKS LLC,

                Defendants.

5:22-cv-00128 (BKS/TWD)

---

**Appearances:**

*For Plaintiff:*
Michael E. Nicholson
David G. Burch, Jr.
Barclay Damon LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, New York 13202

*For Defendants Dustin Parker and Nora Weber:*
Daniel J. Hurteau
Kasey Kaspar Hildonen
Robert McManigal
Nixon Peabody LLP
677 Broadway, 10th Floor
Albany, New York 12207

*For Defendants Paul Meyer, Justice for Native First People, LLC, and C.B. Brooks, LLC:*
Joseph A. Camardo
Camardo Law Firm, PC
127 Genesee Street
Auburn, New York 13021

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

**I.      INTRODUCTION**

Plaintiff Cayuga Nation, by and through its governing body, the Cayuga Nation Council, claims that Defendants Dustin Parker and Nora Weber, Paul Meyer, Justice for Native First People, LLC, and C.B. Brooks, LLC, have used or invested racketeering income in an enterprise, in violation of the Racketeer Income and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a). (*See generally* Dkt. No. 1). Presently before the Court is a motion by Defendants Parker and Weber to exclude or limit the Nation's proposed expert witnesses. (Dkt. No. 164). The Nation filed a response in opposition and Defendants filed a reply. (Dkt. Nos. 192, 204). After reviewing these submissions, the Court directed further briefing, (Dkt. No. 233), which the parties have filed, (Dkt. Nos. 264, 280). The Court also heard oral argument from the parties at the December 1, 2025 final pretrial conference. For the reasons that follow, Defendants' motion to preclude is granted in part and denied in part.

**II.     BACKGROUND**

The facts and history of this case are set forth at length in this Court's November 3, 2025 Order denying Defendants' motions for summary judgment and judgment on the pleadings. (Dkt. No. 226). The Court assumes familiarity with these facts and does not summarize them here. Any additional facts relevant to the pending motion are set forth as necessary in the discussion below.

**III.    EXPERT TESTIMONY**

    **A.      Legal Standard**

The Court incorporates, and does not restate here, its prior recitation of the legal standard governing admissibility of expert testimony. (Dkt. No. 233, at 2–4).

B.   Analysis

1.   BJ Radford

In its prior decision, the Court addressed Defendants' argument that the Nation's expert disclosure did not satisfy Rule 26 because it was not an expert "written report" within the meaning of Rule 26(a)(2)(B). (Dkt. No. 233, at 5). Observing that Radford was a fact witness and employed by the Nation, the Court found that under Rule 26(a)(2)(C), the Nation could file a disclosure summarizing the "facts and opinions" to which Radford was expected to testify, instead of an expert report. (*Id.*). But as "the parties' arguments [were] devoid of further analysis," the Court refrained from further "address[ing] the sufficiency" of the Nation's disclosure. (*Id.*). The Court did, however, (1) alert the parties to its concern that the opinions Radford offered in her first declaration regarding the Nation's "exclusive right," as a sovereign, to engage in tax-free sales of tobacco products, were legal conclusions and thus likely subject to preclusion, (*id.* at 6–7 (citing Dkt. No. 192-1)), and (2) questioned the reliability and support for Radford's opinion that every Pipekeepers' sale caused one of the Nation's tobacco businesses to lose a sale, (*id.* at 7).

Along with its supplemental briefing, the Nation seeks leave to file a second Radford declaration, which contains "a further explanation of" the opinions in Radford's first declaration and addresses "the Court's inquiry regarding the support and methodology underlying" her opinions. (Dkt. No. 264-1, ¶ 1). The Parker Defendants respond that Radford's second declaration is "a transparent attempt to circumvent the expert disclosure deadlines and to introduce new opinions after the close of discovery" and should be precluded under Rule 37, and that, in any event, Radford's opinions should be precluded because she "furnishes no empirical study, no consumer-survey evidence, no econometric analysis, and no third-party

3

documentation—or documentation of any kind—supporting her assumptions" and thus has not cured her original opinion's "foundational defects." (Dkt. No. 280, at 5–7, 10).

As an initial matter, the Court finds, for the reasons discussed at the summary judgment stage, in its prior decision regarding the Nation's experts, and in its pretrial conferences with the parties, (Dkt. No. 226, at 8–9; Dkt. No. 233, at 6–7), that Radford's opinions regarding the Nation's exclusive right to sell tobacco products tax-free as a sovereign Nation are legal conclusions. However, the duty to determine, and advise the jury on, the law falls solely to the Court. S*ee Rondout Valley Cent. Sch. Dist. v. Coneco Corp.*, 321 F. Supp. 2d 469, 480 (N.D.N.Y. 2004) ("[I]t is axiomatic that an expert is not permitted to provide legal opinions, legal conclusions, or interpret legal terms; those roles fall solely within the province of the court." (citing *Hygh v. Jacobs*, 961 F.2d 359, 363–64 (2d Cir. 1992)); *see also Hygh*, 961 F.2d at 363 (holding that courts are "require[ed]" to "exclu[de]" "expert testimony that expresses a legal conclusion"). As the Nation has identified no legal authority that would allow such testimony, and as the Court is not aware of any, Radford will be precluded at trial from offering testimony that expresses a legal conclusion. Accordingly, the Court turns to the parties' arguments regarding the sufficiency of the Nation's expert disclosure and the reliability of Radford's opinion as to causation and damages.

Under Rule 26(a)(2), which governs disclosure of expert testimony, if, as here, "the witness is not required to provide a written report," a party's disclosure must still provide "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C)(i)–(ii); *see also King v. Wang*, No. 14-cv-7694, 2021 WL 5232454, at *17–18, 2021 U.S. Dist. LEXIS 218243, at *51–52 (S.D.N.Y. Nov. 9,

4

2021) (discussing the distinction between expert witnesses who are "retained or specially employed to provide expert testimony in the case or . . . whose duties as the party's employee regularly involve giving expert testimony" and those who are not); *see also Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 182 n.13 (2d Cir. 2004) ("Because Huang was not specially retained to provide expert testimony, and his duties as an employee of Bank of China do not regularly include giving expert testimony, Rule 26(a)(2)(B) does not apply."). A party's initial disclosure must be supplemented "in a timely manner if the party learns that in some material respect the disclosure . . . is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A).[1]

A party's failure "to provide information . . . as required by Rule 26(a) or (e)" may preclude the party from using "that information or witness . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The purpose of the rule is "to prevent the practice of 'sandbagging' an adversary with new evidence," *Johnson Elec. N. Am. v. Mabuchi Motor Am. Corp.*, 77 F. Supp. 2d 446, 458 (S.D.N.Y. 1999), and "to alert an opposing party of the need to take discovery of the named witness," *Pal v. N.Y. Univ.*, No. 06-cv-5892, 2008 U.S. Dist. LEXIS 50902 at *10, 2008 WL 2627614, at *4 (S.D.N.Y. June 30, 2008). But witness preclusion is a "harsh remedy." *Engler v. MTD Prods., Inc.*, 304 F.R.D. 349, 355 (N.D.N.Y. 2015) (quoting *Ritchie Risk-Linked Strategies Trading (Ir.), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 156 (S.D.N.Y. 2012)).

The Nation's expert disclosure, as relevant here, states:

---

[1] The Court assumes this issue is not subject to analysis under Rule 26(e)(2) as there was no expert report in the first instance.

> Ms. Radford has been employed by the Nation since 2003. She has served as the Nation's Chief Financial Officer (CFO) for the past 12 years, and prior to that served for 5 years as the Nation's Chief Operating Officer (COO). Before joining the Nation, Ms. Radford worked for the Oneida Indian Nation. Through her experience she has gained a deep working knowledge and understanding of Indian nation economics, markets, and retail operations. Based upon this experience Ms. Radford will testify as to the geographic region and market in which the Cayuga Nation's retail businesses operate and the unique customer base that patrons Indian nation operated retail stores located on sovereign Indian reservations.
>
> . . .
>
> Ms. Radford is further expected to testify that the Nation is afforded the unique and exclusive right as a sovereign to engage in certain tax-free retail operations on its sovereign Reservation, which effectively provides the Nation with single-retailer status with respect to such tax-free retail sales . . . and creates a unique and nearly exclusive geographic market for the Cayuga Nation. And she will testify that the result is a unique geographic customer base that patrons the Nation's retail stores to make certain tax-free purchases.
>
> . . .
>
> Ms. Radford is expected to testify to the opinion that all of the customers who have purchased goods or items from the Pipekeepers store from its first day of operation through today come from the same unique geographic market that patrons Nation-owned stores. She is further expected to testify to the opinion that Pipekeepers is the only meaningful competitor to the Nation's retail operations within that same geographic market. Ms. Radford is expected to testify that all sales made by the Pipekeepers store on the Cayuga Nation's Reservation constitute sales that would have otherwise been made by the Nation were Pipekeepers not to exist. She is therefore expected to testify that all sales Pipekeepers has made since its first day of operation are sales that would otherwise have been made by the Nation causing the loss to the Nation of all the attendant profits.

(Dkt. No. 164-8, at 3). In her first declaration, Radford repeats, often word-for-word, much of the above summary, and offers few, if any, additional facts. (*See* Dkt. No. 192-1 (Radford stating that she gained a "deep working knowledge" from her professional experience working for

6

multiple Indian nations; that the Nation has a "unique geographic region and market"; that the Nation's "lawfully operates as a single-retailer" with the "exclusive right," as a sovereign, to sell tobacco products tax-free; and opining that all of Pipekeepers' customers "come from the same unique geographic market that patrons Nation-owned sales," and "all sales made by the Pipekeepers store . . . constitute sales that would have otherwise been made by the Nation")).

By contrast, Radford's second declaration, expands on the basis for her opinions and the methodology she utilized in forming them. Radford states that prior to her employment with the Nation, Radford was the Oneida Nation's Managing Director of Retail, Manufacturing, and Agriculture. (Dkt. No. 264-1, ¶ 4). Radford has spent more than thirty years engaged in "the financial management and strategic operations of Native American gaming and retail enterprises," with a significant focus on "cigarette and cannabis sales." (*Id.*). Radford states that her opinion is "based on decades of analyzing daily sales data, inventory turnover rates, competitor pricing impacts, and customer origin data." (*Id.* ¶ 5). Radford explains that she "routinely make[s] capital allocation and pricing decisions based on [her] assessment of the geographic area from which [the Nation] draw[s] customers and the price elasticity of [its] products." (*Id.*). As to methodology, Radford states that she formulated her conclusions regarding the impacts of the Pipekeepers store by applying "the same analytical framework [she] use[s] for the Nation's business operations:

> (a) I defined the relevant market product (Native-manufactured cigarette cartons); (b) I analyzed the price differential between that product and its substitutes (premium taxable cigarettes); (c) I assessed the geographic reach of the customer base; and (d) I evaluated the economic feasibility of alternative sources of sales volume (i.e., new market creation vs. market diversion).

(*Id.* ¶ 6).

Radford next contrasts the "Convenience Shopper," the "average customer at a non-Native convenience store" who buys "a single pack" of cigarettes because he or she is already there for gas or coffee and pays "a premium for convenience" with the "Destination Shopper," a "consumer of Native-manufactured cigarettes" who "plans a specific trip to the Reservation for the sole purpose of purchasing cigarettes in bulk." (*Id.* ¶¶ 8–9). Radford states that in her experience "tracking customer origins, the Nation's customer base resides within an area up to 60 miles in circumference," and that "a significant majority of our customers driv[e] 30 to 60 miles to access tax-free pricing," but she acknowledges that some of the Nation's "[c]ustomers routinely drive from Syracuse, Rochester, and Binghamton to the Nation's stores." (*Id.* ¶ 10). Radford opines that because "Pipekeepers is located approximately six to eight miles from the Nation's established stores," for a customer "who has already committed to driving 30 to 60 miles to save money, an additional deviation of six miles is statistically insignificant." (*Id.* ¶ 11). Radford further opines, based on the above, that the Nation's locations and Pipekeepers "share a customer base from an identical geographic area." (*Id.* ¶ 12).

In support of her opinion that "the driving force of the" Native-brand cigarette market "is not brand loyalty, but price sensitivity," Radford cites the difference in cost per carton between premium brands ($170 per carton) or even "lower-tier brands" ($125 per carton) and Native brands ($30 per carton). (*Id.* ¶ 13). Radford further opines that "Pipekeepers was competing exclusively for this specific pool of price-driven customers—the exact same pool the Nation serves." (*Id.* ¶ 15).

Radford states that "the Native cigarette market is highly commoditized" and that customers view the Native brands, such as "Seneca," "Cayuga," "Signal," or "Niagara," "as functionally interchangeable (fungible) low-cost nicotine delivery systems." (*Id.* ¶ 16). Radford

8

therefore opines that it is irrelevant that Pipekeepers may have carried different Native brands because "[t]he customer is buying" the $30 per-carton price point, not the "brand name on the box." (*Id.* ¶ 17).

In support of her opinion that Pipekeepers derived all its customers from the Nation's customer base, Radford states that Pipekeepers could not have gained customers as a result of "New Market Entrants" (new smokers) or "External Diversion" (diversion of customers from premium-brand sellers). (*Id.* ¶¶ 18–20). Radford opines that it "is economically impossible that Pipekeepers created new smokers" because (a) "[s]moking rates have declined ~13% over the last twenty-five years due to health education"; and (b) a "smoking habit" is expensive and "[n]on-smokers do not wake up, drive 40 miles to a reservation, and decide to start smoking cartons of generic cigarettes because a new store opened." (*Id.* ¶ 19).

As to "External Diversion"—the diversion of customers from non-Native convenience stores—Radford opines that it is "impossible that Pipekeepers stole customers from local gas stations," because the gas-station "customer typically buys a single pack ~$14.00 for immediate gratification," whereas the Pipekeepers' "customers buy one or more cartons (10 packs) for ~$30.00 for long-term supply." (*Id.* ¶ 20). Radford explains "[t]hese are two distinct economic behaviors": "[a] casual smoker does not suddenly switch to buying bulk cartons simply because Pipekeepers opened" and "[t]he only person buying bulk cartons at Pipekeepers is someone who was already buying bulk cartons at the Nation." (*Id.*).

Thus, Radford opines that since "Pipekeepers offered the same unique product (tax-free cigarettes), at the same price ($30/carton), in the same geographic area (Seneca/Cayuga Counties and the greater Finger Lakes region), to the same demographic (regular, bulk-buying smokers)":

> There is no variable in the economic equation that allows for Pipekeepers to have generated meaningful independent sales. Every

> carton sold by Pipekeepers represents a customer who: (a) was already in the trade area; (b) was already a smoker; and (c) was seeking tax-free pricing. By definition, that customer would have purchased from the Nation but for the presence of Pipekeepers.

(*Id.* ¶¶ 22–23).

As it appears that Radford's assertions and opinions concerning "customer origins" and the "geographic reach of [the Nation's] customer base," the statistical insignificance of Pipekeeper's location relative to Nation stores, the "Convenience Shopper" versus the "Destination Shopper," the "impossibility" that "new market creation" or "market diversion" could account for any Pipekeepers' sales, and "price sensitivity" versus "brand loyalty" as the driving force behind a customer's decision to purchase Native-brand cigarettes, were not contained in the Nation's expert disclosure concerning Radford (or elsewhere in the record), the Court must consider whether preclusion is warranted. *See Samuels v. City of N.Y.*, No. 22-cv-01904, 2025 WL 3206488, at *6, 2025 U.S. Dist. LEXIS 225021, at *17 (S.D.N.Y. Nov. 14, 2025) (explaining that under Rule 26(a)(2)(C), "[t]reating physicians are properly precluded from providing expert testimony where the disclosure does not include '*specific facts* and more than bare minimum details of opinions formed therefrom.'" (quoting *Austin v. Commuter R.R.*, No. 22-cv-1645, 2023 WL 3317906, at *1, 2023 U.S. Dist. LEXIS 83944, at *3)); *see also Kaganovich v. McDonough*, 547 F. Supp. 3d 248, 274–75 (E.D.N.Y. 2021) (to satisfy Rule 26(a)(2)(C), the expert must proffer more than "mere generalities" and "bare-minimum details").

In considering a request for Rule 37(c)(1) sanctions, the Court must determine if the failure to provide information was substantially justified or harmlessness. *See* Fed. R. Civ. P. 37(c)(1). "Substantial justification means 'justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request.'" *Kunstler v. City of New York*, 242 F.R.D. 261, 264–65 (S.D.N.Y. 2007)

10

(quoting *Am. Stock Exch., LLC v. Mopex, Inc.*, 215 F.R.D. 87, 93 (S.D.N.Y. 2002)). Harmlessness means "there is no prejudice to the party entitled to the disclosure." *Gary Price Studios, Inc. v. Randolph Rose Collection, Inc.*, No. 03-cv-969, 2006 U.S. Dist. LEXIS 2381817, at *2, 2006 WL 2381817, at *2 (S.D.N.Y. Aug. 16, 2006).

When analyzing a motion to preclude under Rule 37(c)(1), courts within the Second Circuit consider:

> (1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witness[ ]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.

*Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (quoting *Softel, Inc. v. Dragon Med. & Sci. Commcn's, Inc.*, 118 F.3d 955, 961–63 (2d Cir. 1997)). "None of these factors are dispositive and each factor is to be balanced against the others in making the determination." *Lab Crafters, Inc. v. Flow Safe, Inc.*, No. 03-cv-4025, 2007 WL 7034303, at *6, 2007 U.S. Dist. LEXIS 99079, at *18 (E.D.N.Y. Oct. 26, 2007).

The Nation asserts the second declaration is not a "late" disclosure as their initial Rule 26 disclosure was sufficient, but that even it if was late, the Nation was substantially justified in not disclosing the information earlier because Defendants had the right to depose Radford following the June 20, 2025, expert disclosure, but did not. (Dkt. No. 264, at 7). Defendants respond that they cannot be faulted for failing to probe facts that were not disclosed (Dkt. No. 280, at 12). The Court finds that the general and conclusory nature of the Nation's initial expert disclosure, when contrasted with the specificity of Radford's second declaration, eradicates any argument that the initial disclosure could encompass the facts and opinions in Radford's second declaration. *See Point Prods. A.G. v. Sony Music Ent., Inc.*, No. 93-cv-4001, 2004 WL 345551, *9, 2004 U.S.

11

Dist. LEXIS 2676, at *32 (S.D.N.Y. Feb. 23, 2004) ("To accept the contention that the new affidavits merely support an initial position when they in fact expound a wholly new and complex approach designed to fill a significant and logical gap in the first report would eviscerate the purpose of the expert disclosure rules."). The Court therefore concludes there is no basis on which to find that initial expert disclosure encompassed the now-expanded grounds for Radford's opinions or that Defendants' failure to discovery these facts via deposition substantially justified the Nation's failure to disclose the information in Radford's second declaration. Thus, this factor weighs in Defendants' favor.

The information in Radford's second declaration is essential to support her proffered opinion (that every Pipekeepers' sale was a lost sale to the Nation) and without it, the Nation may have difficulty establishing causation in this case, where there is no claim that the Nation's sales declined. Thus, this factor weighs in the Nation's favor.

The prejudice to Defendants in having to prepare to meet Radford's new information is great. Defendants have no opportunity to secure an expert rebuttal on the eve of trial and appear to have had little or no access to the Nation's evidence regarding its customer base. On May 13, 2024, Defendants filed a discovery status report requesting a conference and advising United States Magistrate Judge Andrew T. Baxter that they had requested "[a]ll documents and communications related to customer information, including data related to personal behavior, and transactional information such as name, address, phone numbers, email order history, preferences, and customer feedback, maintained by the Cayuga Nation from January 2021 to present," (Dkt. Nos. 118, 118-1, at 6), but that the Nation objected and declined to produce documents on the grounds that, among other things, "no expert maintained such materials were necessary or relevant to the claims or defenses in these proceedings." (*Id.* at 6–7). During a May

12

22, 2024, discovery conference, Magistrate Judge Baxter "advised plaintiffs' counsel that a more fulsome supplementation of plaintiffs' mandatory disclosures regarding damage theories and calculations should be provided soon." (Text Minute Entry May 22, 2024). Moreover, it does not appear that the Nation has provided any Defendant with the data or evidence supporting Radford's belated factual assertions and opinions. Thus, this factor weighs in Defendants' favor.

Finally, a continuance is not feasible in this instance. The trial begins in less than a week, witnesses have been subpoenaed, and this case has been pending for nearly four years. *Olutosin v. Gunsett*, No. 14-cv-00685, 2019 WL 5616889, at *5, 2019 U.S. Dist. LEXIS 189289, at *13 (S.D.N.Y. Oct. 31, 2019) ("This proposed testimony seemingly goes beyond the four corners of the UOF Policy and would understandably require additional preparation by Plaintiff. Finally, continuance would not be possible with a trial scheduled to commence in just under two weeks.").

Having balanced the relevant factors, the Court finds preclusion warranted as to Radford's opinions regarding "Destination" and "Convenience Shoppers," and her opinions that the distance between Pipekeepers and the Nation's stores are "statistically insignificant," that the "driving force of th[e] [cigarette] market is not brand loyalty, but price sensitivity," that it "is economically impossible that" Pipekeepers' sales are attributable to "New Market Entrants" or "External Diversion," and that Pipekeepers and the Nation share "a customer base from an identical geographic area." Radford may however testify to facts based on her personal knowledge in her capacity as the Nation's CFO, which would appear to include her knowledge

13

regarding the Nation's geographic region and market, the composition of Native-brand cigarettes, and cigarette pricing.[2]

The Court next considers the Parker Defendants' request to preclude Radford's causation opinion—that "100% of the cigarette sales generated by the Pipekeepers store constitute sales diverted from the Cayuga Nation." (Dkt. No. 264-1, ¶ 7). Given Radford's position as CFO, extensive experience serving Indian Nations in an executive capacity and overseeing their retail businesses as well as her personal knowledge of the Nation's retail operations, all of which Defendants were aware of and able to address during her deposition, the Court will evaluate her testimony at trial before determining whether to allow her opinion that every sale by Pipekeepers caused a lost sale to the Nation. *See Campbell v. Metropolitan Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001) (explaining that "the court must determine "whether the proffered testimony has a sufficiently 'reliable foundation' to permit it to be considered." (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. at 579, 597 (1993)).

### C.     James S. Flynn

The Parker Defendants seek to preclude or limit the testimony of accountant James S. Flynn, whom the Nation proffers to quantify Lakeside Trading's lost profits, as "fundamentally unsupported by sufficient facts or data." (Dkt. No. 164-11, at 29). The Nation opposes the Parker Defendants' motion. (Dkt. No. 192, at 26–30).

Flynn is "a certified public accountant, certified valuation analyst and a chartered global management accountant specializing in business valuation." (Dkt. No. 164-9, at 20). Flynn's opinions are "based on the operating assumption," i.e., Radford's causation opinion, that because

---

[2] Radford could also testify to "the revenues, expenses and profits of the Nation's retail stores." (Dkt. No. 164-8, at 4).

the tax-free selling of tobacco and cannabis within a tribal nation represents a market that is closed to all others, any and all sales of tobacco, tobacco-related products and cannabis products sold by [Pipekeepers] . . . represent a loss of sales and profit" from, and thus damages to, the Nation's Lakeside Trading businesses. (*Id.* at 2).

As the Nation correctly recognizes, expert witnesses are "permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592. However, "[w]here the record indicates that the expert failed to consider necessary factors or that his analysis rests on faulty assumptions, the trial court has discretion to exclude his proffered testimony for lack of probative value." *Lightfoot v. Union Carbide Corp.*, No. 98–7166, 175 F.3d 1008 (table), 1999 WL 110424 at *2, 1999 U.S. App. LEXIS 3329, at *7 (2d Cir. Mar. 1, 1999). In this case, Flynn bases his damages calculations on the assumption, i.e., Radford's causation opinion, that every time Montezuma Pipekeepers sold a tax-free cannabis or tobacco product, it caused one of the Nation's Lakeside Trading stores to lose a sale. As discussed, Radford's opinion appears to be unsupported—in large part because it does not account for *any* factor that might influence a customer's decision, other than tax-free availability. However, having considered the parties' arguments and given the simplicity of Flynn's operating assumption,[3] which Defendants are well-equipped to challenge through cross-examination and the rebuttal of their own expert and which jurors will be able to evaluate and choose to accept or reject in favor of their own reason, judgment, and common sense, the Court does not find wholesale preclusion warranted. Indeed, even if jurors reject Flynn's operating assumption in

---

[3] In the event the Court precludes Radford from offering her opinion that all Pipekeepers sales constituted a lost profit to the Nation, the Court will instruct the jury that Flynn's operating assumption was exclusively to provide a structure for his damages calculation, and to disregard it in evaluating causation.

favor of their own determination of causation, they may still find his calculations useful in the event they reach the question of damages.

Defendants further argue that Flynn's use of an "undisclosed averaging technique that groups dissimilar products," and that Flynn's attempt to compute damages for tobacco brands the Nation "never sold," render his testimony speculative and unreliable. (Dkt. No. 164-11, at 30). But these are matters Defendants may challenge through vigorous cross-examination and introduction of testimony from their own expert. Accordingly, Defendants' motion to preclude Flynn is denied.

## IV. CONCLUSION

For these reasons, it is hereby

**ORDERED** Defendants' motion to preclude the Nation's expert witnesses (Dkt. No. 164) is **GRANTED in part and DENIED in part**.

**IT IS SO ORDERED.**

Dated: December 5, 2025
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge